# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.:

In re Application of

    NOVOSHIP (UK) LIMITED,

    Applicant,

Pursuant to 28 U.S.C. § 1782 for Judicial
Assistance in Obtaining Evidence for Use in
Foreign and International Proceedings.
_____/

**DECLARATION OF STEPHEN KIRKPATRICK IN SUPPORT OF *EX PARTE*
PETITION OF NOVOSHIP (UK) LIMITED FOR JUDICIAL ASSISTANCE
IN AID OF A FOREIGN PROCEEDING PURSUANT TO 28 U.S.C. § 1782**

I, Stephen Kirkpatrick, under penalty of perjury and pursuant to 28 U.S.C. § 1746 and the laws of the United States of America, declare the following:

1. I am over the age of 18 and, except as otherwise noted, provide this Declaration based on my own personal knowledge.

2. I am a partner of the law firm of Reed Smith LLP, based in its London office located at Broadgate Tower, 20 Primrose Street, London, England EC2A 2RS.

3. I currently represent Novoship (UK) Limited ("Novoship") in its defense of a legal action taking place before the English High Court (*Maroil Trading Inc & Others v. Cally Shipholdings Inc & Others*, Claim No. CL-2018-000824) (the "Foreign Proceeding").

4. The Foreign Proceeding involves two sets of claims. The first set of claims are those brought by Maroil Trading, Inc. ("Maroil") and Sea Pioneer Shipping Corporation ("Sea Pioneer") (collectively, the "Foreign Claimants")—entities beneficially owned and controlled by Venezuelan businessman Wilmer Ruperti ("Mr. Ruperti")—against Novoship and five other defendants for breach of a settlement agreement due to the disclosure of allegedly confidential documents to third parties. The five other defendants in the Foreign Proceeding are Cally

Shipholdings Inc., Vital Shipping Corporation, Dainford Navigation Inc., Tamara Shipholdings S.A., and Tuscany Maritime S.A. (together with Novoship, the "Foreign Defendants"). In addition to Novoship, Reed Smith represents all of the Foreign Defendants in the Foreign Proceeding.

5. The second set of claims in the Foreign Proceeding are those brought by the Foreign Defendants against two of their former agents who actually caused the disclosure of the allegedly confidential documents at issue: Burford Capital (UK) Limited ("Burford") and Daniel James Hall ("Mr. Hall") (collectively, the "Foreign Third-Party Defendants").

6. One of the Foreign Defendants' defenses in the Foreign Proceeding is that the disclosure of the allegedly confidential documents was made in the public interest because it helped uncover fraudulent and unlawful activity perpetuated by Mr. Ruperti, and it thus was justified under the circumstances. If the English Court finds the Foreign Defendants liable to the Foreign Claimants for breach of the settlement agreement, then the Foreign Defendants will contend that the disclosure was caused by the Foreign Third-Party Defendants acting in breach of confidence and for their sole interest, for which the Foreign Defendants should not be held liable.

7. To prevail on the public policy defense, it will need to be proven that the disclosure of the allegedly confidential documents was justified in the public interest and that there was an actual fraud or other serious unlawful conduct which the disclosure revealed. Although the victims of Mr. Ruperti's misconduct (including the Sargeant family via one of their investment entities) actually sued the Foreign Claimants in the English High Court (*Latin American Investments Limited & Others v. Maroil Trading & Others*, Claim No. CL-2017-000130), they eventually settled and no judicial determination of fraud or other unlawful misconduct was reached. Therefore, Novoship seeks third-party discovery from the Sargeants—who are not parties to the Foreign Proceedings—to gather evidence on the

2

justifiability of the disclosure of the allegedly confidential documents and the merits of the allegations that the Sargeants made against Mr. Ruperti.

8.  To that end, I submit this Declaration in support of Novoship's petition for the granting of an order by this Court pursuant to 28 U.S.C. § 1782 for leave to serve discovery subpoenas on seven discovery targets residing in this District that are believed to have information relating to the fraudulent scheme by Mr. Ruperti against the Sargeants:

   a)   Harry Sargeant Jr., an individual residing in this District;

   b)   Harry Sargeant III, an individual residing in this District;

   c)   Daniel Sargeant, an individual residing in this District;

   d)   James Sargeant, an individual residing in this District;

   e)   Sargeant Marine Inc., a Florida corporation;

   f)   International Oil Trading Company LLC, a Florida limited liability company; and

   g)   Berger Singerman LLP, a Florida law firm based in this District, to the extent it has non-privileged documents relating to Latin American Investments Limited ("LAIL"), which is the foreign investment entity owned by the Sargeants that the Sargeants claimed was the victim of Mr. Ruperti's wrongdoing.

