# COMPOSITE EXHIBIT B

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | |
|---|---|
| IN RE APPLICATION OF | ) |
| NOVOSHIP (UK) LIMITED<br>Applicant, | ) |
| | ) Civil Action No. |
| Pursuant to 28 U.S.C. § 1782 for Judicial Assistance in<br>Obtaining Evidence for use in Foreign and International<br>Proceedings. | )<br>)<br>) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                                HARRY SARGEANT, JR.
                        321 E. HILLSBORO BLVD, DEERFIELD BEACH, FL 33441
                            *(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: Reed Smith LLP<br>1001 Brickell Bay Drive, Suite 900<br>Miami, FL 33131 | Date and Time:<br><br>TBD |
|---|---|

The deposition will be recorded by this method: _____

☑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:
          See Schedule A (enclosed)

        The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

           *CLERK OF COURT*
                                                          OR

    _____          _____
        *Signature of Clerk or Deputy Clerk*                  *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Applicant,
Novoship (UK) Limited                                                   , who issues or requests this subpoena, are:
Edward M. Mullins, Reed Smith LLP, 1001 Brickell Bay Dr. Suite 900, Miami, FL 33131, emullins@reedsmith.com

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**Schedule A to Subpoena**

**Definitions and Instructions**

1. "Novoship" shall mean Novoship (UK) Limited, as well as any of its agents, attorneys, accountants, consultants, representatives, assignees, and any other individual or entity associated or affiliated with it, or purporting to act on its behalf with respect to the matter in question.

2. "Mr. Ruperti" shall mean Wilmer Ruperti.

3. "Ruperti-controlled entities" shall mean all entities beneficially owned by and/or controlled by Mr. Ruperti, including but not limited to Maroil Trading Inc. and Sea Pioneer Shipping Corporation, as well as any of Mr. Ruperti's agents, attorneys, accountants, consultants, representatives, assignees, and any other individual or entity associated or affiliated with him, or purporting to act on his behalf with respect to the matter in question.

4. "Mr. Hall" shall mean Daniel James Hall of Burford.

5. "JV Companies" shall mean the joint business ventures created between Mr. Ruperti and LAIL and/or the Sargeants, including but not limited to Oceanic Oil Venture Inc., Hero Maritime Corp, Herculito Maritime Ltd, Oil Carriers Ltd, Bolivarian Petroleum Transport Ltd, and Suramericana de Transporte Petrolero C.A.

6. "JV Vessels" shall mean the vessels owned by the JV Companies that were chartered to PDVSA, including but not limited to the *Alloro*, the *Polar*, the *Leander*, and the *Hero I*.

7. "LAIL" shall mean Latin American Investments Limited, as well as any of its agents, attorneys, accountants, consultants, representatives, assignees, and any other individual or entity associated or affiliated with it, or purporting to act on its behalf with respect to the matter in question.

8. "PDVSA" shall mean PDVSA Petroleo S.A., the Venezuelan national oil company.

9. "Maroil" shall mean Maroil Trading, Inc., one of the Ruperti-controlled entities.

10. "Burford" shall mean Burford Capital (UK) Limited, as well as any of its agents, attorneys, accountants, consultants, representatives, assignees, and any other individual or entity associated or affiliated with it, or purporting to act on its behalf with respect to the matter in question.

11. "2016 Settlement Agreement" shall mean the second settlement agreement entered into between Novoship and Mr. Ruperti and/or other Ruperti- controlled entities relating to settling the judgment obtained by Novoship in the case before the English High Court entitled *Novoship & Ors v. Mikhaylyuk & Ors*, [2012] EWHC 3586 (Comm).

12. "Florida Action" shall mean the lawsuit entitled *Harry Sargeant III v. Maroil Trading Inc., et al.*, Case No. 17-cv-81070 (S.D. Fla. Sept. 25, 2017).

13. "Document" or "documents" shall mean and include, without limitation, any written or graphic matter or other means of preserving thought or expression, and all tangible things from which information can be processed or transcribed, including the original and all non-identical copies, whether different from the original by reason of any notation made on such copy or otherwise, including, but not limited to, contracts, agreements, mortgages, deeds, leases, financing applications, loan applications, letters of intent, asset purchase agreements, management contracts, operating agreements, writings, written communications, visual, graphic or pictorial displays of any description whatsoever, including, but not limited to, each writing or printing, graph, chart, financial report, tape recording, data computation, ledger sheet, journal entry, invoice, shipping document, bill of lading, purchase order, receipt, return, telephone bill, telephone message slip, schedule, affidavit, memorandum or note of intra office and interoffice telephone calls, letter, letter telegram, blueprint, photograph, video tape, check, canceled check, transcript, statistics, bank statement, financial statement, letter of credit, standby letter of credit, irrevocable and/or revocable standby letter of credit, performance bond, insurance contract and related

and/or appended schedule, promissory note, audit report, writing relating to credit and/or loan committee(s) activities, tested telex, untested telex, wire communication, telegrams, teletype, telefax, email, bulletin, correspondence, notes, word diary, chronological data, minutes, work sheet, book, travel log, survey, magazine or newspaper article, press release (and any and all drafts, alterations or modifications, changes, amendments of any of the foregoing), office memorandum, graphic or oral record or representation of any kind (including, without limitation, graphs, microfiche, microfilm, videotapes, recordings, motion pictures, electronic, mechanical, electrical, or chemical recordings or representations of any kind), photograph, prospectus, testing or analysis report or other source of recorded information, including tapes, cassettes, disks, recordings, computer data from which information can be obtained or translated into useable form including manuals, guides and other written information necessary to translate computer routine documents into useable form

14. "Communication" or "communications" shall mean any exchange or transmission of information, whether moral, written, via electronic mail, text message, direct message, social media, or by other means, and includes, but is not limited to, written, oral, telephonic, via electronic mail, representation, discussion, meeting, letter, correspondence, memorandum, newsletter, telegram, advertisement, speech, conversation, conference, note, e-mail or computer-generated message and any other document which refers to any such communication.

15. "Relating to," "related to," "relates to" or "relate to" shall mean: in any way directly or indirectly, containing, constituting, comprising, showing, evidencing, mentioning, reflecting, pertaining to, or referring in any way, directly or indirectly, to and is meant to include, among other documents, documents underlying, supporting, now or previously

attached or appended to, or used in the preparation of any document called for by the discovery requested herein.

16. "Including" shall mean "including, but not limited to" so as to require the broadest possible inclusion.

17. The terms "and" and "or" shall be construed conjunctively and disjunctively so as to require the broadest possible inclusion.

18. "All" shall be construed to include the word "any," and the word "any" shall be construed to include the word "all."

19. Unless otherwise stated in a request, the time period for documents responsive to these requests is January 1, 2015 to December 31, 2018.

**Document Requests**

***Requests relating to the exchanges of documents between Mr. Hall and Daniel Sargeant/LAIL in January 2015 and October 2016***

1. All documents and communications exchanged between Mr. Hall and Daniel Sargeant and/or anyone acting on behalf of LAIL between January 2015 and March 2017 that concern Mr. Ruperti, any Ruperti-controlled entities, any JV Companies, LAIL, and/or PDVSA.

2. All documents that show there were communications between Mr. Hall and Daniel Sargeant and/or anyone acting on behalf of LAIL between January 2015 and March 2017.

3. All documents indicating the source(s) from which Mr. Hall obtained any of the documents he provided to Daniel Sargeant between January 2015 and December 2016.

4. All documents and communications that show that Daniel Sargeant and/or anyone acting for LAIL actually reviewed the documents provided by Mr. Hall between January 2015 and March 2017.

4

5.   All documents and communications between January 2015 and March 2017 showing that Daniel Sargeant and/or anyone acting for LAIL requested Mr. Hall to provide documents concerning Mr. Ruperti, any Ruperti-controlled entities, any JV Companies, LAIL, and/or PDVSA.

6.   All documents or communications that show that an actual exchange of information related to Mr. Ruperti, Ruperti-controlled entities, the JV Companies, LAIL, and/or PDVSA occurred between Daniel Sargeant and Mr. Hall in January 2015 and/or October 2016.

7.   All documents or communications that show Daniel Sargeant and/or Mr. Hall knew, or should have known, that any of the documents provided by Mr. Hall in October 2016 were confidential and/or subject to duties to maintain their confidentiality.

8.   All documents or communications that show Daniel Sargeant and/or Mr. Hall knew, or should have known, that any of the documents provided by Mr. Hall in October 2016 evidenced unlawful and fraudulent conduct by Mr. Ruperti and/or any of the Ruperti-controlled entities against LAIL and/or the Sargeants.

9.   All documents or communications that show Daniel Sargeant and/or Mr. Hall knew, or should have known, that the provision of the documents by Mr. Hall in October 2016 would or might result in litigation brought (i) by Mr. Ruperti and/or any of the Ruperti-controlled entities against Novoship, or (ii) by Novoship against Mr. Hall and/or Burford.

*Requests relating to meetings and communications between Mr. Hall and Daniel Sargeant/LAIL*

10.   All documents or communications showing when Mr. Hall and Daniel Sargeant or anyone acting for LAIL fist made contact, including documents from in or around November 2014.

11.  All documents or communications showing the matters discussed between Mr. Hall and Daniel Sargeant or anyone acting for LAIL between November 1, 2014 and December 31, 2017, including but not limited to the meetings that took place on:

11.1.  January 13, 2015;

11.2.  October 6, 2016;

11.3.  October 28, 2016; and

11.4.  May 5, 2017.

12.  All documents or communications showing how the meetings between Mr. Hall and Daniel Sargeant or anyone acting for LAIL between November 1, 2014 and December 31, 2017 were arranged, and/or evidencing the purpose and/or subject matter of those meetings.

13.  All documents or communications that show Mr. Hall and Daniel Sargeant were in contact in or about August 2016 regarding matters concerning LAIL or Mr. Ruperti or the possibility of provision of documents or information by Mr. Hall relating to either of these.

14.  All emails exchanged between Mr. Hall and Daniel Sargeant or anyone acting for LAIL regarding Mr. Ruperti, any Ruperti-controlled entities, any JV Companies, LAIL, and/or PDVSA, including but not limited to those dated:

14.1.  May 4, 2017;

14.2.  May 8, 2017;

14.3.  May 10, 2017;

14.4.  May 11, 2017;

14.5.  May 26, 2017;

14.6.  July 19, 2017; and

14.7.  July 26, 2017.

15.     All documents or communications showing that Mr. Hall requested and/or obtained indemnification and/or payment from Mr. Daniel Sargeant and/or LAIL in connection with having provided them with documents in October 2016 that related to Mr. Ruperti, any Ruperti-controlled entities, any JV Companies, LAIL, and/or PDVSA.

16.     All documents and communications showing the purpose for the exchange of documents relating to Mr. Ruperti, any Ruperti-controlled entities, any JV Companies, LAIL, and/or PDVSA between Mr. Hall and Daniel Sargeant, including LAIL's need for such documents.

***Requests relating to whether the PDVSA/Ruperti settlement was in the public domain***

17.     All documents and communications showing that Daniel Sargeant and/or anyone acting for LAIL became aware of and/or reviewed any of the following documents prior to October 6, 2016:

    17.1.   The witness statement of Edward Poulton dated March 18, 2015 and/or its accompanying exhibit;

    17.2.   The witness statement of Benjamin Ogden dated March 27, 2015 and/or its accompanying exhibit;

    17.3.   The witness statement of Richard Allen dated March 30, 2015 and/or its accompanying exhibit;

    17.4.   The judgment entered by the Commercial Court (Mr. Justice Andrew Smith) in *Novoship (UK) Ltd & others v. Mikhaylyuk & others* [2015] EWHC 992 (Comm);

    17.5.   The article in *TradeWinds* magazine entitled "*Novoship demands against Ruperti*"; and/or

17.6.   The settlement agreement between PDVSA and the Ruperti-controlled entities Sea Pioneer Shipping Corporation and Maroil dated on or about December 22, 2014.

18.   All documents and communications between January 2015 and October 2016, which evidence:

18.1.   a belief or suspicion on the part of Daniel Sargeant and/or anyone acting for LAIL that Mr. Ruperti had concluded a settlement agreement with PDVSA; and/or

18.2.   Daniel Sargeant and/or LAIL's intention to bring legal proceedings against Mr. Ruperti and/or any Ruperti-controlled entities in connection with Mr. Ruperti's actual or potential conclusion of a settlement agreement with PDVSA.

19.   All correspondence between Daniel Sargeant, Mr. Andrew Longhurst, and/or Mr. Andrew Preston between March 18, 2015 and October 6, 2016 referring to Mr. Ruperti's actual or potential settlement with PDVSA.

### *Requests relating to the JV Companies and JV Vessels*

20.   All documents or communications related to the negotiation of an agreement between Harry Sargeant III and Mr. Ruperti in or around 2001 concerning:

20.1.   any  joint ventures between LAIL and Maroil, including how the joint venture would be owned and operated;

20.2.   the chartering of vessels owned by any such joint ventures to third parties, including to Maroil, PDVSA or its affiliates;

20.3.   the manner in which the proceeds of such charters would be distributed; and/or

20.4.   the duties that the participants in such joint ventures would owe to each other, which may have included the duty to exercise reasonable diligence in relation to the business of the joint ventures and to act in good faith as business partners.

21.     The full constitutional documents of each of the following companies, including their respective articles of association, shareholders' agreements, and any other written agreements governing the basis on which the companies would be owned and operated:

    21.1.   Oceanic Oil Venture Inc. ("OOV");

    21.2.   Hero Maritime Corp ("HMC");

    21.3.   Herculito Maritime Ltd ("Herculito");

    21.4.   Bolivarian Petroleum Transport Ltd ("BPT");

    21.5.   Oil Carriers Ltd ("OCL"); and

    21.6.   Suramericana de Transporte Petrolero C.A.

22.     The contracts and other agreements by which the purchases of the following vessels were financed and/or mortgaged by Deutsche Schiffsbank Aktiengesellschaft ("DSB"), Commerzbank, and/or Lloyds TSB Bank Plc ("Lloyds Bank"):

    22.1.   The VLCC "*Leander*";

    22.2.   The VLCC "*Hero 1*";

    22.3.   The Panamax "*Polar*"; and

    22.4.   The Panamax "*Alloro.*"

23.     All documents which evidence the dates on which any bank took possession of any of the JV Vessels.

24.     All bills of sale, confirmations from mortgagee banks, or other similar documents formally evidencing the dates of sale of each of the JV Vessels by any of the banks that exercised their mortgagee rights over the JV Vessels.

25.     All statements or other similar documents evidencing the outstanding indebtedness of the JV Companies to their respective mortgagee banks for the purchase of each of the JV Vessels between March 1, 2013 and December 22, 2014.

26. All documents and communications showing any transfer of LAIL's interests in Suramericana de Transporte Petrolero C.A. in or around March 2004.

**Requests relating to the use of the JV Vessels by PDVSA**

27. All documents or communications between Harry Sargeant III and Mr. Ruperti in 2004 and 2005   regarding the distribution of any proceeds of the charter of the *Polar* to PDVSA.

28. All documents or communications between Harry Sargeant III and Mr. Ruperti in 2004 and 2005 regarding the distribution of any proceeds of the charter of the *Alloro* to PDVSA.

29. A copy of the "Clarification Letter" dated April 7, 2006, which varied the contract of affreightment as between Sea Pioneer and PDVSA dated March 22, 2006 (the "COA");

30. All documents or communications between January 1, 2007 and the dates of sale of any of the JV Vessels by any of the mortgagee banks which evidence:

    30.1.  requests made by Sea Pioneer that the *Leander* and/or the *Hero 1* should be made available to perform the COA;

    30.2.  failures or refusals by LAIL, Oceanic Transport Shipping ("OTS"), OOV and/or HMC to make the *Leander* and/or the *Hero 1* available in response to such requests by Sea Pioneer; and/or

    30.3.  the reasons for any such failures or refusals.

31. Any charterparties dated between January 1, 2007 and the dates of sale of any of the JV Vessels by any of the mortgagee banks pursuant to which the *Leander* and/or the *Hero 1* were used, other than for the performance of the COA with PDVSA.

32. All documents or communications between January 1, 2007 and the dates of sale of any of the JV Vessels by any of the mortgagee banks showing that the *Leander* and/or the

*Hero 1* were used in performing voyages under the COA, including the following voyages:

32.1.   As regards the *Leander*:

32.1.1.   A voyage from Bonaire to Guangzhou / Zhoushan between April 5, 2007 and May 25, 2007; and

32.1.2.   A voyage from Bullen Bay / Bonaire to Karimun / Zhousan between August 9, 2007 and October 13, 2007.

32.2.   As regards the *Hero 1*:

32.2.1.   A Karimun / Telapas (Singapore) voyage in early/mid 2007;

32.2.2.   A voyage from Freeport to Shen Zhan and Zhousan between January 28, 2007 and August 23, 2007; and

32.2.3.   A shipment loaded at Curacao and ultimately discharged again at Curacao between November 1, 2008 and December 24, 2008.

33.   All documents or communications from Mr. Ruperti or any Ruperti-controlled entities to LAIL, any of the Sargeants, OTS, OOV, and/or HMC which evidence the chartering by Sea Pioneer of vessels other than the *Leander* and the *Hero 1* to perform the COA, including in particular the vessels *Pisces Star*, *Eagle Valencia* and *Ural*.

***Requests relating to the treatment of earnings of the JV Companies***

34.   All documents and communications showing the JV Companies' financial status between 2006 and 2015, including all income, profit and loss statements during that period.

35.   All documents and communications showing how the finances of the JV Companies were supposed to be managed, including documents and communications regarding (i) how income generated by the chartering of the JV Vessels was to be remitted to the JV

Companies, (ii) how expenses incurred by the JV Companies were to be handled, and (iii) how and when the shareholders of the JV Companies were to be paid.

36.    All documents and communications showing any payments made to LAIL by the JV Companies or by any third parties relating to the chartering of any of the JV Vessels between 2006 and 2015.

37.    All documents and communications showing any payments made to Mr. Ruperti or any Ruperti-controlled entities by the JV Companies or by any third parties relating to the chartering of any of the JV Vessels between 2006 and 2015.

*Requests relating to the disputes with PDVSA*

38.    All documents and communications relating to the meeting held between the directors of OOV and HMC on or about December 20, 2010, including documents indicating the matters discussed at the meeting and any documents reviewed at the meeting.

39.    All documents and communications relating to the decision by OOV and HMC to initiate arbitration proceedings against PDVSA.

40.    Any witness statements, expert reports, documentary evidence and/or written submissions served in the arbitration proceedings brought by OOV and HMC against PDVSA (the "First PDVSA Arbitration").

41.    A copy of the spreadsheets attached to (i) the claim submissions dated August 29, 2011 and (ii) the amended claim submissions dated January 23, 2012 from the First PDVSA Arbitration.

42.    A copy of all documents served in the First PDVSA Arbitration to support the amended claim submissions dated January 23, 2012.

43.     All documents and communications from the tribunal in the First PDVSA Arbitration asking questions about the calculation of the claim submissions, including the tribunal's July 10, 2012 request.

44.     All documents and communications relating to Harry Sargeant III's proposal in or about October and November 2012 that DSB take over the First PDVSA Arbitration, including any response to that proposal by LAIL, Mr. Ruperti, OTS, HMC and/or OOV.

45.     All correspondence between LAIL, Mr. Ruperti, OTS, HMC and/or OOV (on the one hand) and the mortgagee banks of the JV Vessels (DSB or Commerzbank) (on the other hand) relating to the First PDVSA Arbitration.

46.     All documents and communications relating to any claims against PDVSA regarding its charters of the *Polar* and/or the *Alloro*.

47.     All documents and communications relating to any claims by Sea Pioneer and/or Mr Ruperti against PDVSA between 2006 and August 9, 2012.

48.     A copy of the letter dated August 9, 2012 from Freddy Belisario Capella Abogados to Petroleos de Venezuela C.A. (the parent company of PDVSA).


*Requests relating to the negotiations with PDVSA*

49.     All documents and communications relating to the appointment of Mr. Patrick Mooney and Mr. Alejandro Leandros in or about March 2013 on behalf of OOV and HMC to negotiate a settlement of the First PDVSA Arbitration.

50.     All documents and communications reflecting the matters discussed at the meeting in October 2013 between Commerzbank, LAIL, OTS and Maroil.

51.     All documents and communications relating to the appointment of Mr. Mooney and Mr. Ruperti in or about May 2014 on behalf of OOV and HMC to negotiate a settlement of the First PDVSA Arbitration.

52.  All documents and communications reflecting the matters discussed at the meeting on or about May 7, 2014 between Daniel Sargeant, Mr. Mooney, and Mr. Ruperti in Miami.

53.  All documents and communications relating to whether Mr. Mooney and Mr. Preston were authorized by OOV and HMC to meet with Commerzbank on September 25, 2014 on their behalf.

54.  All documents and communications reflecting the matters discussed at the meeting on September 25, 2014 between Commerzbank, Mr. Mooney and Mr. Preston.

55.  All documents and communications relating to the discussions between LAIL, Mr. Ruperti, OTS, OOV and/or HMC (on the one hand) and Commerzbank (on the other hand) between September 1, 2014 and December 22, 2014 regarding a settlement proposal to PDVSA.

56.  All documents and communications between September 1, 2014 and December 22, 2014 relating to:

56.1.  the terms on which Commerzbank was willing settle the First PDVSA Arbitration;

56.2.  the sums which Commerzbank wanted to receive from the settlement for the debt owed on the JV Vessels; and

56.3.  the manner in which Commerzbank wanted the settlement negotiations with PDVSA to be conducted, including whether it was in agreement with Mr. Ruperti leading the settlement negotiations personally.

57.  All documents and communications relating to the consideration given by LAIL, OTS, OOV and/or HMC of the draft board resolutions and letters of authority presented by Mr. Preston on November 7, 2014, that were intended to be given to Mr. Mooney and Mr. Ruperti.

58.     All documents and communications between LAIL, OTS, OOV, HMC, Daniel Sargeant, Mr. Mooney, Mr. Ruperti, and/or Mr. Preston between September 2014 and October 2016 relating to how the proceeds of any settlement with PDVSA ought to be distributed.

59.     All documents and communications from Mr. Mooney, Mr. Ruperti, and/or Mr. Leandros between March 2013 and October 2016 relating to the status of the settlement negotiations with PDVSA.

60.     All documents and communications relating to any expenses allegedly incurred by Mr. Mooney, Mr. Ruperti, and/or any Ruperti-related entities in conducting settlement negotiations with PDVSA.

### Requests relating to Ruperti's concealment of the PDVSA settlements

61.     All documents and communications describing the matters discussed at the meeting on February 12, 2015 between Mr. Mooney and Mr. Preston.

62.     Any draft settlement agreements between Sea Pioneer, Maroil, and/or LAIL created between February 2015 and October 2016, relating to the distribution of the proceeds of any settlement with PDVSA.

63.     All documents and communications exchanged between Daniel Sargeant, Mr. Ruperti, and/or Mr. Mooney relating to any draft settlement agreements with PDVSA.

64.     All documents and communications exchanged between Daniel Sargeant and/or Mr. Preston (on the one hand) and Mr. Mooney and/or Mr. Ruperti (on the other hand) between December 2014 and October 2016 relating to PDVSA.