(Collectively, the "Discovery Targets").

9.  A detailed description of the long and complicated history of facts and circumstances that tie the Foreign Claimants, the Foreign Defendants, the Foreign Third-Party Defendants, and the Discovery Targets together, resulting in the claims and defenses raised in the Foreign Proceedings, is provided below.

**Factual Background Underlying the Foreign Proceeding**

**The Novoship Proceedings Against Mr. Ruperti**

10.  The saga culminating in the Foreign Proceeding began in 2012, when Novoship

3

obtained a judgment against Mr. Ruperti and some of his business entities (including the Foreign Claimants) in the English High Court for fraud (*Novoship & Ors v. Mikhaylyuk & Ors*, [2012] EWHC 3586 (Comm)) (the "Novoship Proceedings"). The judgment entered in Novoship's favor and against the Ruperti parties was for approximately USD $78 million.

11. In 2013, Novoship and the Ruperti parties entered into a Settlement Agreement pursuant to which the Ruperti parties agreed to pay Novoship USD $40 million in an instalment payment plan.

12. The Ruperti parties defaulted on the settlement payments, causing Novoship to seek enforcement of the judgment around the world.

13. In 2014, Novoship hired Mr. Hall and his then-company, Focus Intelligence Limited, which was subsequently acquired by Burford, to assist in the identification and location of Mr. Ruperti's worldwide assets to collect on the judgment obtained in the Novoship Proceedings. As part of said global enforcement efforts, Novoship commenced ancillary judgment enforcement proceedings in Florida seeking attachment and collection of Mr. Ruperti's assets. At the same time, Novoship filed a criminal complaint in Switzerland, requesting that Mr Ruperti be prosecuted by the Republic and Canton of Geneva given that his actions toward Novoship amounted to crimes in that jurisdiction. The Attorney General's Office of Geneva duly commenced the requested criminal proceedings and allowed Novoship to have access to information and documents obtained by the prosecutor. Such information and documents were made available to Mr. Hall and Burford for the purpose of assisting with Novoship's global enforcement actions.

14. In the course of the Swiss proceedings, Novoship acquired various documents reflecting Mr. Ruperti's and his companies' finances (the "Confidential Documents"), including bank statements and other documents reflecting the receipt of a multi-million dollar settlement of various claims he had against PDVSA Petroleo S.A. ("PDVSA"), the Venezuelan

national oil company with whom Mr. Ruperti had close ties.

### The 2016 Settlement Agreement

15. In 2016, Novoship entered into another settlement with Mr. Ruperti, this time approved by the Swiss prosecutor, to resolve the judgment debt and global enforcement proceedings (the "2016 Settlement Agreement"). The 2016 Settlement Agreement was signed by Mr. Ruperti and the Foreign Claimants, on the one hand, and the Foreign Defendants as judgment creditors, on the other hand.

16. The 2016 Settlement Agreement required that the Foreign Defendants, and their respective investigative agents, keep confidential certain information obtained during the course of the judgment enforcement proceedings. The Foreign Claimants argue that this confidentiality provision covered the Confidential Documents and that the Foreign Defendants had an obligation to ensure that Burford and Mr. Hall, as Novoship's agents, maintained the confidentiality of the Confidential Documents.

### The Disclosure of the Confidential Documents by Burford and Mr. Hall

17. Unbeknownst to the Foreign Defendants, Burford and Mr. Hall disclosed the Confidential Documents to a third party in exchange for information that would benefit Burford in a matter entirely unrelated to Novoship or the Foreign Defendants, thereby potentially (as alleged by the Foreign Claimants) breaching the confidentiality provision of the 2016 Settlement Agreement. In doing so, neither Burford nor Mr. Hall were acting as agents for Novoship or for its benefit.

18. Specifically, in or around October 2016, Burford and Mr. Hall provided the Confidential Documents to LAIL (through Daniel Sargeant) in exchange for documents that revealed personally sensitive information pertaining to Harry Sargeant III.