65.     All documents and communications describing the matters discussed at any meetings between Daniel Sargeant and Mr. Ruperti between December 2014 and October 2016,

including but not limited to the meeting held on June 1, 2015 at the Four Seasons Hotel in Geneva.

66.   All documents and communications exchanged between Mr. Ruperti and/or Mr. Mooney between December 2014 and October 2016 relating to whether a settlement had been reached with PDVSA, including any express representations that no such settlement had been reached.

### Requests relating to the LAIL/Ruperti Proceedings and Settlement

67.   A copy of the settlement agreement between LAIL, OTS, Maroil and/or any other Ruperti-controlled entities dated on or around November 17, 2017.

68.   All banking records evidencing any payments made by Maroil or any Ruperti-controlled entities to LAIL and/or OTS pursuant to the settlement agreement between them dated November 17, 2017 (and/or any addenda or supplementary agreements thereto).

### Requests relating to the Florida Action

69.   All documents and communications relating to the merits of the claims of fraud alleged in the Florida Action.

70.   All non-privileged documents and communications relating to the negotiation of the settlement of the Florida Action as between Harry Sargeant III and Mr. Ruperti and his entities, including a copy of the settlement agreement itself.

71.   All documents showing the amounts that Mr. Ruperti and/or his entities paid to Harry Sargeant III to settle the Florida Action.

72.   All testimony (including depositions, witness statements, or testimony given in open court or otherwise) obtained in the Florida Action relating to (1) the claims of fraud

orchestrated by Mr. Ruperti against LAIL, and (2) the exchange of information between Daniel Sargeant and Mr. Hall that helped uncover the fraud.

73.  All documents obtained during the course of discovery in the Florida Action relating to (1) the claims of fraud orchestrated by Mr. Ruperti against LAIL, and (2) the exchange of information between Daniel Sargeant and Mr. Hall that helped uncover the fraud.

74.  All testimony (including depositions, witness statements, or testimony given in open court or otherwise) obtained in the Florida Action relating to whether Mr. Hall knew he was exchanging information with Daniel Sargeant in violation of the 2016 Settlement Agreement.

75.  All documents obtained during the course of discovery in the Florida Action relating to whether Mr. Hall knew he was exchanging information with Daniel Sargeant in violation of the 2016 Settlement Agreement.

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

IN RE APPLICATION OF                                        )
      NOVOSHIP (UK) LIMITED                          )
           Applicant,                               )    Civil Action No.

Pursuant to 28 U.S.C. § 1782 for Judicial Assistance in     )
Obtaining Evidence for use in Foreign and International      )
Proceedings.                                                )

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                  HARRY SARGEANT, III
          25 SEABREEZE AVENUE, SUITE 300, DELRAY BEACH, FL 33483
*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: Reed Smith LLP<br>1001 Brickell Bay Drive, Suite 900<br>Miami, FL 33131 | Date and Time:<br><br>TBD |
|---|---|

The deposition will be recorded by this method: _____

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:
        See Schedule A (enclosed)

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

          *CLERK OF COURT*
                                 OR

_____     _____
   *Signature of Clerk or Deputy Clerk*             *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Applicant, Novoship (UK) Limited                          , who issues or requests this subpoena, are:

Edward M. Mullins, Reed Smith LLP, 1001 Brickell Bay Dr. Suite 900, Miami, FL 33131, emullins@reedsmith.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____           _____
                                                          *Server's signature*

                                              _____
                                                          *Printed name and title*

                                              _____
                                                          *Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## Schedule A to Subpoena

## Definitions and Instructions

1. "Novoship" shall mean Novoship (UK) Limited, as well as any of its agents, attorneys, accountants, consultants, representatives, assignees, and any other individual or entity associated or affiliated with it, or purporting to act on its behalf with respect to the matter in question.

2. "Mr. Ruperti" shall mean Wilmer Ruperti.

3. "Ruperti-controlled entities" shall mean all entities beneficially owned by and/or controlled by Mr. Ruperti, including but not limited to Maroil Trading Inc. and Sea Pioneer Shipping Corporation, as well as any of Mr. Ruperti's agents, attorneys, accountants, consultants, representatives, assignees, and any other individual or entity associated or affiliated with him, or purporting to act on his behalf with respect to the matter in question.

4. "Mr. Hall" shall mean Daniel James Hall of Burford.

5. "JV Companies" shall mean the joint business ventures created between Mr. Ruperti and LAIL and/or the Sargeants, including but not limited to Oceanic Oil Venture Inc., Hero Maritime Corp, Herculito Maritime Ltd, Oil Carriers Ltd, Bolivarian Petroleum Transport Ltd, and Suramericana de Transporte Petrolero C.A.

6. "JV Vessels" shall mean the vessels owned by the JV Companies that were chartered to PDVSA, including but not limited to the *Alloro*, the *Polar*, the *Leander*, and the *Hero I*.

7. "LAIL" shall mean Latin American Investments Limited, as well as any of its agents, attorneys, accountants, consultants, representatives, assignees, and any other individual or entity associated or affiliated with it, or purporting to act on its behalf with respect to the matter in question.

8. "PDVSA" shall mean PDVSA Petroleo S.A., the Venezuelan national oil company.

9. "Maroil" shall mean Maroil Trading, Inc., one of the Ruperti-controlled entities.

10. "Burford" shall mean Burford Capital (UK) Limited, as well as any of its agents, attorneys, accountants, consultants, representatives, assignees, and any other individual or entity associated or affiliated with it, or purporting to act on its behalf with respect to the matter in question.

11. "2016 Settlement Agreement" shall mean the second settlement agreement entered into between Novoship and Mr. Ruperti and/or other Ruperti- controlled entities relating to settling the judgment obtained by Novoship in the case before the English High Court entitled *Novoship & Ors v. Mikhaylyuk & Ors*, [2012] EWHC 3586 (Comm).

12. "Florida Action" shall mean the lawsuit entitled *Harry Sargeant III v. Maroil Trading Inc., et al.*, Case No. 17-cv-81070 (S.D. Fla. Sept. 25, 2017).

13. "Document" or "documents" shall mean and include, without limitation, any written or graphic matter or other means of preserving thought or expression, and all tangible things from which information can be processed or transcribed, including the original and all non-identical copies, whether different from the original by reason of any notation made on such copy or otherwise, including, but not limited to, contracts, agreements, mortgages, deeds, leases, financing applications, loan applications, letters of intent, asset purchase agreements, management contracts, operating agreements, writings, written communications, visual, graphic or pictorial displays of any description whatsoever, including, but not limited to, each writing or printing, graph, chart, financial report, tape recording, data computation, ledger sheet, journal entry, invoice, shipping document, bill of lading, purchase order, receipt, return, telephone bill, telephone message slip, schedule, affidavit, memorandum or note of intra office and interoffice telephone calls, letter, letter telegram, blueprint, photograph, video tape, check, canceled check, transcript, statistics, bank statement, financial statement, letter of credit, standby letter of credit, irrevocable and/or revocable standby letter of credit, performance bond, insurance contract and related

and/or appended schedule, promissory note, audit report, writing relating to credit and/or loan committee(s) activities, tested telex, untested telex, wire communication, telegrams, teletype, telefax, email, bulletin, correspondence, notes, word diary, chronological data, minutes, work sheet, book, travel log, survey, magazine or newspaper article, press release (and any and all drafts, alterations or modifications, changes, amendments of any of the foregoing), office memorandum, graphic or oral record or representation of any kind (including, without limitation, graphs, microfiche, microfilm, videotapes, recordings, motion pictures, electronic, mechanical, electrical, or chemical recordings or representations of any kind), photograph, prospectus, testing or analysis report or other source of recorded information, including tapes, cassettes, disks, recordings, computer data from which information can be obtained or translated into useable form including manuals, guides and other written information necessary to translate computer routine documents into useable form

14. "Communication" or "communications" shall mean any exchange or transmission of information, whether moral, written, via electronic mail, text message, direct message, social media, or by other means, and includes, but is not limited to, written, oral, telephonic, via electronic mail, representation, discussion, meeting, letter, correspondence, memorandum, newsletter, telegram, advertisement, speech, conversation, conference, note, e-mail or computer-generated message and any other document which refers to any such communication.

15. "Relating to," "related to," "relates to" or "relate to" shall mean: in any way directly or indirectly, containing, constituting, comprising, showing, evidencing, mentioning, reflecting, pertaining to, or referring in any way, directly or indirectly, to and is meant to include, among other documents, documents underlying, supporting, now or previously

attached or appended to, or used in the preparation of any document called for by the discovery requested herein.

16. "Including" shall mean "including, but not limited to" so as to require the broadest possible inclusion.

17. The terms "and" and "or" shall be construed conjunctively and disjunctively so as to require the broadest possible inclusion.

18. "All" shall be construed to include the word "any," and the word "any" shall be construed to include the word "all."

19. Unless otherwise stated in a request, the time period for documents responsive to these requests is January 1, 2015 to December 31, 2018.

## Document Requests

***Requests relating to the exchanges of documents between Mr. Hall and Daniel Sargeant/LAIL in January 2015 and October 2016***

1.   All documents and communications exchanged between Mr. Hall and Daniel Sargeant and/or anyone acting on behalf of LAIL between January 2015 and March 2017 that concern Mr. Ruperti, any Ruperti-controlled entities, any JV Companies, LAIL, and/or PDVSA.

2.   All documents that show there were communications between Mr. Hall and Daniel Sargeant and/or anyone acting on behalf of LAIL between January 2015 and March 2017.

3.   All documents indicating the source(s) from which Mr. Hall obtained any of the documents he provided to Daniel Sargeant between January 2015 and December 2016.

4.   All documents and communications that show that Daniel Sargeant and/or anyone acting for LAIL actually reviewed the documents provided by Mr. Hall between January 2015 and March 2017.

4

5.      All documents and communications between January 2015 and March 2017 showing that Daniel Sargeant and/or anyone acting for LAIL requested Mr. Hall to provide documents concerning Mr. Ruperti, any Ruperti-controlled entities, any JV Companies, LAIL, and/or PDVSA.

6.      All documents or communications that show that an actual exchange of information related to Mr. Ruperti, Ruperti-controlled entities, the JV Companies, LAIL, and/or PDVSA occurred between Daniel Sargeant and Mr. Hall in January 2015 and/or October 2016.

7.      All documents or communications that show Daniel Sargeant and/or Mr. Hall knew, or should have known, that any of the documents provided by Mr. Hall in October 2016 were confidential and/or subject to duties to maintain their confidentiality.

8.      All documents or communications that show Daniel Sargeant and/or Mr. Hall knew, or should have known, that any of the documents provided by Mr. Hall in October 2016 evidenced unlawful and fraudulent conduct by Mr. Ruperti and/or any of the Ruperti-controlled entities against LAIL and/or the Sargeants.

9.      All documents or communications that show Daniel Sargeant and/or Mr. Hall knew, or should have known, that the provision of the documents by Mr. Hall in October 2016 would or might result in litigation brought (i) by Mr. Ruperti and/or any of the Ruperti-controlled entities against Novoship, or (ii) by Novoship against Mr. Hall and/or Burford.


*Requests relating to meetings and communications between Mr. Hall and Daniel Sargeant/LAIL*

10.     All documents or communications showing when Mr. Hall and Daniel Sargeant or anyone acting for LAIL fist made contact, including documents from in or around November 2014.

11. All documents or communications showing the matters discussed between Mr. Hall and Daniel Sargeant or anyone acting for LAIL between November 1, 2014 and December 31, 2017, including but not limited to the meetings that took place on:

   11.1. January 13, 2015;

   11.2. October 6, 2016;

   11.3. October 28, 2016; and

   11.4. May 5, 2017.

12. All documents or communications showing how the meetings between Mr. Hall and Daniel Sargeant or anyone acting for LAIL between November 1, 2014 and December 31, 2017 were arranged, and/or evidencing the purpose and/or subject matter of those meetings.

13. All documents or communications that show Mr. Hall and Daniel Sargeant were in contact in or about August 2016 regarding matters concerning LAIL or Mr. Ruperti or the possibility of provision of documents or information by Mr. Hall relating to either of these.

14. All emails exchanged between Mr. Hall and Daniel Sargeant or anyone acting for LAIL regarding Mr. Ruperti, any Ruperti-controlled entities, any JV Companies, LAIL, and/or PDVSA, including but not limited to those dated:

   14.1. May 4, 2017;

   14.2. May 8, 2017;

   14.3. May 10, 2017;

   14.4. May 11, 2017;

   14.5. May 26, 2017;

   14.6. July 19, 2017; and

   14.7. July 26, 2017.

15.     All documents or communications showing that Mr. Hall requested and/or obtained indemnification and/or payment from Mr. Daniel Sargeant and/or LAIL in connection with having provided them with documents in October 2016 that related to Mr. Ruperti, any Ruperti-controlled entities, any JV Companies, LAIL, and/or PDVSA.

16.     All documents and communications showing the purpose for the exchange of documents relating to Mr. Ruperti, any Ruperti-controlled entities, any JV Companies, LAIL, and/or PDVSA between Mr. Hall and Daniel Sargeant, including LAIL's need for such documents.

### *Requests relating to whether the PDVSA/Ruperti settlement was in the public domain*

17.     All documents and communications showing that Daniel Sargeant and/or anyone acting for LAIL became aware of and/or reviewed any of the following documents prior to October 6, 2016:

17.1.   The witness statement of Edward Poulton dated March 18, 2015 and/or its accompanying exhibit;

17.2.   The witness statement of Benjamin Ogden dated March 27, 2015 and/or its accompanying exhibit;

17.3.   The witness statement of Richard Allen dated March 30, 2015 and/or its accompanying exhibit;

17.4.   The judgment entered by the Commercial Court (Mr. Justice Andrew Smith) in *Novoship (UK) Ltd & others v. Mikhaylyuk & others* [2015] EWHC 992 (Comm);

17.5.   The article in *TradeWinds* magazine entitled "*Novoship demands against Ruperti*"; and/or

17.6.   The settlement agreement between PDVSA and the Ruperti-controlled entities Sea Pioneer Shipping Corporation and Maroil dated on or about December 22, 2014.

18.   All documents and communications between January 2015 and October 2016, which evidence:

18.1.   a belief or suspicion on the part of Daniel Sargeant and/or anyone acting for LAIL that Mr. Ruperti had concluded a settlement agreement with PDVSA; and/or

18.2.   Daniel Sargeant and/or LAIL's intention to bring legal proceedings against Mr. Ruperti and/or any Ruperti-controlled entities in connection with Mr. Ruperti's actual or potential conclusion of a settlement agreement with PDVSA.

19.   All correspondence between Daniel Sargeant, Mr. Andrew Longhurst, and/or Mr. Andrew Preston between March 18, 2015 and October 6, 2016 referring to Mr. Ruperti's actual or potential settlement with PDVSA.

### Requests relating to the JV Companies and JV Vessels

20.   All documents or communications related to the negotiation of an agreement between Harry Sargeant III and Mr. Ruperti in or around 2001 concerning:

20.1.   any  joint ventures between LAIL and Maroil, including how the joint venture would be owned and operated;

20.2.   the chartering of vessels owned by any such joint ventures to third parties, including to Maroil, PDVSA or its affiliates;

20.3.   the manner in which the proceeds of such charters would be distributed; and/or

20.4.   the duties that the participants in such joint ventures would owe to each other, which may have included the duty to exercise reasonable diligence in relation to the business of the joint ventures and to act in good faith as business partners.

21. The full constitutional documents of each of the following companies, including their respective articles of association, shareholders' agreements, and any other written agreements governing the basis on which the companies would be owned and operated:

    21.1.   Oceanic Oil Venture Inc. ("OOV");

    21.2.   Hero Maritime Corp ("HMC");

    21.3.   Herculito Maritime Ltd ("Herculito");

    21.4.   Bolivarian Petroleum Transport Ltd ("BPT");

    21.5.   Oil Carriers Ltd ("OCL"); and

    21.6.   Suramericana de Transporte Petrolero C.A.

22. The contracts and other agreements by which the purchases of the following vessels were financed and/or mortgaged by Deutsche Schiffsbank Aktiengesellschaft ("DSB"), Commerzbank, and/or Lloyds TSB Bank Plc ("Lloyds Bank"):

    22.1.   The VLCC "*Leander*";

    22.2.   The VLCC "*Hero 1*";

    22.3.   The Panamax "*Polar*"; and

    22.4.   The Panamax "*Alloro.*"

23. All documents which evidence the dates on which any bank took possession of any of the JV Vessels.

24. All bills of sale, confirmations from mortgagee banks, or other similar documents formally evidencing the dates of sale of each of the JV Vessels by any of the banks that exercised their mortgagee rights over the JV Vessels.

25. All statements or other similar documents evidencing the outstanding indebtedness of the JV Companies to their respective mortgagee banks for the purchase of each of the JV Vessels between March 1, 2013 and December 22, 2014.

26.   All documents and communications showing any transfer of LAIL's interests in Suramericana de Transporte Petrolero C.A. in or around March 2004.

### *Requests relating to the use of the JV Vessels by PDVSA*

27.   All documents or communications between Harry Sargeant III and Mr. Ruperti in 2004 and 2005   regarding the distribution of any proceeds of the charter of the *Polar* to PDVSA.

28.   All documents or communications between Harry Sargeant III and Mr. Ruperti in 2004 and 2005 regarding the distribution of any proceeds of the charter of the *Alloro* to PDVSA.

29.   A copy of the "Clarification Letter" dated April 7, 2006, which varied the contract of affreightment as between Sea Pioneer and PDVSA dated March 22, 2006 (the "COA");

30.   All documents or communications between January 1, 2007 and the dates of sale of any of the JV Vessels by any of the mortgagee banks which evidence:

    30.1.   requests made by Sea Pioneer that the *Leander* and/or the *Hero 1* should be made available to perform the COA;

    30.2.   failures or refusals by LAIL, Oceanic Transport Shipping ("OTS"), OOV and/or HMC to make the *Leander* and/or the *Hero 1* available in response to such requests by Sea Pioneer; and/or

    30.3.   the reasons for any such failures or refusals.

31.   Any charterparties dated between January 1, 2007 and the dates of sale of any of the JV Vessels by any of the mortgagee banks pursuant to which the *Leander* and/or the *Hero 1* were used, other than for the performance of the COA with PDVSA.

32.   All documents or communications between January 1, 2007 and the dates of sale of any of the JV Vessels by any of the mortgagee banks showing that the *Leander* and/or the

*Hero 1* were used in performing voyages under the COA, including the following voyages:

32.1.   As regards the *Leander*:

    32.1.1.   A voyage from Bonaire to Guangzhou / Zhoushan between April 5, 2007 and May 25, 2007; and

    32.1.2.   A voyage from Bullen Bay / Bonaire to Karimun / Zhousan between August 9, 2007 and October 13, 2007.

32.2.   As regards the *Hero 1*:

    32.2.1.   A Karimun / Telapas (Singapore) voyage in early/mid 2007;

    32.2.2.   A voyage from Freeport to Shen Zhan and Zhousan between January 28, 2007 and August 23, 2007; and

    32.2.3.   A shipment loaded at Curacao and ultimately discharged again at Curacao between November 1, 2008 and December 24, 2008.

33.   All documents or communications from Mr. Ruperti or any Ruperti-controlled entities to LAIL, any of the Sargeants, OTS, OOV, and/or HMC which evidence the chartering by Sea Pioneer of vessels other than the *Leander* and the *Hero 1* to perform the COA, including in particular the vessels *Pisces Star*, *Eagle Valencia* and *Ural*.

### Requests relating to the treatment of earnings of the JV Companies

34.   All documents and communications showing the JV Companies' financial status between 2006 and 2015, including all income, profit and loss statements during that period.

35.   All documents and communications showing how the finances of the JV Companies were supposed to be managed, including documents and communications regarding (i) how income generated by the chartering of the JV Vessels was to be remitted to the JV

Companies, (ii) how expenses incurred by the JV Companies were to be handled, and (iii) how and when the shareholders of the JV Companies were to be paid.

36.     All documents and communications showing any payments made to LAIL by the JV Companies or by any third parties relating to the chartering of any of the JV Vessels between 2006 and 2015.

37.     All documents and communications showing any payments made to Mr. Ruperti or any Ruperti-controlled entities by the JV Companies or by any third parties relating to the chartering of any of the JV Vessels between 2006 and 2015.

*Requests relating to the disputes with PDVSA*

38.     All documents and communications relating to the meeting held between the directors of OOV and HMC on or about December 20, 2010, including documents indicating the matters discussed at the meeting and any documents reviewed at the meeting.

39.     All documents and communications relating to the decision by OOV and HMC to initiate arbitration proceedings against PDVSA.

40.     Any witness statements, expert reports, documentary evidence and/or written submissions served in the arbitration proceedings brought by OOV and HMC against PDVSA (the "First PDVSA Arbitration").

41.     A copy of the spreadsheets attached to (i) the claim submissions dated August 29, 2011 and (ii) the amended claim submissions dated January 23, 2012 from the First PDVSA Arbitration.

42.     A copy of all documents served in the First PDVSA Arbitration to support the amended claim submissions dated January 23, 2012.

43.  All documents and communications from the tribunal in the First PDVSA Arbitration asking questions about the calculation of the claim submissions, including the tribunal's July 10, 2012 request.

44.  All documents and communications relating to Harry Sargeant III's proposal in or about October and November 2012 that DSB take over the First PDVSA Arbitration, including any response to that proposal by LAIL, Mr. Ruperti, OTS, HMC and/or OOV.

45.  All correspondence between LAIL, Mr. Ruperti, OTS, HMC and/or OOV (on the one hand) and the mortgagee banks of the JV Vessels (DSB or Commerzbank) (on the other hand) relating to the First PDVSA Arbitration.

46.  All documents and communications relating to any claims against PDVSA regarding its charters of the *Polar* and/or the *Alloro*.

47.  All documents and communications relating to any claims by Sea Pioneer and/or Mr Ruperti against PDVSA between 2006 and August 9, 2012.

48.  A copy of the letter dated August 9, 2012 from Freddy Belisario Capella Abogados to Petroleos de Venezuela C.A. (the parent company of PDVSA).

### *Requests relating to the negotiations with PDVSA*

49.  All documents and communications relating to the appointment of Mr. Patrick Mooney and Mr. Alejandro Leandros in or about March 2013 on behalf of OOV and HMC to negotiate a settlement of the First PDVSA Arbitration.

50.  All documents and communications reflecting the matters discussed at the meeting in October 2013 between Commerzbank, LAIL, OTS and Maroil.

51.  All documents and communications relating to the appointment of Mr. Mooney and Mr. Ruperti in or about May 2014 on behalf of OOV and HMC to negotiate a settlement of the First PDVSA Arbitration.

52.   All documents and communications reflecting the matters discussed at the meeting on or about May 7, 2014 between Daniel Sargeant, Mr. Mooney, and Mr. Ruperti in Miami.

53.   All documents and communications relating to whether Mr. Mooney and Mr. Preston were authorized by OOV and HMC to meet with Commerzbank on September 25, 2014 on their behalf.

54.   All documents and communications reflecting the matters discussed at the meeting on September 25, 2014 between Commerzbank, Mr. Mooney and Mr. Preston.