19. LAIL, an entity incorporated in the Isle of Man, was established as the Sargeant family's investment vehicle for its joint business ventures with Mr. Ruperti in the shipping

industry. At the time LAIL and Mr. Ruperti operated their joint ventures, LAIL was owned equally by Harry Sargeant Jr. and his three sons, Daniel Sargeant, James Sargeant, and Harry Sargeant III. Due to a family rift between Daniel Sargeant and Harry Sargeant III, in or around April 2015, Harry Sargeant III relinquished his ownership interest in LAIL.

20. The Confidential Documents were of interest to LAIL because they revealed, in essence, that Mr. Ruperti had diverted monies away from LAIL by failing to inform them that he had settled claims with PDVSA that belonged to their joint ventures and, therefore, in part, to LAIL, and that Mr. Ruperti had pocketed the settlement sums for himself. This was entirely contrary to the dishonest representations Mr. Ruperti made to LAIL on several previous occasions, to the effect that no settlement with PDVSA had been reached. To understand this, it is necessary to understand the scope of the Ruperti-Sargeant business relationship.

### The Ruperti-Sargeant Business Relationship

21. The Sargeants' business relationship with Mr. Ruperti began in or around 2001. Between 2001 and 2006, the Sargeants, using LAIL, and Mr. Ruperti, using Maroil (one of the Foreign Claimants), entered into various joint ventures, along with a Saudi Arabian company named Oceanic Transport Shipping EST ("OTS"). Some of the joint ventures they formed include Oceanic Oil Venture Inc., Hero Maritime Corp, Bolivarian Petroleum Transport Ltd, Herculito Maritime Ltd, Oil Carriers Ltd, and Suramericana de Transporte Petrolero C.A. (collectively, the "JV Companies").

22. The JV Companies, in turn, owned various vessels that were chartered out to third parties (the "JV Vessels"), principally to PDVSA. For example, on or about May 11, 2004, one of the JV Vessels (the *Alloro*, owned by the JV Company Oil Carriers Ltd) was chartered on a long-term charter contract to PDVSA. On or about June 2, 2005, another JV Vessel (the *Polar*, owned by the JV Company Herculito Maritime Ltd) was chartered to PDVSA for a period of five years. And, on or about March 22, 2006, Sea Pioneer concluded

a five-year contract of affreightment with PDVSA, which was performed by two more JV Vessels (the *Leander* and the *Hero I*, owned by the JV Companies Oceanic Oil Venture Inc. and Hero Maritime Corp, respectively).

23. Upon information and belief, PDVSA breached each of these charter agreements, giving rise to multiple claims inuring to the benefit of LAIL and Mr. Ruperti—via the JV Companies—against PDVSA.

### The Secret PDVSA Settlements

24. Some of the claims against PDVSA resulted in the filing of various arbitrations against PDVSA. LAIL agreed to have Mr. Ruperti take point with settling the claims against PDVSA on its behalf.

25. Unbeknownst to LAIL (or apparently any of the Sargeants), in December 2014, Mr. Ruperti settled all the claims with PDVSA and arranged for the settlement payments to be made to Mr. Ruperti's benefit, fraudulently concealing everything from LAIL and presumably the Sargeants for months, if not years.

26. It was around this time that the Sargeant family feud embroiled, resulting in Harry Sargeant III's eventual relinquishment of his ownership in LAIL.

27. In or around January 2015, Mr. Hall met Daniel Sargeant and told him he was acting for a client who was trying to enforce a judgment against his brother, Harry Sargeant III, and seeking assets to trace, and that he also was acting for Novoship to enforce a judgment against Mr. Ruperti. Thereafter, in or around August 2016, Mr. Hall approached Daniel Sargeant and allegedly offered to give him the Confidential Documents that revealed Mr. Ruperti's fraudulent concealment of the PDVSA settlements, in exchange for personally sensitive information pertaining to Harry Sargeant III, which Daniel Sargeant obtained without Harry Sargeant III's permission. This exchange of information occurred in or around October 2016.

### The LAIL/Ruperti Proceedings

28. Armed with the Confidential Documents, in or around March 2017, LAIL initiated proceedings against Mr. Ruperti in the English High Court to recover its portion of the PDVSA settlements that had been fraudulently concealed (the "LAIL/Ruperti Proceedings"). LAIL alleged that Mr. Ruperti breached his contractual and fiduciary duties, fraudulently concealed these breaches, and wrongfully kept the substantial settlement sums from PVDSA entirely for himself instead of accounting to LAIL.