55.   All documents and communications relating to the discussions between LAIL, Mr. Ruperti, OTS, OOV and/or HMC (on the one hand) and Commerzbank (on the other hand) between September 1, 2014 and December 22, 2014 regarding a settlement proposal to PDVSA.

56.   All documents and communications between September 1, 2014 and December 22, 2014 relating to:

56.1.   the terms on which Commerzbank was willing settle the First PDVSA Arbitration;

56.2.   the sums which Commerzbank wanted to receive from the settlement for the debt owed on the JV Vessels; and

56.3.   the manner in which Commerzbank wanted the settlement negotiations with PDVSA to be conducted, including whether it was in agreement with Mr. Ruperti leading the settlement negotiations personally.

57.   All documents and communications relating to the consideration given by LAIL, OTS, OOV and/or HMC of the draft board resolutions and letters of authority presented by Mr. Preston on November 7, 2014, that were intended to be given to Mr. Mooney and Mr. Ruperti.

58.     All documents and communications between LAIL, OTS, OOV, HMC, Daniel Sargeant, Mr. Mooney, Mr. Ruperti, and/or Mr. Preston between September 2014 and October 2016 relating to how the proceeds of any settlement with PDVSA ought to be distributed.

59.     All documents and communications from Mr. Mooney, Mr. Ruperti, and/or Mr. Leandros between March 2013 and October 2016 relating to the status of the settlement negotiations with PDVSA.

60.     All documents and communications relating to any expenses allegedly incurred by Mr. Mooney, Mr. Ruperti, and/or any Ruperti-related entities in conducting settlement negotiations with PDVSA.

### *Requests relating to Ruperti's concealment of the PDVSA settlements*

61.     All documents and communications describing the matters discussed at the meeting on February 12, 2015 between Mr. Mooney and Mr. Preston.

62.     Any draft settlement agreements between Sea Pioneer, Maroil, and/or LAIL created between February 2015 and October 2016, relating to the distribution of the proceeds of any settlement with PDVSA.

63.     All documents and communications exchanged between Daniel Sargeant, Mr. Ruperti, and/or Mr. Mooney relating to any draft settlement agreements with PDVSA.

64.     All documents and communications exchanged between Daniel Sargeant and/or Mr. Preston (on the one hand) and Mr. Mooney and/or Mr. Ruperti (on the other hand) between December 2014 and October 2016 relating to PDVSA.

65.     All documents and communications describing the matters discussed at any meetings between Daniel Sargeant and Mr. Ruperti between December 2014 and October 2016,

including but not limited to the meeting held on June 1, 2015 at the Four Seasons Hotel in Geneva.

66.    All documents and communications exchanged between Mr. Ruperti and/or Mr. Mooney between December 2014 and October 2016 relating to whether a settlement had been reached with PDVSA, including any express representations that no such settlement had been reached.

*Requests relating to the LAIL/Ruperti Proceedings and Settlement*

67.    A copy of the settlement agreement between LAIL, OTS, Maroil and/or any other Ruperti-controlled entities dated on or around November 17, 2017.

68.    All banking records evidencing any payments made by Maroil or any Ruperti-controlled entities to LAIL and/or OTS pursuant to the settlement agreement between them dated November 17, 2017 (and/or any addenda or supplementary agreements thereto).

*Requests relating to the Florida Action*

69.    All documents and communications relating to the merits of the claims of fraud alleged in the Florida Action.

70.    All non-privileged documents and communications relating to the negotiation of the settlement of the Florida Action as between Harry Sargeant III and Mr. Ruperti and his entities, including a copy of the settlement agreement itself.

71.    All documents showing the amounts that Mr. Ruperti and/or his entities paid to Harry Sargeant III to settle the Florida Action.

72.    All testimony (including depositions, witness statements, or testimony given in open court or otherwise) obtained in the Florida Action relating to (1) the claims of fraud

orchestrated by Mr. Ruperti against LAIL, and (2) the exchange of information between Daniel Sargeant and Mr. Hall that helped uncover the fraud.

73. All documents obtained during the course of discovery in the Florida Action relating to (1) the claims of fraud orchestrated by Mr. Ruperti against LAIL, and (2) the exchange of information between Daniel Sargeant and Mr. Hall that helped uncover the fraud.

74. All testimony (including depositions, witness statements, or testimony given in open court or otherwise) obtained in the Florida Action relating to whether Mr. Hall knew he was exchanging information with Daniel Sargeant in violation of the 2016 Settlement Agreement.

75. All documents obtained during the course of discovery in the Florida Action relating to whether Mr. Hall knew he was exchanging information with Daniel Sargeant in violation of the 2016 Settlement Agreement.

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | |
|---|---|
| IN RE APPLICATION OF | ) |
| NOVOSHIP (UK) LIMITED<br>Applicant, | ) |
| | ) Civil Action No. |
| Pursuant to 28 U.S.C. § 1782 for Judicial Assistance in | ) |
| Obtaining Evidence for use in Foreign and International | ) |
| Proceedings. | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                          DANIEL SARGEANT
               321 E. HILLSBORO BLVD, SUITE 100, DELRAY BEACH, FL 33441
               *(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: Reed Smith LLP<br>1001 Brickell Bay Drive, Suite 900<br>Miami, FL 33131 | Date and Time:<br><br>TBD |
|---|---|

The deposition will be recorded by this method: _____

☑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:
          See Schedule A (enclosed)

        The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

              *CLERK OF COURT*
                                              OR
        _____          _____
           *Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  Applicant,
Novoship (UK) Limited                                                    , who issues or requests this subpoena, are:
Edward M. Mullins, Reed Smith LLP, 1001 Brickell Bay Dr. Suite 900, Miami, FL 33131, emullins@reedsmith.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____  .

❐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____  on *(date)* _____  ; or

❐ I returned the subpoena unexecuted because: _____

_____  .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____  .

My fees are $ _____  for travel and $ _____  for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**Schedule A to Subpoena**

**Definitions and Instructions**

1. "Novoship" shall mean Novoship (UK) Limited, as well as any of its agents, attorneys, accountants, consultants, representatives, assignees, and any other individual or entity associated or affiliated with it, or purporting to act on its behalf with respect to the matter in question.

2. "Mr. Ruperti" shall mean Wilmer Ruperti.

3. "Ruperti-controlled entities" shall mean all entities beneficially owned by and/or controlled by Mr. Ruperti, including but not limited to Maroil Trading Inc. and Sea Pioneer Shipping Corporation, as well as any of Mr. Ruperti's agents, attorneys, accountants, consultants, representatives, assignees, and any other individual or entity associated or affiliated with him, or purporting to act on his behalf with respect to the matter in question.

4. "Mr. Hall" shall mean Daniel James Hall of Burford.

5. "JV Companies" shall mean the joint business ventures created between Mr. Ruperti and LAIL and/or the Sargeants, including but not limited to Oceanic Oil Venture Inc., Hero Maritime Corp, Herculito Maritime Ltd, Oil Carriers Ltd, Bolivarian Petroleum Transport Ltd, and Suramericana de Transporte Petrolero C.A.

6. "JV Vessels" shall mean the vessels owned by the JV Companies that were chartered to PDVSA, including but not limited to the *Alloro*, the *Polar*, the *Leander*, and the *Hero I*.

7. "LAIL" shall mean Latin American Investments Limited, as well as any of its agents, attorneys, accountants, consultants, representatives, assignees, and any other individual or entity associated or affiliated with it, or purporting to act on its behalf with respect to the matter in question.

8. "PDVSA" shall mean PDVSA Petroleo S.A., the Venezuelan national oil company.

9. "Maroil" shall mean Maroil Trading, Inc., one of the Ruperti-controlled entities.

10. "Burford" shall mean Burford Capital (UK) Limited, as well as any of its agents, attorneys, accountants, consultants, representatives, assignees, and any other individual or entity associated or affiliated with it, or purporting to act on its behalf with respect to the matter in question.

11. "2016 Settlement Agreement" shall mean the second settlement agreement entered into between Novoship and Mr. Ruperti and/or other Ruperti- controlled entities relating to settling the judgment obtained by Novoship in the case before the English High Court entitled *Novoship & Ors v. Mikhaylyuk & Ors*, [2012] EWHC 3586 (Comm).

12. "Florida Action" shall mean the lawsuit entitled *Harry Sargeant III v. Maroil Trading Inc., et al.*, Case No. 17-cv-81070 (S.D. Fla. Sept. 25, 2017).

13. "Document" or "documents" shall mean and include, without limitation, any written or graphic matter or other means of preserving thought or expression, and all tangible things from which information can be processed or transcribed, including the original and all non-identical copies, whether different from the original by reason of any notation made on such copy or otherwise, including, but not limited to, contracts, agreements, mortgages, deeds, leases, financing applications, loan applications, letters of intent, asset purchase agreements, management contracts, operating agreements, writings, written communications, visual, graphic or pictorial displays of any description whatsoever, including, but not limited to, each writing or printing, graph, chart, financial report, tape recording, data computation, ledger sheet, journal entry, invoice, shipping document, bill of lading, purchase order, receipt, return, telephone bill, telephone message slip, schedule, affidavit, memorandum or note of intra office and interoffice telephone calls, letter, letter telegram, blueprint, photograph, video tape, check, canceled check, transcript, statistics, bank statement, financial statement, letter of credit, standby letter of credit, irrevocable and/or revocable standby letter of credit, performance bond, insurance contract and related

and/or appended schedule, promissory note, audit report, writing relating to credit and/or loan committee(s) activities, tested telex, untested telex, wire communication, telegrams, teletype, telefax, email, bulletin, correspondence, notes, word diary, chronological data, minutes, work sheet, book, travel log, survey, magazine or newspaper article, press release (and  any and all drafts, alterations or modifications, changes, amendments of any of the foregoing), office memorandum, graphic or oral record or representation of any kind (including, without limitation, graphs, microfiche, microfilm, videotapes, recordings, motion pictures, electronic, mechanical, electrical, or chemical recordings or representations of any kind), photograph, prospectus, testing or analysis report or other source of recorded information, including tapes, cassettes, disks, recordings, computer data from which information can be obtained or translated into useable form including manuals, guides and other written information necessary to translate computer routine documents into useable form

14. "Communication" or "communications" shall mean any exchange or transmission of information, whether moral, written, via electronic mail, text message, direct message, social media, or by other means, and includes, but is not limited to, written, oral, telephonic, via electronic mail, representation, discussion, meeting, letter, correspondence, memorandum, newsletter, telegram, advertisement, speech, conversation, conference, note, e-mail or computer-generated message and any other document which refers to any such communication.

15. "Relating to," "related to," "relates to" or "relate to" shall mean: in any way directly or indirectly, containing, constituting, comprising, showing, evidencing, mentioning, reflecting, pertaining to, or referring in any way, directly or indirectly, to and is meant to include, among other documents, documents underlying, supporting, now or previously

attached or appended to, or used in the preparation of any document called for by the discovery requested herein.

16. "Including" shall mean "including, but not limited to" so as to require the broadest possible inclusion.

17. The terms "and" and "or" shall be construed conjunctively and disjunctively so as to require the broadest possible inclusion.

18. "All" shall be construed to include the word "any," and the word "any" shall be construed to include the word "all."

19. Unless otherwise stated in a request, the time period for documents responsive to these requests is January 1, 2015 to December 31, 2018.

## Document Requests

***Requests relating to the exchanges of documents between Mr. Hall and Daniel Sargeant/LAIL in January 2015 and October 2016***

1. All documents and communications exchanged between Mr. Hall and Daniel Sargeant and/or anyone acting on behalf of LAIL between January 2015 and March 2017 that concern Mr. Ruperti, any Ruperti-controlled entities, any JV Companies, LAIL, and/or PDVSA.

2. All documents that show there were communications between Mr. Hall and Daniel Sargeant and/or anyone acting on behalf of LAIL between January 2015 and March 2017.

3. All documents indicating the source(s) from which Mr. Hall obtained any of the documents he provided to Daniel Sargeant between January 2015 and December 2016.

4. All documents and communications that show that Daniel Sargeant and/or anyone acting for LAIL actually reviewed the documents provided by Mr. Hall between January 2015 and March 2017.

4

5.      All documents and communications between January 2015 and March 2017 showing that Daniel Sargeant and/or anyone acting for LAIL requested Mr. Hall to provide documents concerning Mr. Ruperti, any Ruperti-controlled entities, any JV Companies, LAIL, and/or PDVSA.

6.      All documents or communications that show that an actual exchange of information related to Mr. Ruperti, Ruperti-controlled entities, the JV Companies, LAIL, and/or PDVSA occurred between Daniel Sargeant and Mr. Hall in January 2015 and/or October 2016.

7.      All documents or communications that show Daniel Sargeant and/or Mr. Hall knew, or should have known, that any of the documents provided by Mr. Hall in October 2016 were confidential and/or subject to duties to maintain their confidentiality.

8.      All documents or communications that show Daniel Sargeant and/or Mr. Hall knew, or should have known, that any of the documents provided by Mr. Hall in October 2016 evidenced unlawful and fraudulent conduct by Mr. Ruperti and/or any of the Ruperti-controlled entities against LAIL and/or the Sargeants.

9.      All documents or communications that show Daniel Sargeant and/or Mr. Hall knew, or should have known, that the provision of the documents by Mr. Hall in October 2016 would or might result in litigation brought (i) by Mr. Ruperti and/or any of the Ruperti-controlled entities against Novoship, or (ii) by Novoship against Mr. Hall and/or Burford.

***Requests relating to meetings and communications between Mr. Hall and Daniel Sargeant/LAIL***

10.      All documents or communications showing when Mr. Hall and Daniel Sargeant or anyone acting for LAIL fist made contact, including documents from in or around November 2014.

11.     All documents or communications showing the matters discussed between Mr. Hall and Daniel Sargeant or anyone acting for LAIL between November 1, 2014 and December 31, 2017, including but not limited to the meetings that took place on:

11.1.   January 13, 2015;

11.2.   October 6, 2016;

11.3.   October 28, 2016; and

11.4.   May 5, 2017.

12.     All documents or communications showing how the meetings between Mr. Hall and Daniel Sargeant or anyone acting for LAIL between November 1, 2014 and December 31, 2017 were arranged, and/or evidencing the purpose and/or subject matter of those meetings.

13.     All documents or communications that show Mr. Hall and Daniel Sargeant were in contact in or about August 2016 regarding matters concerning LAIL or Mr. Ruperti or the possibility of provision of documents or information by Mr. Hall relating to either of these.

14.     All emails exchanged between Mr. Hall and Daniel Sargeant or anyone acting for LAIL regarding Mr. Ruperti, any Ruperti-controlled entities, any JV Companies, LAIL, and/or PDVSA, including but not limited to those dated:

14.1.   May 4, 2017;

14.2.   May 8, 2017;

14.3.   May 10, 2017;

14.4.   May 11, 2017;

14.5.   May 26, 2017;

14.6.   July 19, 2017; and

14.7.   July 26, 2017.

15.   All documents or communications showing that Mr. Hall requested and/or obtained indemnification and/or payment from Mr. Daniel Sargeant and/or LAIL in connection with having provided them with documents in October 2016 that related to Mr. Ruperti, any Ruperti-controlled entities, any JV Companies, LAIL, and/or PDVSA.

16.   All documents and communications showing the purpose for the exchange of documents relating to Mr. Ruperti, any Ruperti-controlled entities, any JV Companies, LAIL, and/or PDVSA between Mr. Hall and Daniel Sargeant, including LAIL's need for such documents.

### *Requests relating to whether the PDVSA/Ruperti settlement was in the public domain*

17.   All documents and communications showing that Daniel Sargeant and/or anyone acting for LAIL became aware of and/or reviewed any of the following documents prior to October 6, 2016:

   17.1.   The witness statement of Edward Poulton dated March 18, 2015 and/or its accompanying exhibit;

   17.2.   The witness statement of Benjamin Ogden dated March 27, 2015 and/or its accompanying exhibit;

   17.3.   The witness statement of Richard Allen dated March 30, 2015 and/or its accompanying exhibit;

   17.4.   The judgment entered by the Commercial Court (Mr. Justice Andrew Smith) in *Novoship (UK) Ltd & others v. Mikhaylyuk & others* [2015] EWHC 992 (Comm);

   17.5.   The article in *TradeWinds* magazine entitled "*Novoship demands against Ruperti*"; and/or

17.6.   The settlement agreement between PDVSA and the Ruperti-controlled entities Sea Pioneer Shipping Corporation and Maroil dated on or about December 22, 2014.

18.   All documents and communications between January 2015 and October 2016, which evidence:

18.1.   a belief or suspicion on the part of Daniel Sargeant and/or anyone acting for LAIL that Mr. Ruperti had concluded a settlement agreement with PDVSA; and/or

18.2.   Daniel Sargeant and/or LAIL's intention to bring legal proceedings against Mr. Ruperti and/or any Ruperti-controlled entities in connection with Mr. Ruperti's actual or potential conclusion of a settlement agreement with PDVSA.

19.   All correspondence between Daniel Sargeant, Mr. Andrew Longhurst, and/or Mr. Andrew Preston between March 18, 2015 and October 6, 2016 referring to Mr. Ruperti's actual or potential settlement with PDVSA.

### *Requests relating to the JV Companies and JV Vessels*

20.   All documents or communications related to the negotiation of an agreement between Harry Sargeant III and Mr. Ruperti in or around 2001 concerning:

20.1.   any  joint ventures between LAIL and Maroil, including how the joint venture would be owned and operated;

20.2.   the chartering of vessels owned by any such joint ventures to third parties, including to Maroil, PDVSA or its affiliates;

20.3.   the manner in which the proceeds of such charters would be distributed; and/or

20.4.   the duties that the participants in such joint ventures would owe to each other, which may have included the duty to exercise reasonable diligence in relation to the business of the joint ventures and to act in good faith as business partners.

21.     The full constitutional documents of each of the following companies, including their respective articles of association, shareholders' agreements, and any other written agreements governing the basis on which the companies would be owned and operated:

21.1.   Oceanic Oil Venture Inc. ("OOV");

21.2.   Hero Maritime Corp ("HMC");

21.3.   Herculito Maritime Ltd ("Herculito");

21.4.   Bolivarian Petroleum Transport Ltd ("BPT");

21.5.   Oil Carriers Ltd ("OCL"); and

21.6.   Suramericana de Transporte Petrolero C.A.

22.     The contracts and other agreements by which the purchases of the following vessels were financed and/or mortgaged by Deutsche Schiffsbank Aktiengesellschaft ("DSB"), Commerzbank, and/or Lloyds TSB Bank Plc ("Lloyds Bank"):

22.1.   The VLCC "*Leander*";

22.2.   The VLCC "*Hero 1*";

22.3.   The Panamax "*Polar*"; and

22.4.   The Panamax "*Alloro.*"

23.     All documents which evidence the dates on which any bank took possession of any of the JV Vessels.

24.     All bills of sale, confirmations from mortgagee banks, or other similar documents formally evidencing the dates of sale of each of the JV Vessels by any of the banks that exercised their mortgagee rights over the JV Vessels.

25.     All statements or other similar documents evidencing the outstanding indebtedness of the JV Companies to their respective mortgagee banks for the purchase of each of the JV Vessels between March 1, 2013 and December 22, 2014.

26.     All documents and communications showing any transfer of LAIL's interests in Suramericana de Transporte Petrolero C.A. in or around March 2004.

### Requests relating to the use of the JV Vessels by PDVSA

27.     All documents or communications between Harry Sargeant III and Mr. Ruperti in 2004 and 2005   regarding the distribution of any proceeds of the charter of the *Polar* to PDVSA.

28.     All documents or communications between Harry Sargeant III and Mr. Ruperti in 2004 and 2005 regarding the distribution of any proceeds of the charter of the *Alloro* to PDVSA.

29.     A copy of the "Clarification Letter" dated April 7, 2006, which varied the contract of affreightment as between Sea Pioneer and PDVSA dated March 22, 2006 (the "COA");

30.     All documents or communications between January 1, 2007 and the dates of sale of any of the JV Vessels by any of the mortgagee banks which evidence:

   30.1.   requests made by Sea Pioneer that the *Leander* and/or the *Hero 1* should be made available to perform the COA;

   30.2.   failures or refusals by LAIL, Oceanic Transport Shipping ("OTS"), OOV and/or HMC to make the *Leander* and/or the *Hero 1* available in response to such requests by Sea Pioneer; and/or

   30.3.   the reasons for any such failures or refusals.

31.     Any charterparties dated between January 1, 2007 and the dates of sale of any of the JV Vessels by any of the mortgagee banks pursuant to which the *Leander* and/or the *Hero 1* were used, other than for the performance of the COA with PDVSA.

32.     All documents or communications between January 1, 2007 and the dates of sale of any of the JV Vessels by any of the mortgagee banks showing that the *Leander* and/or the

*Hero 1* were used in performing voyages under the COA, including the following voyages:

    32.1.   As regards the *Leander*:

        32.1.1.   A voyage from Bonaire to Guangzhou / Zhoushan between April 5, 2007 and May 25, 2007; and

        32.1.2.   A voyage from Bullen Bay / Bonaire to Karimun / Zhousan between August 9, 2007 and October 13, 2007.

    32.2.   As regards the *Hero 1*:

        32.2.1.   A Karimun / Telapas (Singapore) voyage in early/mid 2007;

        32.2.2.   A voyage from Freeport to Shen Zhan and Zhousan between January 28, 2007 and August 23, 2007; and

        32.2.3.   A shipment loaded at Curacao and ultimately discharged again at Curacao between November 1, 2008 and December 24, 2008.

33.    All documents or communications from Mr. Ruperti or any Ruperti-controlled entities to LAIL, any of the Sargeants, OTS, OOV, and/or HMC which evidence the chartering by Sea Pioneer of vessels other than the *Leander* and the *Hero 1* to perform the COA, including in particular the vessels *Pisces Star*, *Eagle Valencia* and *Ural*.

***Requests relating to the treatment of earnings of the JV Companies***

34.    All documents and communications showing the JV Companies' financial status between 2006 and 2015, including all income, profit and loss statements during that period.

35.    All documents and communications showing how the finances of the JV Companies were supposed to be managed, including documents and communications regarding (i) how income generated by the chartering of the JV Vessels was to be remitted to the JV

Companies, (ii) how expenses incurred by the JV Companies were to be handled, and (iii) how and when the shareholders of the JV Companies were to be paid.

36.   All documents and communications showing any payments made to LAIL by the JV Companies or by any third parties relating to the chartering of any of the JV Vessels between 2006 and 2015.

37.   All documents and communications showing any payments made to Mr. Ruperti or any Ruperti-controlled entities by the JV Companies or by any third parties relating to the chartering of any of the JV Vessels between 2006 and 2015.

### Requests relating to the disputes with PDVSA

38.   All documents and communications relating to the meeting held between the directors of OOV and HMC on or about December 20, 2010, including documents indicating the matters discussed at the meeting and any documents reviewed at the meeting.

39.   All documents and communications relating to the decision by OOV and HMC to initiate arbitration proceedings against PDVSA.

40.   Any witness statements, expert reports, documentary evidence and/or written submissions served in the arbitration proceedings brought by OOV and HMC against PDVSA (the "First PDVSA Arbitration").

41.   A copy of the spreadsheets attached to (i) the claim submissions dated August 29, 2011 and (ii) the amended claim submissions dated January 23, 2012 from the First PDVSA Arbitration.