29. In or around March 2017, LAIL also obtained a worldwide freezing order against the Foreign Claimants in the sum of USD $60.8 million. OTS obtained a similar injunction against the Foreign Claimants for USD $23 million in May 2017.

30. By November 2017, LAIL and Mr. Ruperti reached a settlement in the LAIL/Ruperti Proceedings pursuant to which the Foreign Claimants were to pay LAIL, OTS, and entities related to them USD $30 million in three tranches. It is believed that the Foreign Claimants paid the first tranche, but then defaulted on the agreement. According to the Foreign Claimants' amended statement of claim in the Foreign Proceeding, a revised agreement was then concluded by which the Foreign Claimants were to pay LAIL, OTS and their related entities further tranches amounting to USD $18 million, of which USD $15 million has been paid. It remains unknown to Novoship whether the Foreign Claimants have complied with the remaining payment obligation of USD $3 million.

### The Florida Action

31. After the disclosure of the Confidential Documents, in September 2017, Harry Sargeant III filed a lawsuit in the U.S. District Court for the Southern District of Florida against, amongst others, Mr. Ruperti, the Foreign Claimants, Daniel Sargeant, LAIL, and Mr. Hall. *See Harry Sargeant III v. Maroil Trading Inc., et al.*, Case No. 17-cv-81070 (S.D. Fla. Sept. 25, 2017) (the "Florida Action").

32. Over the course of the Florida Action, Harry Sargeant III sued Mr. Ruperti and the Foreign Claimants for, *inter alia*, fraud relating to the secret PDVSA settlements, claiming that he would not have relinquished his ownership in LAIL had he known about the settlements. He also brought claims against Daniel Sargeant, LAIL and Mr. Hall for, *inter alia*, conspiracy to unlawfully acquire certain personally sensitive material for use in harassing and embarrassing him publicly, which material Daniel Sargeant ultimately exchanged with Mr. Hall in return for the Confidential Documents that revealed the Ruperti fraud.

33. In or around early 2018, Harry Sargeant III settled the Florida Action as against Mr. Ruperti and the Foreign Claimants in exchange for a sum to be paid by the Ruperti parties over time.

34. The Florida Action eventually was voluntarily dismissed as to all remaining parties in June 2018.

### The Foreign Proceeding and Novoship's Asserted Defenses

35. In 2018, the Foreign Claimants initiated the Foreign Proceeding against the Foreign Defendants for breach of the 2016 Settlement Agreement as a result of the disclosure of the Confidential Documents to LAIL, which sparked the LAIL/Ruperti Proceedings. The Foreign Claimants argue, in effect, that had the Confidential Documents not been disclosed to LAIL, they would not have been sued by LAIL and would not have had to pay LAIL any settlement sums: they would effectively have gotten away with their wrongdoing against LAIL. The damages claimed in the Foreign Proceeding are the amounts that the Foreign Claimants have to pay LAIL to settle the fraud claims in the LAIL/Ruperti Proceedings, that is, USD $30 million, plus additional costs and lost profits allegedly caused by the imposition of the freezing orders which LAIL obtained.

36. The Foreign Defendants have, in turn, sued Burford and Mr. Hall as third-party defendants in the Foreign Proceeding for having disclosed the Confidential Documents to

9

LAIL and the Sargeants.

37. One of the Foreign Defendants' arguments in defense of the claims against them is that the disclosure of the Confidential Documents cannot be deemed a breach of the 2016 Settlement Agreement because the documents uncovered wrongdoing perpetuated by Mr. Ruperti against LAIL as described above, and thus public policy justifies the disclosure and protects them against any liability.

38. To prevail on that defense, however, it must be proven that Mr. Ruperti and the Foreign Claimants were, in fact, liable to LAIL, *i.e.* that Mr. Ruperti did actually divert monies from LAIL and deceive LAIL as to this fact. The Foreign Claimants have also alleged in the Foreign Proceeding that they were in fact under no liability to LAIL, on a number of grounds. The Foreign Defendants are therefore effectively in the position of having to litigate LAIL's claim in full as part of their own defense. The practical challenges which this presents are obvious.

39. Accordingly, Novoship needs discovery of information in the Discovery Targets' possession, custody and control to help evidence the actual wrongdoing by Mr. Ruperti, to overcome the Foreign Claimants' defenses, and also to show that the circumstances justified the disclosure of the Confidential Documents.