42.   A copy of all documents served in the First PDVSA Arbitration to support the amended claim submissions dated January 23, 2012.

43. All documents and communications from the tribunal in the First PDVSA Arbitration asking questions about the calculation of the claim submissions, including the tribunal's July 10, 2012 request.

44. All documents and communications relating to Harry Sargeant III's proposal in or about October and November 2012 that DSB take over the First PDVSA Arbitration, including any response to that proposal by LAIL, Mr. Ruperti, OTS, HMC and/or OOV.

45. All correspondence between LAIL, Mr. Ruperti, OTS, HMC and/or OOV (on the one hand) and the mortgagee banks of the JV Vessels (DSB or Commerzbank) (on the other hand) relating to the First PDVSA Arbitration.

46. All documents and communications relating to any claims against PDVSA regarding its charters of the *Polar* and/or the *Alloro*.

47. All documents and communications relating to any claims by Sea Pioneer and/or Mr Ruperti against PDVSA between 2006 and August 9, 2012.

48. A copy of the letter dated August 9, 2012 from Freddy Belisario Capella Abogados to Petroleos de Venezuela C.A. (the parent company of PDVSA).

### *Requests relating to the negotiations with PDVSA*

49. All documents and communications relating to the appointment of Mr. Patrick Mooney and Mr. Alejandro Leandros in or about March 2013 on behalf of OOV and HMC to negotiate a settlement of the First PDVSA Arbitration.

50. All documents and communications reflecting the matters discussed at the meeting in October 2013 between Commerzbank, LAIL, OTS and Maroil.

51. All documents and communications relating to the appointment of Mr. Mooney and Mr. Ruperti in or about May 2014 on behalf of OOV and HMC to negotiate a settlement of the First PDVSA Arbitration.

52.    All documents and communications reflecting the matters discussed at the meeting on or about May 7, 2014 between Daniel Sargeant, Mr. Mooney, and Mr. Ruperti in Miami.

53.    All documents and communications relating to whether Mr. Mooney and Mr. Preston were authorized by OOV and HMC to meet with Commerzbank on September 25, 2014 on their behalf.

54.    All documents and communications reflecting the matters discussed at the meeting on September 25, 2014 between Commerzbank, Mr. Mooney and Mr. Preston.

55.    All documents and communications relating to the discussions between LAIL, Mr. Ruperti, OTS, OOV and/or HMC (on the one hand) and Commerzbank (on the other hand) between September 1, 2014 and December 22, 2014 regarding a settlement proposal to PDVSA.

56.    All documents and communications between September 1, 2014 and December 22, 2014 relating to:

56.1.   the terms on which Commerzbank was willing settle the First PDVSA Arbitration;

56.2.   the sums which Commerzbank wanted to receive from the settlement for the debt owed on the JV Vessels; and

56.3.   the manner in which Commerzbank wanted the settlement negotiations with PDVSA to be conducted, including whether it was in agreement with Mr. Ruperti leading the settlement negotiations personally.

57.    All documents and communications relating to the consideration given by LAIL, OTS, OOV and/or HMC of the draft board resolutions and letters of authority presented by Mr. Preston on November 7, 2014, that were intended to be given to Mr. Mooney and Mr. Ruperti.

58.　　All documents and communications between LAIL, OTS, OOV, HMC, Daniel Sargeant, Mr. Mooney, Mr. Ruperti, and/or Mr. Preston between September 2014 and October 2016 relating to how the proceeds of any settlement with PDVSA ought to be distributed.

59.　　All documents and communications from Mr. Mooney, Mr. Ruperti, and/or Mr. Leandros between March 2013 and October 2016 relating to the status of the settlement negotiations with PDVSA.

60.　　All documents and communications relating to any expenses allegedly incurred by Mr. Mooney, Mr. Ruperti, and/or any Ruperti-related entities in conducting settlement negotiations with PDVSA.

### Requests relating to Ruperti's concealment of the PDVSA settlements

61.　　All documents and communications describing the matters discussed at the meeting on February 12, 2015 between Mr. Mooney and Mr. Preston.

62.　　Any draft settlement agreements between Sea Pioneer, Maroil, and/or LAIL created between February 2015 and October 2016, relating to the distribution of the proceeds of any settlement with PDVSA.

63.　　All documents and communications exchanged between Daniel Sargeant, Mr. Ruperti, and/or Mr. Mooney relating to any draft settlement agreements with PDVSA.

64.　　All documents and communications exchanged between Daniel Sargeant and/or Mr. Preston (on the one hand) and Mr. Mooney and/or Mr. Ruperti (on the other hand) between December 2014 and October 2016 relating to PDVSA.

65.　　All documents and communications describing the matters discussed at any meetings between Daniel Sargeant and Mr. Ruperti between December 2014 and October 2016,

including but not limited to the meeting held on June 1, 2015 at the Four Seasons Hotel in Geneva.

66.    All documents and communications exchanged between Mr. Ruperti and/or Mr. Mooney between December 2014 and October 2016 relating to whether a settlement had been reached with PDVSA, including any express representations that no such settlement had been reached.

### Requests relating to the LAIL/Ruperti Proceedings and Settlement

67.    A copy of the settlement agreement between LAIL, OTS, Maroil and/or any other Ruperti-controlled entities dated on or around November 17, 2017.

68.    All banking records evidencing any payments made by Maroil or any Ruperti-controlled entities to LAIL and/or OTS pursuant to the settlement agreement between them dated November 17, 2017 (and/or any addenda or supplementary agreements thereto).

### Requests relating to the Florida Action

69.    All documents and communications relating to the merits of the claims of fraud alleged in the Florida Action.

70.    All non-privileged documents and communications relating to the negotiation of the settlement of the Florida Action as between Harry Sargeant III and Mr. Ruperti and his entities, including a copy of the settlement agreement itself.

71.    All documents showing the amounts that Mr. Ruperti and/or his entities paid to Harry Sargeant III to settle the Florida Action.

72.    All testimony (including depositions, witness statements, or testimony given in open court or otherwise) obtained in the Florida Action relating to (1) the claims of fraud

orchestrated by Mr. Ruperti against LAIL, and (2) the exchange of information between Daniel Sargeant and Mr. Hall that helped uncover the fraud.

73.   All documents obtained during the course of discovery in the Florida Action relating to (1) the claims of fraud orchestrated by Mr. Ruperti against LAIL, and (2) the exchange of information between Daniel Sargeant and Mr. Hall that helped uncover the fraud.

74.   All testimony (including depositions, witness statements, or testimony given in open court or otherwise) obtained in the Florida Action relating to whether Mr. Hall knew he was exchanging information with Daniel Sargeant in violation of the 2016 Settlement Agreement.

75.   All documents obtained during the course of discovery in the Florida Action relating to whether Mr. Hall knew he was exchanging information with Daniel Sargeant in violation of the 2016 Settlement Agreement.

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

IN RE APPLICATION OF )
)
NOVOSHIP (UK) LIMITED )
Applicant, )     Civil Action No.
)
Pursuant to 28 U.S.C. § 1782 for Judicial Assistance in )
Obtaining Evidence for use in Foreign and International )
Proceedings. )

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                         JAMES SARGEANT
                    321 E. HILLSBORO BLVD, DEERFIELD BEACH, FL 33441
                    *(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: Reed Smith LLP<br>1001 Brickell Bay Drive, Suite 900<br>Miami, FL 33131 | Date and Time:<br><br>TBD |
|---|---|

The deposition will be recorded by this method: _____

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:
          See Schedule A (enclosed)

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

        *CLERK OF COURT*
                                        OR
        _____        _____
        *Signature of Clerk or Deputy Clerk*            *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* ___Applicant,___
Novoship (UK) Limited _____ , who issues or requests this subpoena, are:
Edward M. Mullins, Reed Smith LLP, 1001 Brickell Bay Dr. Suite 900, Miami, FL 33131, emullins@reedsmith.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _0.00___ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**Schedule A to Subpoena**

**Definitions and Instructions**

1. "Novoship" shall mean Novoship (UK) Limited, as well as any of its agents, attorneys, accountants, consultants, representatives, assignees, and any other individual or entity associated or affiliated with it, or purporting to act on its behalf with respect to the matter in question.

2. "Mr. Ruperti" shall mean Wilmer Ruperti.

3. "Ruperti-controlled entities" shall mean all entities beneficially owned by and/or controlled by Mr. Ruperti, including but not limited to Maroil Trading Inc. and Sea Pioneer Shipping Corporation, as well as any of Mr. Ruperti's agents, attorneys, accountants, consultants, representatives, assignees, and any other individual or entity associated or affiliated with him, or purporting to act on his behalf with respect to the matter in question.

4. "Mr. Hall" shall mean Daniel James Hall of Burford.

5. "JV Companies" shall mean the joint business ventures created between Mr. Ruperti and LAIL and/or the Sargeants, including but not limited to Oceanic Oil Venture Inc., Hero Maritime Corp, Herculito Maritime Ltd, Oil Carriers Ltd, Bolivarian Petroleum Transport Ltd, and Suramericana de Transporte Petrolero C.A.

6. "JV Vessels" shall mean the vessels owned by the JV Companies that were chartered to PDVSA, including but not limited to the *Alloro*, the *Polar*, the *Leander*, and the *Hero I*.

7. "LAIL" shall mean Latin American Investments Limited, as well as any of its agents, attorneys, accountants, consultants, representatives, assignees, and any other individual or entity associated or affiliated with it, or purporting to act on its behalf with respect to the matter in question.

8. "PDVSA" shall mean PDVSA Petroleo S.A., the Venezuelan national oil company.

9. "Maroil" shall mean Maroil Trading, Inc., one of the Ruperti-controlled entities.

10. "Burford" shall mean Burford Capital (UK) Limited, as well as any of its agents, attorneys, accountants, consultants, representatives, assignees, and any other individual or entity associated or affiliated with it, or purporting to act on its behalf with respect to the matter in question.

11. "2016 Settlement Agreement" shall mean the second settlement agreement entered into between Novoship and Mr. Ruperti and/or other Ruperti- controlled entities relating to settling the judgment obtained by Novoship in the case before the English High Court entitled *Novoship & Ors v. Mikhaylyuk & Ors*, [2012] EWHC 3586 (Comm).

12. "Florida Action" shall mean the lawsuit entitled *Harry Sargeant III v. Maroil Trading Inc., et al.*, Case No. 17-cv-81070 (S.D. Fla. Sept. 25, 2017).

13. "Document" or "documents" shall mean and include, without limitation, any written or graphic matter or other means of preserving thought or expression, and all tangible things from which information can be processed or transcribed, including the original and all non-identical copies, whether different from the original by reason of any notation made on such copy or otherwise, including, but not limited to, contracts, agreements, mortgages, deeds, leases, financing applications, loan applications, letters of intent, asset purchase agreements, management contracts, operating agreements, writings, written communications, visual, graphic or pictorial displays of any description whatsoever, including, but not limited to, each writing or printing, graph, chart, financial report, tape recording, data computation, ledger sheet, journal entry, invoice, shipping document, bill of lading, purchase order, receipt, return, telephone bill, telephone message slip, schedule, affidavit, memorandum or note of intra office and interoffice telephone calls, letter, letter telegram, blueprint, photograph, video tape, check, canceled check, transcript, statistics, bank statement, financial statement, letter of credit, standby letter of credit, irrevocable and/or revocable standby letter of credit, performance bond, insurance contract and related

2

and/or appended schedule, promissory note, audit report, writing relating to credit and/or loan committee(s) activities, tested telex, untested telex, wire communication, telegrams, teletype, telefax, email, bulletin, correspondence, notes, word diary, chronological data, minutes, work sheet, book, travel log, survey, magazine or newspaper article, press release (and  any and all drafts, alterations or modifications, changes, amendments of any of the foregoing), office memorandum, graphic or oral record or representation of any kind (including, without limitation, graphs, microfiche, microfilm, videotapes, recordings, motion pictures, electronic, mechanical, electrical, or chemical recordings or representations of any kind), photograph, prospectus, testing or analysis report or other source of recorded information, including tapes, cassettes, disks, recordings, computer data from which information can be obtained or translated into useable form including manuals, guides and other written information necessary to translate computer routine documents into useable form

14. "Communication" or "communications" shall mean any exchange or transmission of information, whether moral, written, via electronic mail, text message, direct message, social media, or by other means, and includes, but is not limited to, written, oral, telephonic, via electronic mail, representation, discussion, meeting, letter, correspondence, memorandum, newsletter, telegram, advertisement, speech, conversation, conference, note, e-mail or computer-generated message and any other document which refers to any such communication.

15. "Relating to," "related to," "relates to" or "relate to" shall mean: in any way directly or indirectly, containing, constituting, comprising, showing, evidencing, mentioning, reflecting, pertaining to, or referring in any way, directly or indirectly, to and is meant to include, among other documents, documents underlying, supporting, now or previously

3

attached or appended to, or used in the preparation of any document called for by the discovery requested herein.

16. "Including" shall mean "including, but not limited to" so as to require the broadest possible inclusion.

17. The terms "and" and "or" shall be construed conjunctively and disjunctively so as to require the broadest possible inclusion.

18. "All" shall be construed to include the word "any," and the word "any" shall be construed to include the word "all."

19. Unless otherwise stated in a request, the time period for documents responsive to these requests is January 1, 2015 to December 31, 2018.

**Document Requests**

***Requests relating to the exchanges of documents between Mr. Hall and Daniel Sargeant/LAIL in January 2015 and October 2016***

1.  All documents and communications exchanged between Mr. Hall and Daniel Sargeant and/or anyone acting on behalf of LAIL between January 2015 and March 2017 that concern Mr. Ruperti, any Ruperti-controlled entities, any JV Companies, LAIL, and/or PDVSA.

2.  All documents that show there were communications between Mr. Hall and Daniel Sargeant and/or anyone acting on behalf of LAIL between January 2015 and March 2017.

3.  All documents indicating the source(s) from which Mr. Hall obtained any of the documents he provided to Daniel Sargeant between January 2015 and December 2016.

4.  All documents and communications that show that Daniel Sargeant and/or anyone acting for LAIL actually reviewed the documents provided by Mr. Hall between January 2015 and March 2017.

5.      All documents and communications between January 2015 and March 2017 showing that Daniel Sargeant and/or anyone acting for LAIL requested Mr. Hall to provide documents concerning Mr. Ruperti, any Ruperti-controlled entities, any JV Companies, LAIL, and/or PDVSA.

6.      All documents or communications that show that an actual exchange of information related to Mr. Ruperti, Ruperti-controlled entities, the JV Companies, LAIL, and/or PDVSA occurred between Daniel Sargeant and Mr. Hall in January 2015 and/or October 2016.

7.      All documents or communications that show Daniel Sargeant and/or Mr. Hall knew, or should have known, that any of the documents provided by Mr. Hall in October 2016 were confidential and/or subject to duties to maintain their confidentiality.

8.      All documents or communications that show Daniel Sargeant and/or Mr. Hall knew, or should have known, that any of the documents provided by Mr. Hall in October 2016 evidenced unlawful and fraudulent conduct by Mr. Ruperti and/or any of the Ruperti-controlled entities against LAIL and/or the Sargeants.

9.      All documents or communications that show Daniel Sargeant and/or Mr. Hall knew, or should have known, that the provision of the documents by Mr. Hall in October 2016 would or might result in litigation brought (i) by Mr. Ruperti and/or any of the Ruperti-controlled entities against Novoship, or (ii) by Novoship against Mr. Hall and/or Burford.

*Requests relating to meetings and communications between Mr. Hall and Daniel Sargeant/LAIL*

10.     All documents or communications showing when Mr. Hall and Daniel Sargeant or anyone acting for LAIL fist made contact, including documents from in or around November 2014.

11.     All documents or communications showing the matters discussed between Mr. Hall and Daniel Sargeant or anyone acting for LAIL between November 1, 2014 and December 31, 2017, including but not limited to the meetings that took place on:

    11.1.   January 13, 2015;

    11.2.   October 6, 2016;

    11.3.   October 28, 2016; and

    11.4.   May 5, 2017.

12.     All documents or communications showing how the meetings between Mr. Hall and Daniel Sargeant or anyone acting for LAIL between November 1, 2014 and December 31, 2017 were arranged, and/or evidencing the purpose and/or subject matter of those meetings.

13.     All documents or communications that show Mr. Hall and Daniel Sargeant were in contact in or about August 2016 regarding matters concerning LAIL or Mr. Ruperti or the possibility of provision of documents or information by Mr. Hall relating to either of these.

14.     All emails exchanged between Mr. Hall and Daniel Sargeant or anyone acting for LAIL regarding Mr. Ruperti, any Ruperti-controlled entities, any JV Companies, LAIL, and/or PDVSA, including but not limited to those dated:

    14.1.   May 4, 2017;

    14.2.   May 8, 2017;

    14.3.   May 10, 2017;

    14.4.   May 11, 2017;

    14.5.   May 26, 2017;

    14.6.   July 19, 2017; and

    14.7.   July 26, 2017.

15. All documents or communications showing that Mr. Hall requested and/or obtained indemnification and/or payment from Mr. Daniel Sargeant and/or LAIL in connection with having provided them with documents in October 2016 that related to Mr. Ruperti, any Ruperti-controlled entities, any JV Companies, LAIL, and/or PDVSA.

16. All documents and communications showing the purpose for the exchange of documents relating to Mr. Ruperti, any Ruperti-controlled entities, any JV Companies, LAIL, and/or PDVSA between Mr. Hall and Daniel Sargeant, including LAIL's need for such documents.

**_Requests relating to whether the PDVSA/Ruperti settlement was in the public domain_**

17. All documents and communications showing that Daniel Sargeant and/or anyone acting for LAIL became aware of and/or reviewed any of the following documents prior to October 6, 2016:

   17.1. The witness statement of Edward Poulton dated March 18, 2015 and/or its accompanying exhibit;

   17.2. The witness statement of Benjamin Ogden dated March 27, 2015 and/or its accompanying exhibit;

   17.3. The witness statement of Richard Allen dated March 30, 2015 and/or its accompanying exhibit;

   17.4. The judgment entered by the Commercial Court (Mr. Justice Andrew Smith) in _Novoship (UK) Ltd & others v. Mikhaylyuk & others_ [2015] EWHC 992 (Comm);

   17.5. The article in _TradeWinds_ magazine entitled "_Novoship demands against Ruperti_"; and/or

17.6.   The settlement agreement between PDVSA and the Ruperti-controlled entities Sea Pioneer Shipping Corporation and Maroil dated on or about December 22, 2014.

18.   All documents and communications between January 2015 and October 2016, which evidence:

18.1.   a belief or suspicion on the part of Daniel Sargeant and/or anyone acting for LAIL that Mr. Ruperti had concluded a settlement agreement with PDVSA; and/or

18.2.   Daniel Sargeant and/or LAIL's intention to bring legal proceedings against Mr. Ruperti and/or any Ruperti-controlled entities in connection with Mr. Ruperti's actual or potential conclusion of a settlement agreement with PDVSA.

19.   All correspondence between Daniel Sargeant, Mr. Andrew Longhurst, and/or Mr. Andrew Preston between March 18, 2015 and October 6, 2016 referring to Mr. Ruperti's actual or potential settlement with PDVSA.

### Requests relating to the JV Companies and JV Vessels

20.   All documents or communications related to the negotiation of an agreement between Harry Sargeant III and Mr. Ruperti in or around 2001 concerning:

20.1.   any  joint ventures between LAIL and Maroil, including how the joint venture would be owned and operated;

20.2.   the chartering of vessels owned by any such joint ventures to third parties, including to Maroil, PDVSA or its affiliates;

20.3.   the manner in which the proceeds of such charters would be distributed; and/or

20.4.   the duties that the participants in such joint ventures would owe to each other, which may have included the duty to exercise reasonable diligence in relation to the business of the joint ventures and to act in good faith as business partners.

21.     The full constitutional documents of each of the following companies, including their respective articles of association, shareholders' agreements, and any other written agreements governing the basis on which the companies would be owned and operated:

21.1.   Oceanic Oil Venture Inc. ("OOV");

21.2.   Hero Maritime Corp ("HMC");

21.3.   Herculito Maritime Ltd ("Herculito");

21.4.   Bolivarian Petroleum Transport Ltd ("BPT");

21.5.   Oil Carriers Ltd ("OCL"); and

21.6.   Suramericana de Transporte Petrolero C.A.

22.     The contracts and other agreements by which the purchases of the following vessels were financed and/or mortgaged by Deutsche Schiffsbank Aktiengesellschaft ("DSB"), Commerzbank, and/or Lloyds TSB Bank Plc ("Lloyds Bank"):

22.1.   The VLCC "*Leander*";

22.2.   The VLCC "*Hero 1*";

22.3.   The Panamax "*Polar*"; and

22.4.   The Panamax "*Alloro.*"

23.     All documents which evidence the dates on which any bank took possession of any of the JV Vessels.

24.     All bills of sale, confirmations from mortgagee banks, or other similar documents formally evidencing the dates of sale of each of the JV Vessels by any of the banks that exercised their mortgagee rights over the JV Vessels.

25.     All statements or other similar documents evidencing the outstanding indebtedness of the JV Companies to their respective mortgagee banks for the purchase of each of the JV Vessels between March 1, 2013 and December 22, 2014.

26. All documents and communications showing any transfer of LAIL's interests in Suramericana de Transporte Petrolero C.A. in or around March 2004.

### Requests relating to the use of the JV Vessels by PDVSA

27. All documents or communications between Harry Sargeant III and Mr. Ruperti in 2004 and 2005  regarding the distribution of any proceeds of the charter of the *Polar* to PDVSA.

28. All documents or communications between Harry Sargeant III and Mr. Ruperti in 2004 and 2005 regarding the distribution of any proceeds of the charter of the *Alloro* to PDVSA.

29. A copy of the "Clarification Letter" dated April 7, 2006, which varied the contract of affreightment as between Sea Pioneer and PDVSA dated March 22, 2006 (the "COA");

30. All documents or communications between January 1, 2007 and the dates of sale of any of the JV Vessels by any of the mortgagee banks which evidence:

    30.1. requests made by Sea Pioneer that the *Leander* and/or the *Hero 1* should be made available to perform the COA;

    30.2. failures or refusals by LAIL, Oceanic Transport Shipping ("OTS"), OOV and/or HMC to make the *Leander* and/or the *Hero 1* available in response to such requests by Sea Pioneer; and/or

    30.3. the reasons for any such failures or refusals.

31. Any charterparties dated between January 1, 2007 and the dates of sale of any of the JV Vessels by any of the mortgagee banks pursuant to which the *Leander* and/or the *Hero 1* were used, other than for the performance of the COA with PDVSA.

32. All documents or communications between January 1, 2007 and the dates of sale of any of the JV Vessels by any of the mortgagee banks showing that the *Leander* and/or the

*Hero 1* were used in performing voyages under the COA, including the following voyages:

32.1.  As regards the *Leander*:

32.1.1.  A voyage from Bonaire to Guangzhou / Zhoushan between April 5, 2007 and May 25, 2007; and

32.1.2.  A voyage from Bullen Bay / Bonaire to Karimun / Zhousan between August 9, 2007 and October 13, 2007.

32.2.  As regards the *Hero 1*:

32.2.1.  A Karimun / Telapas (Singapore) voyage in early/mid 2007;

32.2.2.  A voyage from Freeport to Shen Zhan and Zhousan between January 28, 2007 and August 23, 2007; and

32.2.3.  A shipment loaded at Curacao and ultimately discharged again at Curacao between November 1, 2008 and December 24, 2008.