40. The Foreign Defendants also have an additional defense to the effect that the contents of one of the settlement agreements concluded in secret by Mr. Ruperti with PDVSA had entered the public domain and lost its confidential character prior to its disclosure by Mr. Hall to Daniel Sargeant. This is said to have occurred in connection with a hearing in the English High Court in April 2015, at which the relevant settlement was in evidence. The judgment following that hearing made reference to the settlement and was reported in the trade press, and evidence served in the LAIL/Ruperti Proceedings indicated that these matters came to the attention of Daniel Sargeant and/or LAIL. Novoship accordingly needs discovery of

10

information in the Discovery Targets' possession, custody and control to help sustain its public domain defense.

## Summary and Recap of the Factual Background

41. To summarize this complicated history and the importance of the discovery sought by Novoship for its defense in the Foreign Proceeding, there are four sets of players that can be grouped as follows:

   a. *the Ruperti-related parties*, which include the Foreign Claimants currently suing Novoship for breach of the 2016 Settlement Agreement due to the disclosure by its purported agents, Burford and Mr. Hall, of the Confidential Documents to the Sargeants and LAIL;

   b. *the Foreign Defendants* (including Novoship), which are defending against claims of breach of the 2016 Settlement Agreement by arguing, among other things, that the disclosure of the Confidential Documents by its former agents should not be deemed an actionable breach of the 2016 Settlement Agreement because, *inter alia*, it revealed that Mr. Ruperti had secretly diverted monies from LAIL and fraudulently concealed the same, thus the disclosure was for the public good and, consequently, there can be no liability;

   c. *the Foreign Third-Party Defendants*, which are the former Novoship agents that actually disclosed the Confidential Documents to the Sargeants and LAIL, having done so for their own individual interest and without Novoship's knowledge or involvement; and

   d. *the Sargeant-related parties* (including the Discovery Targets), who are believed to possess evidence of the circumstances surrounding the disclosure of the Confidential Documents and evidence that Mr. Ruperti actually diverted monies from LAIL and fraudulently concealed the same, which Novoship seeks

11

as part of its defense that the disclosure of the Confidential Documents is not actionable based on public policy.

42. This grouping of parties is distilled in the following chart, with the shaded Sargeant-related entities denoting the Discovery Targets:

| Foreign Claimants (controlled by Mr. Ruperti) | Foreign Defendants | Foreign Third-Party Defendants |
|---|---|---|
| Maroil Trading, Inc. | Novoship | Burford Capital (UK) Limited |
| Sea Pioneer Shipping Corporation | Cally Shipholdings, Inc. | Daniel James Hall |
|  | Vital Shipping Corporation |  |
|  | Dainford Navigation Inc. |  |
|  | Tamara Shipholdings S.A. |  |
|  | Tuscany Maritime S.A. |  |
| **Sargeant-Related Entities** |  |  |
| Harry Sargeant Jr. |  |  |
| James Sargeant |  |  |
| Harry Sargeant III |  |  |
| Daniel Sargeant |  |  |
| LAIL (non-Florida entity) |  |  |
| Sargeant Marine Inc. |  |  |
| International Oil Trading Company LLC |  |  |
| Berger Singerman LLP (LAIL's Florida counsel) |  |  |

**Summary of the Requested Discovery and its Relevance to the Foreign Proceeding**

43. As described above, the Sargeants have information helpful to establishing Novoship's defenses in the Foreign Proceeding that the disclosure of the Confidential Documents was justifiable under the circumstances and that it is not actionable conduct because it helped reveal wrongdoing by Mr. Ruperti, in addition to information that will assist Novoship in overcoming the Foreign Claimants' defenses to the underlying allegations of such wrongdoing.

44. Harry Sargeant Jr., Harry Sargeant III, Daniel Sargeant, and James Sargeant are individuals with knowledge of Mr. Ruperti's dishonest scheme against LAIL regarding the secret PDVSA settlements; indeed, the Sargeants have sued Mr. Ruperti for this in both

England (the LAIL/Ruperti Proceedings) and the U.S. (the Florida Action) and thus are almost certainly in possession of documents and information that establish Mr. Ruperti's wrongdoing. Furthermore, it is believed that they are in possession of documents evidencing that the disclosure of the Confidential Documents was made with a view to exposing that wrongdoing, including documents revealing the nature of any "deal" made with Burford or Mr. Hall in exchange for the information, the state of knowledge of the persons involved in the disclosure, and whether the Confidential Documents potentially existed in the public domain even prior to the disclosure.