33.  All documents or communications from Mr. Ruperti or any Ruperti-controlled entities to LAIL, any of the Sargeants, OTS, OOV, and/or HMC which evidence the chartering by Sea Pioneer of vessels other than the *Leander* and the *Hero 1* to perform the COA, including in particular the vessels *Pisces Star*, *Eagle Valencia* and *Ural*.


*Requests relating to the treatment of earnings of the JV Companies*

34.  All documents and communications showing the JV Companies' financial status between 2006 and 2015, including all income, profit and loss statements during that period.

35.  All documents and communications showing how the finances of the JV Companies were supposed to be managed, including documents and communications regarding (i) how income generated by the chartering of the JV Vessels was to be remitted to the JV

Companies, (ii) how expenses incurred by the JV Companies were to be handled, and (iii) how and when the shareholders of the JV Companies were to be paid.

36. All documents and communications showing any payments made to LAIL by the JV Companies or by any third parties relating to the chartering of any of the JV Vessels between 2006 and 2015.

37. All documents and communications showing any payments made to Mr. Ruperti or any Ruperti-controlled entities by the JV Companies or by any third parties relating to the chartering of any of the JV Vessels between 2006 and 2015.

*Requests relating to the disputes with PDVSA*

38. All documents and communications relating to the meeting held between the directors of OOV and HMC on or about December 20, 2010, including documents indicating the matters discussed at the meeting and any documents reviewed at the meeting.

39. All documents and communications relating to the decision by OOV and HMC to initiate arbitration proceedings against PDVSA.

40. Any witness statements, expert reports, documentary evidence and/or written submissions served in the arbitration proceedings brought by OOV and HMC against PDVSA (the "First PDVSA Arbitration").

41. A copy of the spreadsheets attached to (i) the claim submissions dated August 29, 2011 and (ii) the amended claim submissions dated January 23, 2012 from the First PDVSA Arbitration.

42. A copy of all documents served in the First PDVSA Arbitration to support the amended claim submissions dated January 23, 2012.

43. All documents and communications from the tribunal in the First PDVSA Arbitration asking questions about the calculation of the claim submissions, including the tribunal's July 10, 2012 request.

44. All documents and communications relating to Harry Sargeant III's proposal in or about October and November 2012 that DSB take over the First PDVSA Arbitration, including any response to that proposal by LAIL, Mr. Ruperti, OTS, HMC and/or OOV.

45. All correspondence between LAIL, Mr. Ruperti, OTS, HMC and/or OOV (on the one hand) and the mortgagee banks of the JV Vessels (DSB or Commerzbank) (on the other hand) relating to the First PDVSA Arbitration.

46. All documents and communications relating to any claims against PDVSA regarding its charters of the *Polar* and/or the *Alloro*.

47. All documents and communications relating to any claims by Sea Pioneer and/or Mr Ruperti against PDVSA between 2006 and August 9, 2012.

48. A copy of the letter dated August 9, 2012 from Freddy Belisario Capella Abogados to Petroleos de Venezuela C.A. (the parent company of PDVSA).

### *Requests relating to the negotiations with PDVSA*

49. All documents and communications relating to the appointment of Mr. Patrick Mooney and Mr. Alejandro Leandros in or about March 2013 on behalf of OOV and HMC to negotiate a settlement of the First PDVSA Arbitration.

50. All documents and communications reflecting the matters discussed at the meeting in October 2013 between Commerzbank, LAIL, OTS and Maroil.

51. All documents and communications relating to the appointment of Mr. Mooney and Mr. Ruperti in or about May 2014 on behalf of OOV and HMC to negotiate a settlement of the First PDVSA Arbitration.

52.  All documents and communications reflecting the matters discussed at the meeting on or about May 7, 2014 between Daniel Sargeant, Mr. Mooney, and Mr. Ruperti in Miami.

53.  All documents and communications relating to whether Mr. Mooney and Mr. Preston were authorized by OOV and HMC to meet with Commerzbank on September 25, 2014 on their behalf.

54.  All documents and communications reflecting the matters discussed at the meeting on September 25, 2014 between Commerzbank, Mr. Mooney and Mr. Preston.

55.  All documents and communications relating to the discussions between LAIL, Mr. Ruperti, OTS, OOV and/or HMC (on the one hand) and Commerzbank (on the other hand) between September 1, 2014 and December 22, 2014 regarding a settlement proposal to PDVSA.

56.  All documents and communications between September 1, 2014 and December 22, 2014 relating to:

    56.1.  the terms on which Commerzbank was willing settle the First PDVSA Arbitration;

    56.2.  the sums which Commerzbank wanted to receive from the settlement for the debt owed on the JV Vessels; and

    56.3.  the manner in which Commerzbank wanted the settlement negotiations with PDVSA to be conducted, including whether it was in agreement with Mr. Ruperti leading the settlement negotiations personally.

57.  All documents and communications relating to the consideration given by LAIL, OTS, OOV and/or HMC of the draft board resolutions and letters of authority presented by Mr. Preston on November 7, 2014, that were intended to be given to Mr. Mooney and Mr. Ruperti.

58.     All documents and communications between LAIL, OTS, OOV, HMC, Daniel Sargeant, Mr. Mooney, Mr. Ruperti, and/or Mr. Preston between September 2014 and October 2016 relating to how the proceeds of any settlement with PDVSA ought to be distributed.

59.     All documents and communications from Mr. Mooney, Mr. Ruperti, and/or Mr. Leandros between March 2013 and October 2016 relating to the status of the settlement negotiations with PDVSA.

60.     All documents and communications relating to any expenses allegedly incurred by Mr. Mooney, Mr. Ruperti, and/or any Ruperti-related entities in conducting settlement negotiations with PDVSA.


***Requests relating to Ruperti's concealment of the PDVSA settlements***

61.     All documents and communications describing the matters discussed at the meeting on February 12, 2015 between Mr. Mooney and Mr. Preston.

62.     Any draft settlement agreements between Sea Pioneer, Maroil, and/or LAIL created between February 2015 and October 2016, relating to the distribution of the proceeds of any settlement with PDVSA.

63.     All documents and communications exchanged between Daniel Sargeant, Mr. Ruperti, and/or Mr. Mooney relating to any draft settlement agreements with PDVSA.

64.     All documents and communications exchanged between Daniel Sargeant and/or Mr. Preston (on the one hand) and Mr. Mooney and/or Mr. Ruperti (on the other hand) between December 2014 and October 2016 relating to PDVSA.

65.     All documents and communications describing the matters discussed at any meetings between Daniel Sargeant and Mr. Ruperti between December 2014 and October 2016,

including but not limited to the meeting held on June 1, 2015 at the Four Seasons Hotel in Geneva.

66. All documents and communications exchanged between Mr. Ruperti and/or Mr. Mooney between December 2014 and October 2016 relating to whether a settlement had been reached with PDVSA, including any express representations that no such settlement had been reached.

*Requests relating to the LAIL/Ruperti Proceedings and Settlement*

67. A copy of the settlement agreement between LAIL, OTS, Maroil and/or any other Ruperti-controlled entities dated on or around November 17, 2017.

68. All banking records evidencing any payments made by Maroil or any Ruperti-controlled entities to LAIL and/or OTS pursuant to the settlement agreement between them dated November 17, 2017 (and/or any addenda or supplementary agreements thereto).

*Requests relating to the Florida Action*

69. All documents and communications relating to the merits of the claims of fraud alleged in the Florida Action.

70. All non-privileged documents and communications relating to the negotiation of the settlement of the Florida Action as between Harry Sargeant III and Mr. Ruperti and his entities, including a copy of the settlement agreement itself.

71. All documents showing the amounts that Mr. Ruperti and/or his entities paid to Harry Sargeant III to settle the Florida Action.

72. All testimony (including depositions, witness statements, or testimony given in open court or otherwise) obtained in the Florida Action relating to (1) the claims of fraud

orchestrated by Mr. Ruperti against LAIL, and (2) the exchange of information between Daniel Sargeant and Mr. Hall that helped uncover the fraud.

73. All documents obtained during the course of discovery in the Florida Action relating to (1) the claims of fraud orchestrated by Mr. Ruperti against LAIL, and (2) the exchange of information between Daniel Sargeant and Mr. Hall that helped uncover the fraud.

74. All testimony (including depositions, witness statements, or testimony given in open court or otherwise) obtained in the Florida Action relating to whether Mr. Hall knew he was exchanging information with Daniel Sargeant in violation of the 2016 Settlement Agreement.

75. All documents obtained during the course of discovery in the Florida Action relating to whether Mr. Hall knew he was exchanging information with Daniel Sargeant in violation of the 2016 Settlement Agreement.

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

IN RE APPLICATION OF

      NOVOSHIP (UK) LIMITED

Applicant,

Pursuant to 28 U.S.C. § 1782 for Judicial Assistance in
Obtaining Evidence for use in Foreign and International
Proceedings.

)
)
)
)
)
)

Civil Action No.

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                           SARGEANT MARINE, INC.
                    321 E. HILLSBORO BLVD, DEERFIELD BEACH, FL 33441

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

          See Schedule A (enclosed)

| Place: Reed Smith LLP | Date and Time: |
|---|---|
| 1001 Brickell Bay Drive, Suite 900<br>Miami, FL 33131 | TBD |

          The deposition will be recorded by this method: _____

☑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

          See Schedule B (enclosed)

      The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

          *CLERK OF COURT*

                                     OR

    _____        _____
        *Signature of Clerk or Deputy Clerk*                 *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Applicant,
Novoship (UK) Limited
_____ , who issues or requests this subpoena, are:

Edward M. Mullins, Reed Smith LLP, 1001 Brickell Bay Dr. Suite 900, Miami, FL 33131, emullins@reedsmith.com

## Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*

    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## Schedule A to Subpoena

The areas of examination for the deposition shall include the following:

1.       The exchange of documents from 2014 to 2018 between Daniel Sargeant and/or anyone acting for LAIL, on the one hand, and Mr. Hall and Burford, on the other hand, related to Mr. Ruperti and any of his business entities, PDVSA, LAIL, and/or Harry Sargeant III, including identification of the documents exchanged and the purpose of the exchange of documents.

2.       The occurrence of any communications or meetings between Daniel Sargeant and/or anyone acting for LAIL, on the one hand, and Mr. Hall, on the other hand, in which Mr. Ruperti or any of the Ruperti-related business was discussed in relation toto LAIL or PDVSA.

3.       Whether Daniel Sargeant and/or anyone acting for LAIL became aware of and/or reviewed (i) any English Court documents that referred to any of the Confidential Documents (as defined in the Declaration of Stephen Kirkpatrick), or (ii) an article in *TradeWinds* magazine entitled "*Novoship demands against Ruperti*"  prior to October 2016.

4.       The extent of knowledge or awareness by Daniel Sargeant and/or anyone acting for LAIL regarding the source of the documents they received from Mr. Hall and whether they were confidential and that their disclosure could subject Mr. Hall and/or Novoship to liability.

5.       The basis and merits of LAIL's claims against Mr. Ruperti for fraudulently concealing the settlements obtained from PDVSA, including the claims asserted in the lawsuit LAIL filed against Mr. Ruperti and his related entities in England.

6.       The agreements between Harry Sargeant III and Mr. Ruperti and between LAIL and Maroil as to the ownership, operation and sharing of proceeds of the JV Companies (as defined in Schedule B of this subpoena), and any corporate and business documentation relating to the JV Companies.

7.      The actual business conducted by the JV Companies and the treatment of the proceeds of that business.

8.      The background of the disputes between the JV Companies and PDVSA, including any arbitrations and any settlement discussions relating to PDVSA, including any discussion with Mr. Ruperti or his related entities about the settlement discussions or the arbitrations.

9.      The settlement of the claims between LAIL and Mr. Ruperti and/or any of the Ruperti-related business, including the status and fulfilment of such settlement.

10.     The lawsuit initiated by Harry Sargeant III in Florida entitled *Harry Sargeant III v. Maroil Trading Inc., et al.*, Case No. 17-cv-81070 (S.D. Fla. Sept. 25, 2017), including LAIL's intervention in that lawsuit and LAIL's defense of claims brought against it by Harry Sargeant III.

11.     Any of the documents produced in response to the requests listed in Schedule B to this subpoean.

12.     The location of documents related to these deposition topics and/or the document requests listed in Schedule B, and the identification of other individuals with knowledge.

**Schedule B to Subpoena**

**Definitions and Instructions**

1. "Novoship" shall mean Novoship (UK) Limited, as well as any of its agents, attorneys, accountants, consultants, representatives, assignees, and any other individual or entity associated or affiliated with it, or purporting to act on its behalf with respect to the matter in question.

2. "Mr. Ruperti" shall mean Wilmer Ruperti.

3. "Ruperti-controlled entities" shall mean all entities beneficially owned by and/or controlled by Mr. Ruperti, including but not limited to Maroil Trading Inc. and Sea Pioneer Shipping Corporation, as well as any of Mr. Ruperti's agents, attorneys, accountants, consultants, representatives, assignees, and any other individual or entity associated or affiliated with him, or purporting to act on his behalf with respect to the matter in question.

4. "Mr. Hall" shall mean Daniel James Hall of Burford.

5. "JV Companies" shall mean the joint business ventures created between Mr. Ruperti and LAIL and/or the Sargeants, including but not limited to Oceanic Oil Venture Inc., Hero Maritime Corp, Herculito Maritime Ltd, Oil Carriers Ltd, Bolivarian Petroleum Transport Ltd, and Suramericana de Transporte Petrolero C.A.

6. "JV Vessels" shall mean the vessels owned by the JV Companies that were chartered to PDVSA, including but not limited to the *Alloro*, the *Polar*, the *Leander*, and the *Hero I*.

7. "LAIL" shall mean Latin American Investments Limited, as well as any of its agents, attorneys, accountants, consultants, representatives, assignees, and any other individual or entity associated or affiliated with it, or purporting to act on its behalf with respect to the matter in question.

8. "PDVSA" shall mean PDVSA Petroleo S.A., the Venezuelan national oil company.

9. "Maroil" shall mean Maroil Trading, Inc., one of the Ruperti-controlled entities.

1

10. "Burford" shall mean Burford Capital (UK) Limited, as well as any of its agents, attorneys, accountants, consultants, representatives, assignees, and any other individual or entity associated or affiliated with it, or purporting to act on its behalf with respect to the matter in question.

11. "2016 Settlement Agreement" shall mean the second settlement agreement entered into between Novoship and Mr. Ruperti and/or other Ruperti- controlled entities relating to settling the judgment obtained by Novoship in the case before the English High Court entitled *Novoship & Ors v. Mikhaylyuk & Ors*, [2012] EWHC 3586 (Comm).

12. "Florida Action" shall mean the lawsuit entitled *Harry Sargeant III v. Maroil Trading Inc., et al.*, Case No. 17-cv-81070 (S.D. Fla. Sept. 25, 2017).

13. "Document" or "documents" shall mean and include, without limitation, any written or graphic matter or other means of preserving thought or expression, and all tangible things from which information can be processed or transcribed, including the original and all non-identical copies, whether different from the original by reason of any notation made on such copy or otherwise, including, but not limited to, contracts, agreements, mortgages, deeds, leases, financing applications, loan applications, letters of intent, asset purchase agreements, management contracts, operating agreements, writings, written communications, visual, graphic or pictorial displays of any description whatsoever, including, but not limited to, each writing or printing, graph, chart, financial report, tape recording, data computation, ledger sheet, journal entry, invoice, shipping document, bill of lading, purchase order, receipt, return, telephone bill, telephone message slip, schedule, affidavit, memorandum or note of intra office and interoffice telephone calls, letter, letter telegram, blueprint, photograph, video tape, check, canceled check, transcript, statistics, bank statement, financial statement, letter of credit, standby letter of credit, irrevocable and/or revocable standby letter of credit, performance bond, insurance contract and related

and/or appended schedule, promissory note, audit report, writing relating to credit and/or loan committee(s) activities, tested telex, untested telex, wire communication, telegrams, teletype, telefax, email, bulletin, correspondence, notes, word diary, chronological data, minutes, work sheet, book, travel log, survey, magazine or newspaper article, press release (and  any and all drafts, alterations or modifications, changes, amendments of any of the foregoing), office memorandum, graphic or oral record or representation of any kind (including, without limitation, graphs, microfiche, microfilm, videotapes, recordings, motion pictures, electronic, mechanical, electrical, or chemical recordings or representations of any kind), photograph, prospectus, testing or analysis report or other source of recorded information, including tapes, cassettes, disks, recordings, computer data from which information can be obtained or translated into useable form including manuals, guides and other written information necessary to translate computer routine documents into useable form

14. "Communication" or "communications" shall mean any exchange or transmission of information, whether moral, written, via electronic mail, text message, direct message, social media, or by other means, and includes, but is not limited to, written, oral, telephonic, via electronic mail, representation, discussion, meeting, letter, correspondence, memorandum, newsletter, telegram, advertisement, speech, conversation, conference, note, e-mail or computer-generated message and any other document which refers to any such communication.

15. "Relating to," "related to," "relates to" or "relate to" shall mean: in any way directly or indirectly, containing, constituting, comprising, showing, evidencing, mentioning, reflecting, pertaining to, or referring in any way, directly or indirectly, to and is meant to include, among other documents, documents underlying, supporting, now or previously

3

attached or appended to, or used in the preparation of any document called for by the discovery requested herein.

16. "Including" shall mean "including, but not limited to" so as to require the broadest possible inclusion.

17. The terms "and" and "or" shall be construed conjunctively and disjunctively so as to require the broadest possible inclusion.

18. "All" shall be construed to include the word "any," and the word "any" shall be construed to include the word "all."

19. Unless otherwise stated in a request, the time period for documents responsive to these requests is January 1, 2015 to December 31, 2018.

**Document Requests**

***Requests relating to the exchanges of documents between Mr. Hall and Daniel Sargeant/LAIL in January 2015 and October 2016***

1. All documents and communications exchanged between Mr. Hall and Daniel Sargeant and/or anyone acting on behalf of LAIL between January 2015 and March 2017 that concern Mr. Ruperti, any Ruperti-controlled entities, any JV Companies, LAIL, and/or PDVSA.

2. All documents that show there were communications between Mr. Hall and Daniel Sargeant and/or anyone acting on behalf of LAIL between January 2015 and March 2017.

3. All documents indicating the source(s) from which Mr. Hall obtained any of the documents he provided to Daniel Sargeant between January 2015 and December 2016.

4. All documents and communications that show that Daniel Sargeant and/or anyone acting for LAIL actually reviewed the documents provided by Mr. Hall between January 2015 and March 2017.

5.      All documents and communications between January 2015 and March 2017 showing that Daniel Sargeant and/or anyone acting for LAIL requested Mr. Hall to provide documents concerning Mr. Ruperti, any Ruperti-controlled entities, any JV Companies, LAIL, and/or PDVSA.

6.      All documents or communications that show that an actual exchange of information related to Mr. Ruperti, Ruperti-controlled entities, the JV Companies, LAIL, and/or PDVSA occurred between Daniel Sargeant and Mr. Hall in January 2015 and/or October 2016.

7.      All documents or communications that show Daniel Sargeant and/or Mr. Hall knew, or should have known, that any of the documents provided by Mr. Hall in October 2016 were confidential and/or subject to duties to maintain their confidentiality.

8.      All documents or communications that show Daniel Sargeant and/or Mr. Hall knew, or should have known, that any of the documents provided by Mr. Hall in October 2016 evidenced unlawful and fraudulent conduct by Mr. Ruperti and/or any of the Ruperti-controlled entities against LAIL and/or the Sargeants.

9.      All documents or communications that show Daniel Sargeant and/or Mr. Hall knew, or should have known, that the provision of the documents by Mr. Hall in October 2016 would or might result in litigation brought (i) by Mr. Ruperti and/or any of the Ruperti-controlled entities against Novoship, or (ii) by Novoship against Mr. Hall and/or Burford.

*Requests relating to meetings and communications between Mr. Hall and Daniel Sargeant/LAIL*

10.      All documents or communications showing when Mr. Hall and Daniel Sargeant or anyone acting for LAIL fist made contact, including documents from in or around November 2014.

11.     All documents or communications showing the matters discussed between Mr. Hall and Daniel Sargeant or anyone acting for LAIL between November 1, 2014 and December 31, 2017, including but not limited to the meetings that took place on:

11.1.   January 13, 2015;

11.2.   October 6, 2016;

11.3.   October 28, 2016; and

11.4.   May 5, 2017.

12.     All documents or communications showing how the meetings between Mr. Hall and Daniel Sargeant or anyone acting for LAIL between November 1, 2014 and December 31, 2017 were arranged, and/or evidencing the purpose and/or subject matter of those meetings.

13.     All documents or communications that show Mr. Hall and Daniel Sargeant were in contact in or about August 2016 regarding matters concerning LAIL or Mr. Ruperti or the possibility of provision of documents or information by Mr. Hall relating to either of these.

14.     All emails exchanged between Mr. Hall and Daniel Sargeant or anyone acting for LAIL regarding Mr. Ruperti, any Ruperti-controlled entities, any JV Companies, LAIL, and/or PDVSA, including but not limited to those dated:

14.1.   May 4, 2017;

14.2.   May 8, 2017;

14.3.   May 10, 2017;

14.4.   May 11, 2017;

14.5.   May 26, 2017;

14.6.   July 19, 2017; and

14.7.   July 26, 2017.

15.  All documents or communications showing that Mr. Hall requested and/or obtained indemnification and/or payment from Mr. Daniel Sargeant and/or LAIL in connection with having provided them with documents in October 2016 that related to Mr. Ruperti, any Ruperti-controlled entities, any JV Companies, LAIL, and/or PDVSA.

16.  All documents and communications showing the purpose for the exchange of documents relating to Mr. Ruperti, any Ruperti-controlled entities, any JV Companies, LAIL, and/or PDVSA between Mr. Hall and Daniel Sargeant, including LAIL's need for such documents.

### Requests relating to whether the PDVSA/Ruperti settlement was in the public domain

17.  All documents and communications showing that Daniel Sargeant and/or anyone acting for LAIL became aware of and/or reviewed any of the following documents prior to October 6, 2016:

    17.1.  The witness statement of Edward Poulton dated March 18, 2015 and/or its accompanying exhibit;

    17.2.  The witness statement of Benjamin Ogden dated March 27, 2015 and/or its accompanying exhibit;

    17.3.  The witness statement of Richard Allen dated March 30, 2015 and/or its accompanying exhibit;

    17.4.  The judgment entered by the Commercial Court (Mr. Justice Andrew Smith) in *Novoship (UK) Ltd & others v. Mikhaylyuk & others* [2015] EWHC 992 (Comm);

    17.5.  The article in *TradeWinds* magazine entitled "*Novoship demands against Ruperti*"; and/or

17.6.   The settlement agreement between PDVSA and the Ruperti-controlled entities Sea Pioneer Shipping Corporation and Maroil dated on or about December 22, 2014.