45.  Sargeant Marine Inc. and International Oil Trading Company LLC are entities owned and controlled by members of the Sargeant family that also are believed to have information probative of Mr. Ruperti's wrongdoing and the circumstances surrounding the disclosure of the Confidential Documents.  Based on information and belief, the Sargeants used these entities' servers for email correspondence and as document repositories for business conducted in relation to LAIL, which, in turn, relates to the dishonest scheme.

46.  Finally, while LAIL does not reside in the United States, to the extent LAIL's Florida counsel in the Florida Action, Berger Singerman, has non-privileged documents in its possession, custody and control responsive to the discovery that Novoship seeks, those documents also should be discoverable for aiding Novoship in the Foreign Proceeding.

47.  The discovery sought from the Discovery Targets generally consists of (1) documents relating to the circumstances of the actual divulgation of the Confidential Documents by Mr. Hall and Burford, and (2) documents probative of Mr. Ruperti's misconduct towards LAIL by concealing the PDVSA settlements and pocketing the sums for himself.

48.  To that end, the document requests are aimed at establishing the facts surrounding Mr. Hall and Daniel Sargeant's agreement to exchange information; the circumstances of the disclosure of the Confidential Documents, which are highly probative and

13

relevant to the justifiability of the disclosure in the public interest; the relationship between LAIL and Mr. Ruperti, including their business operations and treatment of the JV Companies' earnings; and the details of the PDVSA settlements, and LAIL's claims against Mr. Ruperti for fraudulently keeping them from the Sargeants.

49. Furthermore, Novoship believes that the negotiation and the terms of the settlement of the Florida Action between Harry Sargeant III and the Ruperti-related parties may shed light on facts critical to proving Mr. Ruperti's misconduct. That such misconduct and dishonesty occurred would explain why the Ruperti-related parties paid to settle Harry Sargeant III's fraud claims that arise from the same nucleus of fact.

50. Finally, in addition to documentary discovery, Novoship also seeks leave to obtain testimony from the Discovery Targets in the event that the documents obtained pursuant to this Petition are insufficient or need explanation or context that the Sargeants can provide. Novoship would depose the individual Discovery Targets based on their personal knowledge, and would take record custodian depositions of the corporate Discovery Targets for purposes of determining where additional documents may be found.

### The Elements of 28 U.S.C. § 1782 Are Satisfied

51. Novoship seeks assistance from the United States District Court for the Southern District of Florida, pursuant to 28 U.S.C. § 1782, to obtain relevant and probative documentary and testimony evidence from the Discovery Targets for use in its defense of the claims against it in the Foreign Proceeding. This request meets all necessary and discretionary elements.

52. The Discovery Targets all reside in this District.

53. In addition, the Discovery Targets are not parties to the Foreign Proceeding, nor are they expected to become parties to the Foreign Proceeding. Moreover, it is not otherwise possible to compel the Discovery Targets to provide the discovery sought as they are located

outside of the jurisdiction of the English High Court presiding over the Foreign Proceeding.

54. There is no indication that the English High Court would not be receptive to the documentary evidence obtained through this Section 1782 petition. Indeed, such evidence will very likely be admissible before the English High Court, and the Section 1782 petition does not circumvent any proof-gathering restriction under English law or any specific orders issued in the Foreign Proceeding.

55. The Foreign Proceeding is in its discovery stages. Novoship anticipates that the trial will be set for some time in 2021.

56. The requested discovery is not intrusive or unduly burdensome. Novoship seeks documentary business information that is, or should be, readily available to the Discovery Targets.

57. No previous application for this relief has been made in the United States.

58. In light of the foregoing, Novoship respectfully submits that all of the requirements of 28 U.S.C. § 1782 are met:

   a. the Discovery Targets are found in this District;

   b. Novoship seeks to obtain documents and possibly testimony for use in its defense in a foreign proceeding currently before the English High Court;

   c. Novoship is an "interested person" in the Foreign Proceeding within the meaning of the statute; and

   d. the Discovery Targets have relevant and probative information relating to Novoship's defense in the Foreign Proceeding.

I declare under penalty of perjury under the laws of the United States of America that

the foregoing is true and correct.

Executed on this 30th day of April 2020, in London, United Kingdom

By: _____
Stephen Kirkpatrick
Partner
Reed Smith LLP