18.   All documents and communications between January 2015 and October 2016, which evidence:

18.1.   a belief or suspicion on the part of Daniel Sargeant and/or anyone acting for LAIL that Mr. Ruperti had concluded a settlement agreement with PDVSA; and/or

18.2.   Daniel Sargeant and/or LAIL's intention to bring legal proceedings against Mr. Ruperti and/or any Ruperti-controlled entities in connection with Mr. Ruperti's actual or potential conclusion of a settlement agreement with PDVSA.

19.   All correspondence between Daniel Sargeant, Mr. Andrew Longhurst, and/or Mr. Andrew Preston between March 18, 2015 and October 6, 2016 referring to Mr. Ruperti's actual or potential settlement with PDVSA.

*Requests relating to the JV Companies and JV Vessels*

20.   All documents or communications related to the negotiation of an agreement between Harry Sargeant III and Mr. Ruperti in or around 2001 concerning:

20.1.   any  joint ventures between LAIL and Maroil, including how the joint venture would be owned and operated;

20.2.   the chartering of vessels owned by any such joint ventures to third parties, including to Maroil, PDVSA or its affiliates;

20.3.   the manner in which the proceeds of such charters would be distributed; and/or

20.4.   the duties that the participants in such joint ventures would owe to each other, which may have included the duty to exercise reasonable diligence in relation to the business of the joint ventures and to act in good faith as business partners.

21.     The full constitutional documents of each of the following companies, including their respective articles of association, shareholders' agreements, and any other written agreements governing the basis on which the companies would be owned and operated:

21.1.   Oceanic Oil Venture Inc. ("OOV");

21.2.   Hero Maritime Corp ("HMC");

21.3.   Herculito Maritime Ltd ("Herculito");

21.4.   Bolivarian Petroleum Transport Ltd ("BPT");

21.5.   Oil Carriers Ltd ("OCL"); and

21.6.   Suramericana de Transporte Petrolero C.A.

22.     The contracts and other agreements by which the purchases of the following vessels were financed and/or mortgaged by Deutsche Schiffsbank Aktiengesellschaft ("DSB"), Commerzbank, and/or Lloyds TSB Bank Plc ("Lloyds Bank"):

22.1.   The VLCC "*Leander*";

22.2.   The VLCC "*Hero 1*";

22.3.   The Panamax "*Polar*"; and

22.4.   The Panamax "*Alloro.*"

23.     All documents which evidence the dates on which any bank took possession of any of the JV Vessels.

24.     All bills of sale, confirmations from mortgagee banks, or other similar documents formally evidencing the dates of sale of each of the JV Vessels by any of the banks that exercised their mortgagee rights over the JV Vessels.

25.     All statements or other similar documents evidencing the outstanding indebtedness of the JV Companies to their respective mortgagee banks for the purchase of each of the JV Vessels between March 1, 2013 and December 22, 2014.

26.     All documents and communications showing any transfer of LAIL's interests in Suramericana de Transporte Petrolero C.A. in or around March 2004.

### Requests relating to the use of the JV Vessels by PDVSA

27.     All documents or communications between Harry Sargeant III and Mr. Ruperti in 2004 and 2005   regarding the distribution of any proceeds of the charter of the *Polar* to PDVSA.

28.     All documents or communications between Harry Sargeant III and Mr. Ruperti in 2004 and 2005 regarding the distribution of any proceeds of the charter of the *Alloro* to PDVSA.

29.     A copy of the "Clarification Letter" dated April 7, 2006, which varied the contract of affreightment as between Sea Pioneer and PDVSA dated March 22, 2006 (the "COA");

30.     All documents or communications between January 1, 2007 and the dates of sale of any of the JV Vessels by any of the mortgagee banks which evidence:

   30.1.   requests made by Sea Pioneer that the *Leander* and/or the *Hero 1* should be made available to perform the COA;

   30.2.   failures or refusals by LAIL, Oceanic Transport Shipping ("OTS"), OOV and/or HMC to make the *Leander* and/or the *Hero 1* available in response to such requests by Sea Pioneer; and/or

   30.3.   the reasons for any such failures or refusals.

31.     Any charterparties dated between January 1, 2007 and the dates of sale of any of the JV Vessels by any of the mortgagee banks pursuant to which the *Leander* and/or the *Hero 1* were used, other than for the performance of the COA with PDVSA.

32.     All documents or communications between January 1, 2007 and the dates of sale of any of the JV Vessels by any of the mortgagee banks showing that the *Leander* and/or the

*Hero 1* were used in performing voyages under the COA, including the following voyages:

32.1.   As regards the *Leander*:

    32.1.1.   A voyage from Bonaire to Guangzhou / Zhoushan between April 5, 2007 and May 25, 2007; and

    32.1.2.   A voyage from Bullen Bay / Bonaire to Karimun / Zhousan between August 9, 2007 and October 13, 2007.

32.2.   As regards the *Hero 1*:

    32.2.1.   A Karimun / Telapas (Singapore) voyage in early/mid 2007;

    32.2.2.   A voyage from Freeport to Shen Zhan and Zhousan between January 28, 2007 and August 23, 2007; and

    32.2.3.   A shipment loaded at Curacao and ultimately discharged again at Curacao between November 1, 2008 and December 24, 2008.

33.   All documents or communications from Mr. Ruperti or any Ruperti-controlled entities to LAIL, any of the Sargeants, OTS, OOV, and/or HMC which evidence the chartering by Sea Pioneer of vessels other than the *Leander* and the *Hero 1* to perform the COA, including in particular the vessels *Pisces Star*, *Eagle Valencia* and *Ural*.

### Requests relating to the treatment of earnings of the JV Companies

34.   All documents and communications showing the JV Companies' financial status between 2006 and 2015, including all income, profit and loss statements during that period.

35.   All documents and communications showing how the finances of the JV Companies were supposed to be managed, including documents and communications regarding (i) how income generated by the chartering of the JV Vessels was to be remitted to the JV

Companies, (ii) how expenses incurred by the JV Companies were to be handled, and (iii) how and when the shareholders of the JV Companies were to be paid.

36.     All documents and communications showing any payments made to LAIL by the JV Companies or by any third parties relating to the chartering of any of the JV Vessels between 2006 and 2015.

37.     All documents and communications showing any payments made to Mr. Ruperti or any Ruperti-controlled entities by the JV Companies or by any third parties relating to the chartering of any of the JV Vessels between 2006 and 2015.

*Requests relating to the disputes with PDVSA*

38.     All documents and communications relating to the meeting held between the directors of OOV and HMC on or about December 20, 2010, including documents indicating the matters discussed at the meeting and any documents reviewed at the meeting.

39.     All documents and communications relating to the decision by OOV and HMC to initiate arbitration proceedings against PDVSA.

40.     Any witness statements, expert reports, documentary evidence and/or written submissions served in the arbitration proceedings brought by OOV and HMC against PDVSA (the "First PDVSA Arbitration").

41.     A copy of the spreadsheets attached to (i) the claim submissions dated August 29, 2011 and (ii) the amended claim submissions dated January 23, 2012 from the First PDVSA Arbitration.

42.     A copy of all documents served in the First PDVSA Arbitration to support the amended claim submissions dated January 23, 2012.

43. All documents and communications from the tribunal in the First PDVSA Arbitration asking questions about the calculation of the claim submissions, including the tribunal's July 10, 2012 request.

44. All documents and communications relating to Harry Sargeant III's proposal in or about October and November 2012 that DSB take over the First PDVSA Arbitration, including any response to that proposal by LAIL, Mr. Ruperti, OTS, HMC and/or OOV.

45. All correspondence between LAIL, Mr. Ruperti, OTS, HMC and/or OOV (on the one hand) and the mortgagee banks of the JV Vessels (DSB or Commerzbank) (on the other hand) relating to the First PDVSA Arbitration.

46. All documents and communications relating to any claims against PDVSA regarding its charters of the *Polar* and/or the *Alloro*.

47. All documents and communications relating to any claims by Sea Pioneer and/or Mr Ruperti against PDVSA between 2006 and August 9, 2012.

48. A copy of the letter dated August 9, 2012 from Freddy Belisario Capella Abogados to Petroleos de Venezuela C.A. (the parent company of PDVSA).

### *Requests relating to the negotiations with PDVSA*

49. All documents and communications relating to the appointment of Mr. Patrick Mooney and Mr. Alejandro Leandros in or about March 2013 on behalf of OOV and HMC to negotiate a settlement of the First PDVSA Arbitration.

50. All documents and communications reflecting the matters discussed at the meeting in October 2013 between Commerzbank, LAIL, OTS and Maroil.

51. All documents and communications relating to the appointment of Mr. Mooney and Mr. Ruperti in or about May 2014 on behalf of OOV and HMC to negotiate a settlement of the First PDVSA Arbitration.

52.   All documents and communications reflecting the matters discussed at the meeting on or about May 7, 2014 between Daniel Sargeant, Mr. Mooney, and Mr. Ruperti in Miami.

53.   All documents and communications relating to whether Mr. Mooney and Mr. Preston were authorized by OOV and HMC to meet with Commerzbank on September 25, 2014 on their behalf.

54.   All documents and communications reflecting the matters discussed at the meeting on September 25, 2014 between Commerzbank, Mr. Mooney and Mr. Preston.

55.   All documents and communications relating to the discussions between LAIL, Mr. Ruperti, OTS, OOV and/or HMC (on the one hand) and Commerzbank (on the other hand) between September 1, 2014 and December 22, 2014 regarding a settlement proposal to PDVSA.

56.   All documents and communications between September 1, 2014 and December 22, 2014 relating to:

   56.1.   the terms on which Commerzbank was willing settle the First PDVSA Arbitration;

   56.2.   the sums which Commerzbank wanted to receive from the settlement for the debt owed on the JV Vessels; and

   56.3.   the manner in which Commerzbank wanted the settlement negotiations with PDVSA to be conducted, including whether it was in agreement with Mr. Ruperti leading the settlement negotiations personally.

57.   All documents and communications relating to the consideration given by LAIL, OTS, OOV and/or HMC of the draft board resolutions and letters of authority presented by Mr. Preston on November 7, 2014, that were intended to be given to Mr. Mooney and Mr. Ruperti.

58. All documents and communications between LAIL, OTS, OOV, HMC, Daniel Sargeant, Mr. Mooney, Mr. Ruperti, and/or Mr. Preston between September 2014 and October 2016 relating to how the proceeds of any settlement with PDVSA ought to be distributed.

59. All documents and communications from Mr. Mooney, Mr. Ruperti, and/or Mr. Leandros between March 2013 and October 2016 relating to the status of the settlement negotiations with PDVSA.

60. All documents and communications relating to any expenses allegedly incurred by Mr. Mooney, Mr. Ruperti, and/or any Ruperti-related entities in conducting settlement negotiations with PDVSA.

### *Requests relating to Ruperti's concealment of the PDVSA settlements*

61. All documents and communications describing the matters discussed at the meeting on February 12, 2015 between Mr. Mooney and Mr. Preston.

62. Any draft settlement agreements between Sea Pioneer, Maroil, and/or LAIL created between February 2015 and October 2016, relating to the distribution of the proceeds of any settlement with PDVSA.

63. All documents and communications exchanged between Daniel Sargeant, Mr. Ruperti, and/or Mr. Mooney relating to any draft settlement agreements with PDVSA.

64. All documents and communications exchanged between Daniel Sargeant and/or Mr. Preston (on the one hand) and Mr. Mooney and/or Mr. Ruperti (on the other hand) between December 2014 and October 2016 relating to PDVSA.

65. All documents and communications describing the matters discussed at any meetings between Daniel Sargeant and Mr. Ruperti between December 2014 and October 2016,

including but not limited to the meeting held on June 1, 2015 at the Four Seasons Hotel in Geneva.

66. All documents and communications exchanged between Mr. Ruperti and/or Mr. Mooney between December 2014 and October 2016 relating to whether a settlement had been reached with PDVSA, including any express representations that no such settlement had been reached.

### *Requests relating to the LAIL/Ruperti Proceedings and Settlement*

67. A copy of the settlement agreement between LAIL, OTS, Maroil and/or any other Ruperti-controlled entities dated on or around November 17, 2017.

68. All banking records evidencing any payments made by Maroil or any Ruperti-controlled entities to LAIL and/or OTS pursuant to the settlement agreement between them dated November 17, 2017 (and/or any addenda or supplementary agreements thereto).

### *Requests relating to the Florida Action*

69. All documents and communications relating to the merits of the claims of fraud alleged in the Florida Action.

70. All non-privileged documents and communications relating to the negotiation of the settlement of the Florida Action as between Harry Sargeant III and Mr. Ruperti and his entities, including a copy of the settlement agreement itself.

71. All documents showing the amounts that Mr. Ruperti and/or his entities paid to Harry Sargeant III to settle the Florida Action.

72. All testimony (including depositions, witness statements, or testimony given in open court or otherwise) obtained in the Florida Action relating to (1) the claims of fraud

orchestrated by Mr. Ruperti against LAIL, and (2) the exchange of information between Daniel Sargeant and Mr. Hall that helped uncover the fraud.

73.    All documents obtained during the course of discovery in the Florida Action relating to (1) the claims of fraud orchestrated by Mr. Ruperti against LAIL, and (2) the exchange of information between Daniel Sargeant and Mr. Hall that helped uncover the fraud.

74.    All testimony (including depositions, witness statements, or testimony given in open court or otherwise) obtained in the Florida Action relating to whether Mr. Hall knew he was exchanging information with Daniel Sargeant in violation of the 2016 Settlement Agreement.

75.    All documents obtained during the course of discovery in the Florida Action relating to whether Mr. Hall knew he was exchanging information with Daniel Sargeant in violation of the 2016 Settlement Agreement.

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

IN RE APPLICATION OF )
)
    NOVOSHIP (UK) LIMITED )
        Applicant, )    Civil Action No.
)
Pursuant to 28 U.S.C. § 1782 for Judicial Assistance in )
Obtaining Evidence for use in Foreign and International )
Proceedings. )

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:               INTERNATIONAL OIL TRADING COMPANY, LLC
25 SEABREEZE AVENUE, SUITE 300, DELRAY BEACH, FL 33483

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

See Schedule A (enclosed)

| Place: Reed Smith LLP<br>1001 Brickell Bay Drive, Suite 900<br>Miami, FL 33131 | Date and Time:<br><br>TBD |
|---|---|

The deposition will be recorded by this method: _____

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

See Schedule B (enclosed)

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

| *CLERK OF COURT* | |
|---|---|
| | OR |
| _____ | _____ |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* ___Applicant,___
Novoship (UK) Limited _____ , who issues or requests this subpoena, are:

Edward M. Mullins, Reed Smith LLP, 1001 Brickell Bay Dr. Suite 900, Miami, FL 33131, emullins@reedsmith.com

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## Schedule A to Subpoena

The areas of examination for the deposition shall include the following:

1.　　The exchange of documents from 2014 to 2018 between Daniel Sargeant and/or anyone acting for LAIL, on the one hand, and Mr. Hall and Burford, on the other hand, related to Mr. Ruperti and any of his business entities, PDVSA, LAIL, and/or Harry Sargeant III, including identification of the documents exchanged and the purpose of the exchange of documents.

2.　　The occurrence of any communications or meetings between Daniel Sargeant and/or anyone acting for LAIL, on the one hand, and Mr. Hall, on the other hand, in which Mr. Ruperti or any of the Ruperti-related business was discussed in relation toto LAIL or PDVSA.

3.　　Whether Daniel Sargeant and/or anyone acting for LAIL became aware of and/or reviewed (i) any English Court documents that referred to any of the Confidential Documents (as defined in the Declaration of Stephen Kirkpatrick), or (ii) an article in *TradeWinds* magazine entitled "*Novoship demands against Ruperti*" prior to October 2016.

4.　　The extent of knowledge or awareness by Daniel Sargeant and/or anyone acting for LAIL regarding the source of the documents they received from Mr. Hall and whether they were confidential and that their disclosure could subject Mr. Hall and/or Novoship to liability.

5.　　The basis and merits of LAIL's claims against Mr. Ruperti for fraudulently concealing the settlements obtained from PDVSA, including the claims asserted in the lawsuit LAIL filed against Mr. Ruperti and his related entities in England.

6.　　The agreements between Harry Sargeant III and Mr. Ruperti and between LAIL and Maroil as to the ownership, operation and sharing of proceeds of the JV Companies (as defined in Schedule B of this subpoena), and any corporate and business documentation relating to the JV Companies.

7.      The actual business conducted by the JV Companies and the treatment of the proceeds of that business.

8.      The background of the disputes between the JV Companies and PDVSA, including any arbitrations and any settlement discussions relating to PDVSA, including any discussion with Mr. Ruperti or his related entities about the settlement discussions or the arbitrations.

9.      The settlement of the claims between LAIL and Mr. Ruperti and/or any of the Ruperti-related business, including the status and fulfilment of such settlement.

10.     The lawsuit initiated by Harry Sargeant III in Florida entitled *Harry Sargeant III v. Maroil Trading Inc., et al.*, Case No. 17-cv-81070 (S.D. Fla. Sept. 25, 2017), including LAIL's intervention in that lawsuit and LAIL's defense of claims brought against it by Harry Sargeant III.

11.     Any of the documents produced in response to the requests listed in Schedule B to this subpoean.

12.     The location of documents related to these deposition topics and/or the document requests listed in Schedule B, and the identification of other individuals with knowledge.

## Schedule B to Subpoena

## Definitions and Instructions

1. "Novoship" shall mean Novoship (UK) Limited, as well as any of its agents, attorneys, accountants, consultants, representatives, assignees, and any other individual or entity associated or affiliated with it, or purporting to act on its behalf with respect to the matter in question.

2. "Mr. Ruperti" shall mean Wilmer Ruperti.

3. "Ruperti-controlled entities" shall mean all entities beneficially owned by and/or controlled by Mr. Ruperti, including but not limited to Maroil Trading Inc. and Sea Pioneer Shipping Corporation, as well as any of Mr. Ruperti's agents, attorneys, accountants, consultants, representatives, assignees, and any other individual or entity associated or affiliated with him, or purporting to act on his behalf with respect to the matter in question.

4. "Mr. Hall" shall mean Daniel James Hall of Burford.

5. "JV Companies" shall mean the joint business ventures created between Mr. Ruperti and LAIL and/or the Sargeants, including but not limited to Oceanic Oil Venture Inc., Hero Maritime Corp, Herculito Maritime Ltd, Oil Carriers Ltd, Bolivarian Petroleum Transport Ltd, and Suramericana de Transporte Petrolero C.A.

6. "JV Vessels" shall mean the vessels owned by the JV Companies that were chartered to PDVSA, including but not limited to the *Alloro*, the *Polar*, the *Leander*, and the *Hero I*.

7. "LAIL" shall mean Latin American Investments Limited, as well as any of its agents, attorneys, accountants, consultants, representatives, assignees, and any other individual or entity associated or affiliated with it, or purporting to act on its behalf with respect to the matter in question.

8. "PDVSA" shall mean PDVSA Petroleo S.A., the Venezuelan national oil company.

9. "Maroil" shall mean Maroil Trading, Inc., one of the Ruperti-controlled entities.

10. "Burford" shall mean Burford Capital (UK) Limited, as well as any of its agents, attorneys, accountants, consultants, representatives, assignees, and any other individual or entity associated or affiliated with it, or purporting to act on its behalf with respect to the matter in question.

11. "2016 Settlement Agreement" shall mean the second settlement agreement entered into between Novoship and Mr. Ruperti and/or other Ruperti- controlled entities relating to settling the judgment obtained by Novoship in the case before the English High Court entitled *Novoship & Ors v. Mikhaylyuk & Ors*, [2012] EWHC 3586 (Comm).

12. "Florida Action" shall mean the lawsuit entitled *Harry Sargeant III v. Maroil Trading Inc., et al.*, Case No. 17-cv-81070 (S.D. Fla. Sept. 25, 2017).

13. "Document" or "documents" shall mean and include, without limitation, any written or graphic matter or other means of preserving thought or expression, and all tangible things from which information can be processed or transcribed, including the original and all non-identical copies, whether different from the original by reason of any notation made on such copy or otherwise, including, but not limited to, contracts, agreements, mortgages, deeds, leases, financing applications, loan applications, letters of intent, asset purchase agreements, management contracts, operating agreements, writings, written communications, visual, graphic or pictorial displays of any description whatsoever, including, but not limited to, each writing or printing, graph, chart, financial report, tape recording, data computation, ledger sheet, journal entry, invoice, shipping document, bill of lading, purchase order, receipt, return, telephone bill, telephone message slip, schedule, affidavit, memorandum or note of intra office and interoffice telephone calls, letter, letter telegram, blueprint, photograph, video tape, check, canceled check, transcript, statistics, bank statement, financial statement, letter of credit, standby letter of credit, irrevocable and/or revocable standby letter of credit, performance bond, insurance contract and related

2

and/or appended schedule, promissory note, audit report, writing relating to credit and/or loan committee(s) activities, tested telex, untested telex, wire communication, telegrams, teletype, telefax, email, bulletin, correspondence, notes, word diary, chronological data, minutes, work sheet, book, travel log, survey, magazine or newspaper article, press release (and any and all drafts, alterations or modifications, changes, amendments of any of the foregoing), office memorandum, graphic or oral record or representation of any kind (including, without limitation, graphs, microfiche, microfilm, videotapes, recordings, motion pictures, electronic, mechanical, electrical, or chemical recordings or representations of any kind), photograph, prospectus, testing or analysis report or other source of recorded information, including tapes, cassettes, disks, recordings, computer data from which information can be obtained or translated into useable form including manuals, guides and other written information necessary to translate computer routine documents into useable form

14. "Communication" or "communications" shall mean any exchange or transmission of information, whether moral, written, via electronic mail, text message, direct message, social media, or by other means, and includes, but is not limited to, written, oral, telephonic, via electronic mail, representation, discussion, meeting, letter, correspondence, memorandum, newsletter, telegram, advertisement, speech, conversation, conference, note, e-mail or computer-generated message and any other document which refers to any such communication.

15. "Relating to," "related to," "relates to" or "relate to" shall mean: in any way directly or indirectly, containing, constituting, comprising, showing, evidencing, mentioning, reflecting, pertaining to, or referring in any way, directly or indirectly, to and is meant to include, among other documents, documents underlying, supporting, now or previously

3

attached or appended to, or used in the preparation of any document called for by the discovery requested herein.

16. "Including" shall mean "including, but not limited to" so as to require the broadest possible inclusion.

17. The terms "and" and "or" shall be construed conjunctively and disjunctively so as to require the broadest possible inclusion.

18. "All" shall be construed to include the word "any," and the word "any" shall be construed to include the word "all."

19. Unless otherwise stated in a request, the time period for documents responsive to these requests is January 1, 2015 to December 31, 2018.

### Document Requests

***Requests relating to the exchanges of documents between Mr. Hall and Daniel Sargeant/LAIL in January 2015 and October 2016***

1. All documents and communications exchanged between Mr. Hall and Daniel Sargeant and/or anyone acting on behalf of LAIL between January 2015 and March 2017 that concern Mr. Ruperti, any Ruperti-controlled entities, any JV Companies, LAIL, and/or PDVSA.

2. All documents that show there were communications between Mr. Hall and Daniel Sargeant and/or anyone acting on behalf of LAIL between January 2015 and March 2017.

3. All documents indicating the source(s) from which Mr. Hall obtained any of the documents he provided to Daniel Sargeant between January 2015 and December 2016.

4. All documents and communications that show that Daniel Sargeant and/or anyone acting for LAIL actually reviewed the documents provided by Mr. Hall between January 2015 and March 2017.

4

5.      All documents and communications between January 2015 and March 2017 showing that Daniel Sargeant and/or anyone acting for LAIL requested Mr. Hall to provide documents concerning Mr. Ruperti, any Ruperti-controlled entities, any JV Companies, LAIL, and/or PDVSA.

6.      All documents or communications that show that an actual exchange of information related to Mr. Ruperti, Ruperti-controlled entities, the JV Companies, LAIL, and/or PDVSA occurred between Daniel Sargeant and Mr. Hall in January 2015 and/or October 2016.

7.      All documents or communications that show Daniel Sargeant and/or Mr. Hall knew, or should have known, that any of the documents provided by Mr. Hall in October 2016 were confidential and/or subject to duties to maintain their confidentiality.

8.      All documents or communications that show Daniel Sargeant and/or Mr. Hall knew, or should have known, that any of the documents provided by Mr. Hall in October 2016 evidenced unlawful and fraudulent conduct by Mr. Ruperti and/or any of the Ruperti-controlled entities against LAIL and/or the Sargeants.

9.      All documents or communications that show Daniel Sargeant and/or Mr. Hall knew, or should have known, that the provision of the documents by Mr. Hall in October 2016 would or might result in litigation brought (i) by Mr. Ruperti and/or any of the Ruperti-controlled entities against Novoship, or (ii) by Novoship against Mr. Hall and/or Burford.

***Requests relating to meetings and communications between Mr. Hall and Daniel Sargeant/LAIL***

10.     All documents or communications showing when Mr. Hall and Daniel Sargeant or anyone acting for LAIL fist made contact, including documents from in or around November 2014.

11.     All documents or communications showing the matters discussed between Mr. Hall and Daniel Sargeant or anyone acting for LAIL between November 1, 2014 and December 31, 2017, including but not limited to the meetings that took place on:

   11.1.   January 13, 2015;

   11.2.   October 6, 2016;

   11.3.   October 28, 2016; and

   11.4.   May 5, 2017.

12.     All documents or communications showing how the meetings between Mr. Hall and Daniel Sargeant or anyone acting for LAIL between November 1, 2014 and December 31, 2017 were arranged, and/or evidencing the purpose and/or subject matter of those meetings.

13.     All documents or communications that show Mr. Hall and Daniel Sargeant were in contact in or about August 2016 regarding matters concerning LAIL or Mr. Ruperti or the possibility of provision of documents or information by Mr. Hall relating to either of these.

14.     All emails exchanged between Mr. Hall and Daniel Sargeant or anyone acting for LAIL regarding Mr. Ruperti, any Ruperti-controlled entities, any JV Companies, LAIL, and/or PDVSA, including but not limited to those dated:

   14.1.   May 4, 2017;

   14.2.   May 8, 2017;

   14.3.   May 10, 2017;

   14.4.   May 11, 2017;

   14.5.   May 26, 2017;

   14.6.   July 19, 2017; and

   14.7.   July 26, 2017.

15. All documents or communications showing that Mr. Hall requested and/or obtained indemnification and/or payment from Mr. Daniel Sargeant and/or LAIL in connection with having provided them with documents in October 2016 that related to Mr. Ruperti, any Ruperti-controlled entities, any JV Companies, LAIL, and/or PDVSA.

16. All documents and communications showing the purpose for the exchange of documents relating to Mr. Ruperti, any Ruperti-controlled entities, any JV Companies, LAIL, and/or PDVSA between Mr. Hall and Daniel Sargeant, including LAIL's need for such documents.

### *Requests relating to whether the PDVSA/Ruperti settlement was in the public domain*

17. All documents and communications showing that Daniel Sargeant and/or anyone acting for LAIL became aware of and/or reviewed any of the following documents prior to October 6, 2016:

   17.1. The witness statement of Edward Poulton dated March 18, 2015 and/or its accompanying exhibit;

   17.2. The witness statement of Benjamin Ogden dated March 27, 2015 and/or its accompanying exhibit;

   17.3. The witness statement of Richard Allen dated March 30, 2015 and/or its accompanying exhibit;

   17.4. The judgment entered by the Commercial Court (Mr. Justice Andrew Smith) in *Novoship (UK) Ltd & others v. Mikhaylyuk & others* [2015] EWHC 992 (Comm);

   17.5. The article in *TradeWinds* magazine entitled "*Novoship demands against Ruperti*"; and/or

17.6.    The settlement agreement between PDVSA and the Ruperti-controlled entities Sea Pioneer Shipping Corporation and Maroil dated on or about December 22, 2014.

18.    All documents and communications between January 2015 and October 2016, which evidence:

18.1.    a belief or suspicion on the part of Daniel Sargeant and/or anyone acting for LAIL that Mr. Ruperti had concluded a settlement agreement with PDVSA; and/or

18.2.    Daniel Sargeant and/or LAIL's intention to bring legal proceedings against Mr. Ruperti and/or any Ruperti-controlled entities in connection with Mr. Ruperti's actual or potential conclusion of a settlement agreement with PDVSA.

19.    All correspondence between Daniel Sargeant, Mr. Andrew Longhurst, and/or Mr. Andrew Preston between March 18, 2015 and October 6, 2016 referring to Mr. Ruperti's actual or potential settlement with PDVSA.

*Requests relating to the JV Companies and JV Vessels*

20.    All documents or communications related to the negotiation of an agreement between Harry Sargeant III and Mr. Ruperti in or around 2001 concerning:

20.1.    any  joint ventures between LAIL and Maroil, including how the joint venture would be owned and operated;

20.2.    the chartering of vessels owned by any such joint ventures to third parties, including to Maroil, PDVSA or its affiliates;

20.3.    the manner in which the proceeds of such charters would be distributed; and/or

20.4.    the duties that the participants in such joint ventures would owe to each other, which may have included the duty to exercise reasonable diligence in relation to the business of the joint ventures and to act in good faith as business partners.

8

21.     The full constitutional documents of each of the following companies, including their respective articles of association, shareholders' agreements, and any other written agreements governing the basis on which the companies would be owned and operated:

21.1.   Oceanic Oil Venture Inc. ("OOV");

21.2.   Hero Maritime Corp ("HMC");

21.3.   Herculito Maritime Ltd ("Herculito");

21.4.   Bolivarian Petroleum Transport Ltd ("BPT");

21.5.   Oil Carriers Ltd ("OCL"); and

21.6.   Suramericana de Transporte Petrolero C.A.

22.     The contracts and other agreements by which the purchases of the following vessels were financed and/or mortgaged by Deutsche Schiffsbank Aktiengesellschaft ("DSB"), Commerzbank, and/or Lloyds TSB Bank Plc ("Lloyds Bank"):

22.1.   The VLCC "*Leander*";

22.2.   The VLCC "*Hero 1*";

22.3.   The Panamax "*Polar*"; and

22.4.   The Panamax "*Alloro.*"

23.     All documents which evidence the dates on which any bank took possession of any of the JV Vessels.

24.     All bills of sale, confirmations from mortgagee banks, or other similar documents formally evidencing the dates of sale of each of the JV Vessels by any of the banks that exercised their mortgagee rights over the JV Vessels.

25.     All statements or other similar documents evidencing the outstanding indebtedness of the JV Companies to their respective mortgagee banks for the purchase of each of the JV Vessels between March 1, 2013 and December 22, 2014.

26.   All documents and communications showing any transfer of LAIL's interests in Suramericana de Transporte Petrolero C.A. in or around March 2004.


**_Requests relating to the use of the JV Vessels by PDVSA_**

27.   All documents or communications between Harry Sargeant III and Mr. Ruperti in 2004 and 2005   regarding the distribution of any proceeds of the charter of the _Polar_ to PDVSA.

28.   All documents or communications between Harry Sargeant III and Mr. Ruperti in 2004 and 2005 regarding the distribution of any proceeds of the charter of the _Alloro_ to PDVSA.

29.   A copy of the "Clarification Letter" dated April 7, 2006, which varied the contract of affreightment as between Sea Pioneer and PDVSA dated March 22, 2006 (the "COA");

30.   All documents or communications between January 1, 2007 and the dates of sale of any of the JV Vessels by any of the mortgagee banks which evidence:

   30.1.   requests made by Sea Pioneer that the _Leander_ and/or the _Hero 1_ should be made available to perform the COA;

   30.2.   failures or refusals by LAIL, Oceanic Transport Shipping ("OTS"), OOV and/or HMC to make the _Leander_ and/or the _Hero 1_ available in response to such requests by Sea Pioneer; and/or

   30.3.   the reasons for any such failures or refusals.

31.   Any charterparties dated between January 1, 2007 and the dates of sale of any of the JV Vessels by any of the mortgagee banks pursuant to which the _Leander_ and/or the _Hero 1_ were used, other than for the performance of the COA with PDVSA.

32.   All documents or communications between January 1, 2007 and the dates of sale of any of the JV Vessels by any of the mortgagee banks showing that the _Leander_ and/or the

*Hero 1* were used in performing voyages under the COA, including the following voyages:

32.1.   As regards the *Leander*:

    32.1.1.   A voyage from Bonaire to Guangzhou / Zhoushan between April 5, 2007 and May 25, 2007; and

    32.1.2.   A voyage from Bullen Bay / Bonaire to Karimun / Zhousan between August 9, 2007 and October 13, 2007.

32.2.   As regards the *Hero 1*:

    32.2.1.   A Karimun / Telapas (Singapore) voyage in early/mid 2007;

    32.2.2.   A voyage from Freeport to Shen Zhan and Zhousan between January 28, 2007 and August 23, 2007; and

    32.2.3.   A shipment loaded at Curacao and ultimately discharged again at Curacao between November 1, 2008 and December 24, 2008.

33.   All documents or communications from Mr. Ruperti or any Ruperti-controlled entities to LAIL, any of the Sargeants, OTS, OOV, and/or HMC which evidence the chartering by Sea Pioneer of vessels other than the *Leander* and the *Hero 1* to perform the COA, including in particular the vessels *Pisces Star*, *Eagle Valencia* and *Ural*.

### Requests relating to the treatment of earnings of the JV Companies

34.   All documents and communications showing the JV Companies' financial status between 2006 and 2015, including all income, profit and loss statements during that period.

35.   All documents and communications showing how the finances of the JV Companies were supposed to be managed, including documents and communications regarding (i) how income generated by the chartering of the JV Vessels was to be remitted to the JV

Companies, (ii) how expenses incurred by the JV Companies were to be handled, and (iii) how and when the shareholders of the JV Companies were to be paid.

36.    All documents and communications showing any payments made to LAIL by the JV Companies or by any third parties relating to the chartering of any of the JV Vessels between 2006 and 2015.

37.    All documents and communications showing any payments made to Mr. Ruperti or any Ruperti-controlled entities by the JV Companies or by any third parties relating to the chartering of any of the JV Vessels between 2006 and 2015.


*Requests relating to the disputes with PDVSA*

38.    All documents and communications relating to the meeting held between the directors of OOV and HMC on or about December 20, 2010, including documents indicating the matters discussed at the meeting and any documents reviewed at the meeting.

39.    All documents and communications relating to the decision by OOV and HMC to initiate arbitration proceedings against PDVSA.

40.    Any witness statements, expert reports, documentary evidence and/or written submissions served in the arbitration proceedings brought by OOV and HMC against PDVSA (the "First PDVSA Arbitration").

41.    A copy of the spreadsheets attached to (i) the claim submissions dated August 29, 2011 and (ii) the amended claim submissions dated January 23, 2012 from the First PDVSA Arbitration.

42.    A copy of all documents served in the First PDVSA Arbitration to support the amended claim submissions dated January 23, 2012.

43. All documents and communications from the tribunal in the First PDVSA Arbitration asking questions about the calculation of the claim submissions, including the tribunal's July 10, 2012 request.

44. All documents and communications relating to Harry Sargeant III's proposal in or about October and November 2012 that DSB take over the First PDVSA Arbitration, including any response to that proposal by LAIL, Mr. Ruperti, OTS, HMC and/or OOV.

45. All correspondence between LAIL, Mr. Ruperti, OTS, HMC and/or OOV (on the one hand) and the mortgagee banks of the JV Vessels (DSB or Commerzbank) (on the other hand) relating to the First PDVSA Arbitration.

46. All documents and communications relating to any claims against PDVSA regarding its charters of the *Polar* and/or the *Alloro*.

47. All documents and communications relating to any claims by Sea Pioneer and/or Mr Ruperti against PDVSA between 2006 and August 9, 2012.

48. A copy of the letter dated August 9, 2012 from Freddy Belisario Capella Abogados to Petroleos de Venezuela C.A. (the parent company of PDVSA).

### *Requests relating to the negotiations with PDVSA*

49. All documents and communications relating to the appointment of Mr. Patrick Mooney and Mr. Alejandro Leandros in or about March 2013 on behalf of OOV and HMC to negotiate a settlement of the First PDVSA Arbitration.

50. All documents and communications reflecting the matters discussed at the meeting in October 2013 between Commerzbank, LAIL, OTS and Maroil.

51. All documents and communications relating to the appointment of Mr. Mooney and Mr. Ruperti in or about May 2014 on behalf of OOV and HMC to negotiate a settlement of the First PDVSA Arbitration.

13

52.     All documents and communications reflecting the matters discussed at the meeting on or about May 7, 2014 between Daniel Sargeant, Mr. Mooney, and Mr. Ruperti in Miami.

53.     All documents and communications relating to whether Mr. Mooney and Mr. Preston were authorized by OOV and HMC to meet with Commerzbank on September 25, 2014 on their behalf.

54.     All documents and communications reflecting the matters discussed at the meeting on September 25, 2014 between Commerzbank, Mr. Mooney and Mr. Preston.

55.     All documents and communications relating to the discussions between LAIL, Mr. Ruperti, OTS, OOV and/or HMC (on the one hand) and Commerzbank (on the other hand) between September 1, 2014 and December 22, 2014 regarding a settlement proposal to PDVSA.

56.     All documents and communications between September 1, 2014 and December 22, 2014 relating to:

    56.1.   the terms on which Commerzbank was willing settle the First PDVSA Arbitration;

    56.2.   the sums which Commerzbank wanted to receive from the settlement for the debt owed on the JV Vessels; and

    56.3.   the manner in which Commerzbank wanted the settlement negotiations with PDVSA to be conducted, including whether it was in agreement with Mr. Ruperti leading the settlement negotiations personally.

57.     All documents and communications relating to the consideration given by LAIL, OTS, OOV and/or HMC of the draft board resolutions and letters of authority presented by Mr. Preston on November 7, 2014, that were intended to be given to Mr. Mooney and Mr. Ruperti.

58.   All documents and communications between LAIL, OTS, OOV, HMC, Daniel Sargeant, Mr. Mooney, Mr. Ruperti, and/or Mr. Preston between September 2014 and October 2016 relating to how the proceeds of any settlement with PDVSA ought to be distributed.

59.   All documents and communications from Mr. Mooney, Mr. Ruperti, and/or Mr. Leandros between March 2013 and October 2016 relating to the status of the settlement negotiations with PDVSA.

60.   All documents and communications relating to any expenses allegedly incurred by Mr. Mooney, Mr. Ruperti, and/or any Ruperti-related entities in conducting settlement negotiations with PDVSA.

### *Requests relating to Ruperti's concealment of the PDVSA settlements*

61.   All documents and communications describing the matters discussed at the meeting on February 12, 2015 between Mr. Mooney and Mr. Preston.

62.   Any draft settlement agreements between Sea Pioneer, Maroil, and/or LAIL created between February 2015 and October 2016, relating to the distribution of the proceeds of any settlement with PDVSA.

63.   All documents and communications exchanged between Daniel Sargeant, Mr. Ruperti, and/or Mr. Mooney relating to any draft settlement agreements with PDVSA.

64.   All documents and communications exchanged between Daniel Sargeant and/or Mr. Preston (on the one hand) and Mr. Mooney and/or Mr. Ruperti (on the other hand) between December 2014 and October 2016 relating to PDVSA.

65.   All documents and communications describing the matters discussed at any meetings between Daniel Sargeant and Mr. Ruperti between December 2014 and October 2016,

including but not limited to the meeting held on June 1, 2015 at the Four Seasons Hotel in Geneva.

66. All documents and communications exchanged between Mr. Ruperti and/or Mr. Mooney between December 2014 and October 2016 relating to whether a settlement had been reached with PDVSA, including any express representations that no such settlement had been reached.

### Requests relating to the LAIL/Ruperti Proceedings and Settlement

67. A copy of the settlement agreement between LAIL, OTS, Maroil and/or any other Ruperti-controlled entities dated on or around November 17, 2017.

68. All banking records evidencing any payments made by Maroil or any Ruperti-controlled entities to LAIL and/or OTS pursuant to the settlement agreement between them dated November 17, 2017 (and/or any addenda or supplementary agreements thereto).

### Requests relating to the Florida Action

69. All documents and communications relating to the merits of the claims of fraud alleged in the Florida Action.

70. All non-privileged documents and communications relating to the negotiation of the settlement of the Florida Action as between Harry Sargeant III and Mr. Ruperti and his entities, including a copy of the settlement agreement itself.

71. All documents showing the amounts that Mr. Ruperti and/or his entities paid to Harry Sargeant III to settle the Florida Action.

72. All testimony (including depositions, witness statements, or testimony given in open court or otherwise) obtained in the Florida Action relating to (1) the claims of fraud

orchestrated by Mr. Ruperti against LAIL, and (2) the exchange of information between Daniel Sargeant and Mr. Hall that helped uncover the fraud.

73.    All documents obtained during the course of discovery in the Florida Action relating to (1) the claims of fraud orchestrated by Mr. Ruperti against LAIL, and (2) the exchange of information between Daniel Sargeant and Mr. Hall that helped uncover the fraud.

74.    All testimony (including depositions, witness statements, or testimony given in open court or otherwise) obtained in the Florida Action relating to whether Mr. Hall knew he was exchanging information with Daniel Sargeant in violation of the 2016 Settlement Agreement.

75.    All documents obtained during the course of discovery in the Florida Action relating to whether Mr. Hall knew he was exchanging information with Daniel Sargeant in violation of the 2016 Settlement Agreement.

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | |
|---|---|
| IN RE APPLICATION OF | ) |
| NOVOSHIP (UK) LIMITED<br>Applicant, | )<br>) |
| | )   Civil Action No. |
| Pursuant to 28 U.S.C. § 1782 for Judicial Assistance in<br>Obtaining Evidence for use in Foreign and International<br>Proceedings. | )<br>)<br>)<br>) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                        BERGER SINGERMAN, P.A.
          350 E. LAS OLAS BLVD, SUITE 1000, FORT LAUDERDALE, FL 33301
                        *(Name of person to whom this subpoena is directed)*

☑ *Testimony:*  **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

                    See Schedule A (enclosed)

| Place:  Reed Smith LLP<br>1001 Brickell Bay Drive, Suite 900<br>Miami, FL 33131 | Date and Time:<br><br>TBD |
|---|---|

            The deposition will be recorded by this method: _____

☑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:
                    See Schedule B (enclosed)

            The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  _____

          *CLERK OF COURT*
                                                    OR

          _____              _____
             *Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  Applicant,
Novoship (UK) Limited                                                , who issues or requests this subpoena, are:
Edward M. Mullins, Reed Smith LLP, 1001 Brickell Bay Dr. Suite 900, Miami, FL 33131, emullins@reedsmith.com

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## Schedule A to Subpoena

The areas of examination for the deposition shall include the following:

1.      The exchange of documents from 2014 to 2018 between Daniel Sargeant and/or anyone acting for LAIL, on the one hand, and Mr. Hall and Burford, on the other hand, related to Mr. Ruperti and any of his business entities, PDVSA, LAIL, and/or Harry Sargeant III, including identification of the documents exchanged and the purpose of the exchange of documents.

2.      The occurrence of any communications or meetings between Daniel Sargeant and/or anyone acting for LAIL, on the one hand, and Mr. Hall, on the other hand, in which Mr. Ruperti or any of the Ruperti-related business was discussed in relation toto LAIL or PDVSA.

3.      Whether Daniel Sargeant and/or anyone acting for LAIL became aware of and/or reviewed (i) any English Court documents that referred to any of the Confidential Documents (as defined in the Declaration of Stephen Kirkpatrick), or (ii) an article in *TradeWinds* magazine entitled "*Novoship demands against Ruperti*" prior to October 2016.

4.      The extent of knowledge or awareness by Daniel Sargeant and/or anyone acting for LAIL regarding the source of the documents they received from Mr. Hall and whether they were confidential and that their disclosure could subject Mr. Hall and/or Novoship to liability.

5.      The basis and merits of LAIL's claims against Mr. Ruperti for fraudulently concealing the settlements obtained from PDVSA, including the claims asserted in the lawsuit LAIL filed against Mr. Ruperti and his related entities in England.

6.      The agreements between Harry Sargeant III and Mr. Ruperti and between LAIL and Maroil as to the ownership, operation and sharing of proceeds of the JV Companies (as defined in Schedule B of this subpoena), and any corporate and business documentation relating to the JV Companies.

7.      The actual business conducted by the JV Companies and the treatment of the proceeds of that business.

8.      The background of the disputes between the JV Companies and PDVSA, including any arbitrations and any settlement discussions relating to PDVSA, including any discussion with Mr. Ruperti or his related entities about the settlement discussions or the arbitrations.

9.      The settlement of the claims between LAIL and Mr. Ruperti and/or any of the Ruperti-related business, including the status and fulfilment of such settlement.

10.      The lawsuit initiated by Harry Sargeant III in Florida entitled *Harry Sargeant III v. Maroil Trading Inc., et al.*, Case No. 17-cv-81070 (S.D. Fla. Sept. 25, 2017), including LAIL's intervention in that lawsuit and LAIL's defense of claims brought against it by Harry Sargeant III.

11.      Any of the documents produced in response to the requests listed in Schedule B to this subpoean.

12.      The location of documents related to these deposition topics and/or the document requests listed in Schedule B, and the identification of other individuals with knowledge.

## Schedule B to Subpoena

## Definitions and Instructions

1. "Novoship" shall mean Novoship (UK) Limited, as well as any of its agents, attorneys, accountants, consultants, representatives, assignees, and any other individual or entity associated or affiliated with it, or purporting to act on its behalf with respect to the matter in question.

2. "Mr. Ruperti" shall mean Wilmer Ruperti.

3. "Ruperti-controlled entities" shall mean all entities beneficially owned by and/or controlled by Mr. Ruperti, including but not limited to Maroil Trading Inc. and Sea Pioneer Shipping Corporation, as well as any of Mr. Ruperti's agents, attorneys, accountants, consultants, representatives, assignees, and any other individual or entity associated or affiliated with him, or purporting to act on his behalf with respect to the matter in question.

4. "Mr. Hall" shall mean Daniel James Hall of Burford.

5. "JV Companies" shall mean the joint business ventures created between Mr. Ruperti and LAIL and/or the Sargeants, including but not limited to Oceanic Oil Venture Inc., Hero Maritime Corp, Herculito Maritime Ltd, Oil Carriers Ltd, Bolivarian Petroleum Transport Ltd, and Suramericana de Transporte Petrolero C.A.

6. "JV Vessels" shall mean the vessels owned by the JV Companies that were chartered to PDVSA, including but not limited to the *Alloro*, the *Polar*, the *Leander*, and the *Hero I*.

7. "LAIL" shall mean Latin American Investments Limited, as well as any of its agents, attorneys, accountants, consultants, representatives, assignees, and any other individual or entity associated or affiliated with it, or purporting to act on its behalf with respect to the matter in question.

8. "PDVSA" shall mean PDVSA Petroleo S.A., the Venezuelan national oil company.

9. "Maroil" shall mean Maroil Trading, Inc., one of the Ruperti-controlled entities.

10. "Burford" shall mean Burford Capital (UK) Limited, as well as any of its agents, attorneys, accountants, consultants, representatives, assignees, and any other individual or entity associated or affiliated with it, or purporting to act on its behalf with respect to the matter in question.

11. "2016 Settlement Agreement" shall mean the second settlement agreement entered into between Novoship and Mr. Ruperti and/or other Ruperti- controlled entities relating to settling the judgment obtained by Novoship in the case before the English High Court entitled *Novoship & Ors v. Mikhaylyuk & Ors*, [2012] EWHC 3586 (Comm).

12. "Florida Action" shall mean the lawsuit entitled *Harry Sargeant III v. Maroil Trading Inc., et al.*, Case No. 17-cv-81070 (S.D. Fla. Sept. 25, 2017).

13. "Document" or "documents" shall mean and include, without limitation, any written or graphic matter or other means of preserving thought or expression, and all tangible things from which information can be processed or transcribed, including the original and all non-identical copies, whether different from the original by reason of any notation made on such copy or otherwise, including, but not limited to, contracts, agreements, mortgages, deeds, leases, financing applications, loan applications, letters of intent, asset purchase agreements, management contracts, operating agreements, writings, written communications, visual, graphic or pictorial displays of any description whatsoever, including, but not limited to, each writing or printing, graph, chart, financial report, tape recording, data computation, ledger sheet, journal entry, invoice, shipping document, bill of lading, purchase order, receipt, return, telephone bill, telephone message slip, schedule, affidavit, memorandum or note of intra office and interoffice telephone calls, letter, letter telegram, blueprint, photograph, video tape, check, canceled check, transcript, statistics, bank statement, financial statement, letter of credit, standby letter of credit, irrevocable and/or revocable standby letter of credit, performance bond, insurance contract and related

2

and/or appended schedule, promissory note, audit report, writing relating to credit and/or loan committee(s) activities, tested telex, untested telex, wire communication, telegrams, teletype, telefax, email, bulletin, correspondence, notes, word diary, chronological data, minutes, work sheet, book, travel log, survey, magazine or newspaper article, press release (and any and all drafts, alterations or modifications, changes, amendments of any of the foregoing), office memorandum, graphic or oral record or representation of any kind (including, without limitation, graphs, microfiche, microfilm, videotapes, recordings, motion pictures, electronic, mechanical, electrical, or chemical recordings or representations of any kind), photograph, prospectus, testing or analysis report or other source of recorded information, including tapes, cassettes, disks, recordings, computer data from which information can be obtained or translated into useable form including manuals, guides and other written information necessary to translate computer routine documents into useable form

14. "Communication" or "communications" shall mean any exchange or transmission of information, whether moral, written, via electronic mail, text message, direct message, social media, or by other means, and includes, but is not limited to, written, oral, telephonic, via electronic mail, representation, discussion, meeting, letter, correspondence, memorandum, newsletter, telegram, advertisement, speech, conversation, conference, note, e-mail or computer-generated message and any other document which refers to any such communication.

15. "Relating to," "related to," "relates to" or "relate to" shall mean: in any way directly or indirectly, containing, constituting, comprising, showing, evidencing, mentioning, reflecting, pertaining to, or referring in any way, directly or indirectly, to and is meant to include, among other documents, documents underlying, supporting, now or previously

3

attached or appended to, or used in the preparation of any document called for by the discovery requested herein.

16. "Including" shall mean "including, but not limited to" so as to require the broadest possible inclusion.

17. The terms "and" and "or" shall be construed conjunctively and disjunctively so as to require the broadest possible inclusion.

18. "All" shall be construed to include the word "any," and the word "any" shall be construed to include the word "all."

19. Unless otherwise stated in a request, the time period for documents responsive to these requests is January 1, 2015 to December 31, 2018.

## Document Requests

*Requests relating to the exchanges of documents between Mr. Hall and Daniel Sargeant/LAIL in January 2015 and October 2016*

1. All documents and communications exchanged between Mr. Hall and Daniel Sargeant and/or anyone acting on behalf of LAIL between January 2015 and March 2017 that concern Mr. Ruperti, any Ruperti-controlled entities, any JV Companies, LAIL, and/or PDVSA.

2. All documents that show there were communications between Mr. Hall and Daniel Sargeant and/or anyone acting on behalf of LAIL between January 2015 and March 2017.

3. All documents indicating the source(s) from which Mr. Hall obtained any of the documents he provided to Daniel Sargeant between January 2015 and December 2016.

4. All documents and communications that show that Daniel Sargeant and/or anyone acting for LAIL actually reviewed the documents provided by Mr. Hall between January 2015 and March 2017.

4

5.      All documents and communications between January 2015 and March 2017 showing that Daniel Sargeant and/or anyone acting for LAIL requested Mr. Hall to provide documents concerning Mr. Ruperti, any Ruperti-controlled entities, any JV Companies, LAIL, and/or PDVSA.

6.      All documents or communications that show that an actual exchange of information related to Mr. Ruperti, Ruperti-controlled entities, the JV Companies, LAIL, and/or PDVSA occurred between Daniel Sargeant and Mr. Hall in January 2015 and/or October 2016.

7.      All documents or communications that show Daniel Sargeant and/or Mr. Hall knew, or should have known, that any of the documents provided by Mr. Hall in October 2016 were confidential and/or subject to duties to maintain their confidentiality.

8.      All documents or communications that show Daniel Sargeant and/or Mr. Hall knew, or should have known, that any of the documents provided by Mr. Hall in October 2016 evidenced unlawful and fraudulent conduct by Mr. Ruperti and/or any of the Ruperti-controlled entities against LAIL and/or the Sargeants.

9.      All documents or communications that show Daniel Sargeant and/or Mr. Hall knew, or should have known, that the provision of the documents by Mr. Hall in October 2016 would or might result in litigation brought (i) by Mr. Ruperti and/or any of the Ruperti-controlled entities against Novoship, or (ii) by Novoship against Mr. Hall and/or Burford.

*Requests relating to meetings and communications between Mr. Hall and Daniel Sargeant/LAIL*

10.     All documents or communications showing when Mr. Hall and Daniel Sargeant or anyone acting for LAIL fist made contact, including documents from in or around November 2014.

11. All documents or communications showing the matters discussed between Mr. Hall and Daniel Sargeant or anyone acting for LAIL between November 1, 2014 and December 31, 2017, including but not limited to the meetings that took place on:

11.1. January 13, 2015;

11.2. October 6, 2016;

11.3. October 28, 2016; and

11.4. May 5, 2017.

12. All documents or communications showing how the meetings between Mr. Hall and Daniel Sargeant or anyone acting for LAIL between November 1, 2014 and December 31, 2017 were arranged, and/or evidencing the purpose and/or subject matter of those meetings.

13. All documents or communications that show Mr. Hall and Daniel Sargeant were in contact in or about August 2016 regarding matters concerning LAIL or Mr. Ruperti or the possibility of provision of documents or information by Mr. Hall relating to either of these.

14. All emails exchanged between Mr. Hall and Daniel Sargeant or anyone acting for LAIL regarding Mr. Ruperti, any Ruperti-controlled entities, any JV Companies, LAIL, and/or PDVSA, including but not limited to those dated:

14.1. May 4, 2017;

14.2. May 8, 2017;

14.3. May 10, 2017;

14.4. May 11, 2017;

14.5. May 26, 2017;

14.6. July 19, 2017; and

14.7. July 26, 2017.

15.    All documents or communications showing that Mr. Hall requested and/or obtained indemnification and/or payment from Mr. Daniel Sargeant and/or LAIL in connection with having provided them with documents in October 2016 that related to Mr. Ruperti, any Ruperti-controlled entities, any JV Companies, LAIL, and/or PDVSA.

16.    All documents and communications showing the purpose for the exchange of documents relating to Mr. Ruperti, any Ruperti-controlled entities, any JV Companies, LAIL, and/or PDVSA between Mr. Hall and Daniel Sargeant, including LAIL's need for such documents.

***Requests relating to whether the PDVSA/Ruperti settlement was in the public domain***

17.    All documents and communications showing that Daniel Sargeant and/or anyone acting for LAIL became aware of and/or reviewed any of the following documents prior to October 6, 2016:

  17.1.    The witness statement of Edward Poulton dated March 18, 2015 and/or its accompanying exhibit;

  17.2.    The witness statement of Benjamin Ogden dated March 27, 2015 and/or its accompanying exhibit;

  17.3.    The witness statement of Richard Allen dated March 30, 2015 and/or its accompanying exhibit;

  17.4.    The judgment entered by the Commercial Court (Mr. Justice Andrew Smith) in *Novoship (UK) Ltd & others v. Mikhaylyuk & others* [2015] EWHC 992 (Comm);

  17.5.    The article in *TradeWinds* magazine entitled "*Novoship demands against Ruperti*"; and/or

17.6.   The settlement agreement between PDVSA and the Ruperti-controlled entities Sea Pioneer Shipping Corporation and Maroil dated on or about December 22, 2014.

18.   All documents and communications between January 2015 and October 2016, which evidence:

18.1.   a belief or suspicion on the part of Daniel Sargeant and/or anyone acting for LAIL that Mr. Ruperti had concluded a settlement agreement with PDVSA; and/or

18.2.   Daniel Sargeant and/or LAIL's intention to bring legal proceedings against Mr. Ruperti and/or any Ruperti-controlled entities in connection with Mr. Ruperti's actual or potential conclusion of a settlement agreement with PDVSA.

19.   All correspondence between Daniel Sargeant, Mr. Andrew Longhurst, and/or Mr. Andrew Preston between March 18, 2015 and October 6, 2016 referring to Mr. Ruperti's actual or potential settlement with PDVSA.

*Requests relating to the JV Companies and JV Vessels*

20.   All documents or communications related to the negotiation of an agreement between Harry Sargeant III and Mr. Ruperti in or around 2001 concerning:

20.1.   any  joint ventures between LAIL and Maroil, including how the joint venture would be owned and operated;

20.2.   the chartering of vessels owned by any such joint ventures to third parties, including to Maroil, PDVSA or its affiliates;

20.3.   the manner in which the proceeds of such charters would be distributed; and/or

20.4.   the duties that the participants in such joint ventures would owe to each other, which may have included the duty to exercise reasonable diligence in relation to the business of the joint ventures and to act in good faith as business partners.

21.     The full constitutional documents of each of the following companies, including their respective articles of association, shareholders' agreements, and any other written agreements governing the basis on which the companies would be owned and operated:

21.1.   Oceanic Oil Venture Inc. ("OOV");

21.2.   Hero Maritime Corp ("HMC");

21.3.   Herculito Maritime Ltd ("Herculito");

21.4.   Bolivarian Petroleum Transport Ltd ("BPT");

21.5.   Oil Carriers Ltd ("OCL"); and

21.6.   Suramericana de Transporte Petrolero C.A.

22.     The contracts and other agreements by which the purchases of the following vessels were financed and/or mortgaged by Deutsche Schiffsbank Aktiengesellschaft ("DSB"), Commerzbank, and/or Lloyds TSB Bank Plc ("Lloyds Bank"):

22.1.   The VLCC "*Leander*";

22.2.   The VLCC "*Hero 1*";

22.3.   The Panamax "*Polar*"; and

22.4.   The Panamax "*Alloro.*"

23.     All documents which evidence the dates on which any bank took possession of any of the JV Vessels.

24.     All bills of sale, confirmations from mortgagee banks, or other similar documents formally evidencing the dates of sale of each of the JV Vessels by any of the banks that exercised their mortgagee rights over the JV Vessels.

25.     All statements or other similar documents evidencing the outstanding indebtedness of the JV Companies to their respective mortgagee banks for the purchase of each of the JV Vessels between March 1, 2013 and December 22, 2014.

26. All documents and communications showing any transfer of LAIL's interests in Suramericana de Transporte Petrolero C.A. in or around March 2004.

**Requests relating to the use of the JV Vessels by PDVSA**

27. All documents or communications between Harry Sargeant III and Mr. Ruperti in 2004 and 2005  regarding the distribution of any proceeds of the charter of the *Polar* to PDVSA.

28. All documents or communications between Harry Sargeant III and Mr. Ruperti in 2004 and 2005 regarding the distribution of any proceeds of the charter of the *Alloro* to PDVSA.

29. A copy of the "Clarification Letter" dated April 7, 2006, which varied the contract of affreightment as between Sea Pioneer and PDVSA dated March 22, 2006 (the "COA");

30. All documents or communications between January 1, 2007 and the dates of sale of any of the JV Vessels by any of the mortgagee banks which evidence:

    30.1. requests made by Sea Pioneer that the *Leander* and/or the *Hero 1* should be made available to perform the COA;

    30.2. failures or refusals by LAIL, Oceanic Transport Shipping ("OTS"), OOV and/or HMC to make the *Leander* and/or the *Hero 1* available in response to such requests by Sea Pioneer; and/or

    30.3. the reasons for any such failures or refusals.

31. Any charterparties dated between January 1, 2007 and the dates of sale of any of the JV Vessels by any of the mortgagee banks pursuant to which the *Leander* and/or the *Hero 1* were used, other than for the performance of the COA with PDVSA.

32. All documents or communications between January 1, 2007 and the dates of sale of any of the JV Vessels by any of the mortgagee banks showing that the *Leander* and/or the

*Hero 1* were used in performing voyages under the COA, including the following voyages:

32.1.   As regards the *Leander*:

32.1.1.   A voyage from Bonaire to Guangzhou / Zhoushan between April 5, 2007 and May 25, 2007; and

32.1.2.   A voyage from Bullen Bay / Bonaire to Karimun / Zhousan between August 9, 2007 and October 13, 2007.

32.2.   As regards the *Hero 1*:

32.2.1.   A Karimun / Telapas (Singapore) voyage in early/mid 2007;

32.2.2.   A voyage from Freeport to Shen Zhan and Zhousan between January 28, 2007 and August 23, 2007; and

32.2.3.   A shipment loaded at Curacao and ultimately discharged again at Curacao between November 1, 2008 and December 24, 2008.

33.   All documents or communications from Mr. Ruperti or any Ruperti-controlled entities to LAIL, any of the Sargeants, OTS, OOV, and/or HMC which evidence the chartering by Sea Pioneer of vessels other than the *Leander* and the *Hero 1* to perform the COA, including in particular the vessels *Pisces Star*, *Eagle Valencia* and *Ural*.

### Requests relating to the treatment of earnings of the JV Companies

34.   All documents and communications showing the JV Companies' financial status between 2006 and 2015, including all income, profit and loss statements during that period.

35.   All documents and communications showing how the finances of the JV Companies were supposed to be managed, including documents and communications regarding (i) how income generated by the chartering of the JV Vessels was to be remitted to the JV

Companies, (ii) how expenses incurred by the JV Companies were to be handled, and (iii) how and when the shareholders of the JV Companies were to be paid.

36.    All documents and communications showing any payments made to LAIL by the JV Companies or by any third parties relating to the chartering of any of the JV Vessels between 2006 and 2015.

37.    All documents and communications showing any payments made to Mr. Ruperti or any Ruperti-controlled entities by the JV Companies or by any third parties relating to the chartering of any of the JV Vessels between 2006 and 2015.


*Requests relating to the disputes with PDVSA*

38.    All documents and communications relating to the meeting held between the directors of OOV and HMC on or about December 20, 2010, including documents indicating the matters discussed at the meeting and any documents reviewed at the meeting.

39.    All documents and communications relating to the decision by OOV and HMC to initiate arbitration proceedings against PDVSA.

40.    Any witness statements, expert reports, documentary evidence and/or written submissions served in the arbitration proceedings brought by OOV and HMC against PDVSA (the "First PDVSA Arbitration").

41.    A copy of the spreadsheets attached to (i) the claim submissions dated August 29, 2011 and (ii) the amended claim submissions dated January 23, 2012 from the First PDVSA Arbitration.

42.    A copy of all documents served in the First PDVSA Arbitration to support the amended claim submissions dated January 23, 2012.

43.    All documents and communications from the tribunal in the First PDVSA Arbitration asking questions about the calculation of the claim submissions, including the tribunal's July 10, 2012 request.

44.    All documents and communications relating to Harry Sargeant III's proposal in or about October and November 2012 that DSB take over the First PDVSA Arbitration, including any response to that proposal by LAIL, Mr. Ruperti, OTS, HMC and/or OOV.

45.    All correspondence between LAIL, Mr. Ruperti, OTS, HMC and/or OOV (on the one hand) and the mortgagee banks of the JV Vessels (DSB or Commerzbank) (on the other hand) relating to the First PDVSA Arbitration.

46.    All documents and communications relating to any claims against PDVSA regarding its charters of the *Polar* and/or the *Alloro*.

47.    All documents and communications relating to any claims by Sea Pioneer and/or Mr Ruperti against PDVSA between 2006 and August 9, 2012.

48.    A copy of the letter dated August 9, 2012 from Freddy Belisario Capella Abogados to Petroleos de Venezuela C.A. (the parent company of PDVSA).

### *Requests relating to the negotiations with PDVSA*

49.    All documents and communications relating to the appointment of Mr. Patrick Mooney and Mr. Alejandro Leandros in or about March 2013 on behalf of OOV and HMC to negotiate a settlement of the First PDVSA Arbitration.

50.    All documents and communications reflecting the matters discussed at the meeting in October 2013 between Commerzbank, LAIL, OTS and Maroil.

51.    All documents and communications relating to the appointment of Mr. Mooney and Mr. Ruperti in or about May 2014 on behalf of OOV and HMC to negotiate a settlement of the First PDVSA Arbitration.

52. All documents and communications reflecting the matters discussed at the meeting on or about May 7, 2014 between Daniel Sargeant, Mr. Mooney, and Mr. Ruperti in Miami.

53. All documents and communications relating to whether Mr. Mooney and Mr. Preston were authorized by OOV and HMC to meet with Commerzbank on September 25, 2014 on their behalf.

54. All documents and communications reflecting the matters discussed at the meeting on September 25, 2014 between Commerzbank, Mr. Mooney and Mr. Preston.

55. All documents and communications relating to the discussions between LAIL, Mr. Ruperti, OTS, OOV and/or HMC (on the one hand) and Commerzbank (on the other hand) between September 1, 2014 and December 22, 2014 regarding a settlement proposal to PDVSA.

56. All documents and communications between September 1, 2014 and December 22, 2014 relating to:

   56.1. the terms on which Commerzbank was willing settle the First PDVSA Arbitration;

   56.2. the sums which Commerzbank wanted to receive from the settlement for the debt owed on the JV Vessels; and

   56.3. the manner in which Commerzbank wanted the settlement negotiations with PDVSA to be conducted, including whether it was in agreement with Mr. Ruperti leading the settlement negotiations personally.

57. All documents and communications relating to the consideration given by LAIL, OTS, OOV and/or HMC of the draft board resolutions and letters of authority presented by Mr. Preston on November 7, 2014, that were intended to be given to Mr. Mooney and Mr. Ruperti.

58.     All documents and communications between LAIL, OTS, OOV, HMC, Daniel Sargeant, Mr. Mooney, Mr. Ruperti, and/or Mr. Preston between September 2014 and October 2016 relating to how the proceeds of any settlement with PDVSA ought to be distributed.

59.     All documents and communications from Mr. Mooney, Mr. Ruperti, and/or Mr. Leandros between March 2013 and October 2016 relating to the status of the settlement negotiations with PDVSA.

60.     All documents and communications relating to any expenses allegedly incurred by Mr. Mooney, Mr. Ruperti, and/or any Ruperti-related entities in conducting settlement negotiations with PDVSA.


*Requests relating to Ruperti's concealment of the PDVSA settlements*

61.     All documents and communications describing the matters discussed at the meeting on February 12, 2015 between Mr. Mooney and Mr. Preston.

62.     Any draft settlement agreements between Sea Pioneer, Maroil, and/or LAIL created between February 2015 and October 2016, relating to the distribution of the proceeds of any settlement with PDVSA.

63.     All documents and communications exchanged between Daniel Sargeant, Mr. Ruperti, and/or Mr. Mooney relating to any draft settlement agreements with PDVSA.

64.     All documents and communications exchanged between Daniel Sargeant and/or Mr. Preston (on the one hand) and Mr. Mooney and/or Mr. Ruperti (on the other hand) between December 2014 and October 2016 relating to PDVSA.

65.     All documents and communications describing the matters discussed at any meetings between Daniel Sargeant and Mr. Ruperti between December 2014 and October 2016,

including but not limited to the meeting held on June 1, 2015 at the Four Seasons Hotel in Geneva.

66.     All documents and communications exchanged between Mr. Ruperti and/or Mr. Mooney between December 2014 and October 2016 relating to whether a settlement had been reached with PDVSA, including any express representations that no such settlement had been reached.


*Requests relating to the LAIL/Ruperti Proceedings and Settlement*

67.     A copy of the settlement agreement between LAIL, OTS, Maroil and/or any other Ruperti-controlled entities dated on or around November 17, 2017.

68.     All banking records evidencing any payments made by Maroil or any Ruperti-controlled entities to LAIL and/or OTS pursuant to the settlement agreement between them dated November 17, 2017 (and/or any addenda or supplementary agreements thereto).


*Requests relating to the Florida Action*

69.     All documents and communications relating to the merits of the claims of fraud alleged in the Florida Action.

70.     All non-privileged documents and communications relating to the negotiation of the settlement of the Florida Action as between Harry Sargeant III and Mr. Ruperti and his entities, including a copy of the settlement agreement itself.

71.     All documents showing the amounts that Mr. Ruperti and/or his entities paid to Harry Sargeant III to settle the Florida Action.

72.     All testimony (including depositions, witness statements, or testimony given in open court or otherwise) obtained in the Florida Action relating to (1) the claims of fraud

orchestrated by Mr. Ruperti against LAIL, and (2) the exchange of information between Daniel Sargeant and Mr. Hall that helped uncover the fraud.

73.     All documents obtained during the course of discovery in the Florida Action relating to (1) the claims of fraud orchestrated by Mr. Ruperti against LAIL, and (2) the exchange of information between Daniel Sargeant and Mr. Hall that helped uncover the fraud.

74.     All testimony (including depositions, witness statements, or testimony given in open court or otherwise) obtained in the Florida Action relating to whether Mr. Hall knew he was exchanging information with Daniel Sargeant in violation of the 2016 Settlement Agreement.

75.     All documents obtained during the course of discovery in the Florida Action relating to whether Mr. Hall knew he was exchanging information with Daniel Sargeant in violation of the 2016 Settlement Agreement.